**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CLAUDIA G. COTE, M.D.,**
**DIANE T. GOWSKI, M.D.,**
**and SALLY B. ZACHARIAH, M.D.**

     **Plaintiffs,**

**v.**
                       **Case No.:** 8:07-CV-1524-T-30 TBM

**R. JAMES NICHOLSON, SECRETARY,**
**DEPARTMENT OF VETERANS AFFAIRS,**

     **Defendant.**
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL
## INJUNCTIVE RELIEF REQUESTED

     Plaintiffs, Claudia G. Cote, M.D., Diane T. Gowski, M.D. and Sally B. Zachariah, M.D.

complain of Defendant, R. James Nicholson as Secretary of the Department of Veterans Affairs

as follows:

     1.     This court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e *et seq.*, 29 U.S.C. § 791, *et seq.,* and 28 U.S.C. § 1367.

     2.     Plaintiffs have complied with all jurisdictional prerequisites to action under Title

VII of the Civil Rights Act of 1964 as amended including having exhausted their administrative

remedies.

     3.     Bay Pines VA Health Care System ("Bay Pines VAHCS") is a Veterans

Administration ("VA") hospital and medical center with related services.  It is directed by a

Medical Center Director ("MCD"), currently Mr. Wallace Hopkins.  It is broken down into

various services.  Within the hospital, Dr. George Van Buskirk is the current Chief of Staff with

line authority over the five medical services within the hospital, including the Medicine,

Surgical, Geriatrics and Extended Care, Primary Care and Mental Health Services.    The Medicine Service, whose chief is Dr. Lithium Lin, is broken down into various sections including pulmonary, cardiology, neurology and hospitalists.  Dr. Sharachandra Patel is the Chief of Hospitalists who are internists that treat patients in the hospital.  As Chief of Staff, Dr. Van Buskirk has line authority over Dr. Lin, Dr. Patel and the Plaintiffs.  Dr. Lin reports to Dr. Van Buskirk and has line authority over and supervises the three Plaintiffs.  Dr. Lin also has line authority over Dr. Patel who in turn has line authority over Dr. Gowski.

4.     Dr. Cote is a female physician at Bay Pines VAHCS. She began her employment as a pulmonologist at in August 1996.  Dr. Cote has been and is an associate professor of internal medicine at the University of South Florida College of Medicine.

5.     Dr. Gowski is a female physician at Bay Pines VAHCS.    She began her employment there on June 6, 1997.  After leaving Bay Pines VAHCS in 1999 and going to the University of South Florida College of Medicine, she came back to Bay Pines VAHCS on August 11, 2002.    She is a hospitalist/intensivist with a two-year fellowship and board certification in critical care medicine.

6.     Dr. Zachariah is a female physician at Bay Pines VAHCS.    She began her employment at Bay Pines VAHCS as a neurologist in 1989.

7.     The Defendant has engaged in a pattern and practice of discrimination on the basis of gender (female), and a pattern and practice of retaliation in relation to Equal Employment Opportunity ("EEO") claims or participation as a witness on behalf of other parties' EEO claims.  These include retaliation for current EEO claims and past EEO claims.  Those past claims include but are not limited to cases settled for damages and other relief arising out of a pattern and practice of age discrimination and retaliation of which there was considerable

2

evidence including a videotaped speech in which the then Chief of Medicine purposefully announced his intent to drive out all older doctors to make room for younger doctors. At the time these statements were made all of the full-time sections chiefs were over 40 years of age. The Chief of Medicine Service at that time let it be known he had the support of the Chief of Staff at that time. Each was ultimately asked to step down.

8.    Dr. Cote filed an EEO complaint on October 26, 2005 and more than 360 days have passed since that point, thus satisfying the jurisdictional requirements of 42 U.S.C. § 2000e-16(c).

9.    Dr. Gowski filed an EEO complaint on October 13, 2005 and more than 360 days have passed since that point thus satisfying the jurisdictional requirements of 42 U.S.C. § 2000e-16(c).

10.    Dr. Zachariah filed an EEO complaint in April 3, 2006 and more than 360 days have passed since that point, thus satisfying the jurisdictional requirements of 42 U.S.C. § 2000e-16(c).

11.    The Plaintiffs' claims arise out of the same transaction or occurrence or series of transactions or occurrences and the claims have common questions of fact and law.

## GENERAL ALLEGATIONS

### A.    Pattern and Practice of Retaliation

12.    Dr. Van Buskirk, Chief of Staff, Dr. Lin, Chief of the Medicine Service, with the knowledge, assistance and support of Dr. Patel, and Mr. Hopkins, MCD, or in the alternative with the benefit of a policy of antagonism to EEO claims by Mr. Hopkins, decided to deter the filing of EEO complaints by retaliating against those who filed EEO claims. To this end Dr. Lin and Dr. Van Buskirk, periodically with the help of Dr. Patel and the actual or tacit support of Mr.

3

Hopkins, have undertaken a course of retaliation against Dr. Gowski, Dr. Cote and Dr. Zachariah for their EEO activity by: denying them leadership positions; changing their duties and office assignments; and subjecting them to lower evaluations, inappropriate bonuses and increasingly higher levels of discipline up to suspension without pay and termination. It was the plan of Dr. Van Buskirk and Dr. Lin, Dr. Patel and others, to discipline and terminate employees who persisted in EEO claims. They have each used their positions to carry out this plan.

13.     Dr. Lin has actively sought out employees to assist him in his efforts to gather information to discipline and terminate employees who have filed EEO claims. This has included seeking Reports of Contact ("ROCs") which are written complaints by one employee against another. Dr. Lin has even sought ROCs months after the alleged incidents supposedly occurred. The ROCs can be used for many purposes, but for employees filing EEOs they are used as a basis for steps in discipline to achieve the ultimate goal of terminating those employees.

14.     Dr. Lin has sought out and received the assistance of Dr. Patel in efforts to gather information to discipline and terminate employees and to enlist other employees to provide ROCs to help in that effort.

15.     Dr. Van Buskirk and Dr. Lin expressed a desire to terminate Dr. Zachariah because of EEO activity before undertaking a course of conduct designed to create a record for her termination. In furtherance of this plan Dr. Van Buskirk and Dr. Lin have employed Sylvia Russell in efforts to gather information to discipline and terminate Dr. Zachariah. Mrs. Russell is an administrative assistant in the Neurology Section of the Medicine Service. She had been recommended by the Section Chief of Neurology for a performance award which was supported by the administrative officer of the Medicine Service. Nevertheless, Dr. Lin refused to give her

4

that award because he wanted to enlist her aid in obtaining information, including false information and information about conduct engaged in by many doctors which is selectively asserted to be improper when engaged in by Dr. Zachariah. This information was to be utilized to discipline and terminate Dr. Zachariah. Dr. Lin told Mrs. Russell that if she wanted this award, or otherwise wanted to get ahead within the Medicine Service, she needed to be a team player, to help out as directed and to go above and beyond her normal duties. He told her that it would be necessary for her to do things that were not in her position description, including helping him obtain evidence to be used against Dr. Zachariah in his efforts to discipline and ultimately terminate her. Mrs. Russell ultimately agreed to help Dr. Lin and has continued to do so.

16.     Similarly, Dr. Lin has approached Thomas Wells, M.D. to come to "our way of thinking" and write up a ROC against Dr. Diane Gowski. Dr. Patel also contacted Dr. Wells.

17.     Dr. Lin also uses unjust criticism to pressure employees to comply with his desires. For example, Dr. Lin dislikes, disrespects and will discriminate against women, blacks and people of different sexual orientation. He has a stereotypical bias relating to gender roles. Dr. Lin has described several "blacks as lazy and lacking in discipline." He has accused Roxanne Lainhart, when she was the Administrative Officer for the Medicine Service, of not disciplining black employees he disliked "because they were black and you are afraid of people of color." In fact, those employees were performing satisfactorily when he made these statements.

18.     Dr. Lin uses Dr. Patel to obtain and create negative information, sometimes including false information, against employees including Dr. Gowski and Dr. Zachariah. Dr. Patel has gone to other employees including nurses and physicians to solicit ROCs against Dr.

5

Gowski and even to suggest areas he wants them to complain about. Dr. Lin also uses Dr. Patel to disseminate unfavorable information about those being retaliated against including Drs. Cote, Gowski and Zachariah. Dr. Lin and Dr. Patel have withheld and altered evidence to further their aims.

19.     Numerous decisions relating to filling competitive positions are supposed to be made by committees through a committee review process. Dr. Lin has selected personnel for such positions before the committee has convened or otherwise conducted the required review process. Dr. Lin has also attempted to coerce the administrative officer for the Medicine Service into pre-selecting employees and stacking committees to ensure selection of the candidate he wants. Dr. Lin weights committee memberships so that they will make a decision he favors beforehand. He speaks to key decision makers beforehand to let them know what he expects to happen.

20.     For years, Dr. Lin has stated that Dr. Van Buskirk does not like Dr. Zachariah and wants her gone and that he (Dr. Lin) must carry out that desire. Dr. Van Buskirk wanted Dr. Lin to be the point person for these efforts. As a result, Dr. Lin planned and schemed to terminate or discharge Dr. Zachariah.

21.     As part of their effort to discharge Dr. Zachariah and others, Dr. Van Buskirk changed the Professional Standards Board (PSB) credentialing process. Typically the PSB approved credentials for two year periods and was not used to punish doctors in order to push them out. Dr. Van Buskirk undertook to approve renewals of privileges for much shorter periods of time for disfavored doctors. Dr. Lin has assisted him in efforts to shorten the period for renewal of Dr. Zachariah's credentials and with Dr. Patel's assistance to limit Dr. Gowski's privileges. Various documents relating to this process have been adjusted or changed.

6

22.     Dr. Lin, on behalf of Dr. Van Buskirk and others in the administration, began surreptitiously pulling Dr. Zachariah's clinical protocols, patient notes, schedules and other documents in order to find things that they could use as an excuse or pretext to discipline and terminate her. Mrs. Russell agreed to help them in their efforts to discipline and terminate Dr. Zachariah. Dr. Lin has also reviewed or possibly edited summaries or orders on the charts of Dr. Gowski's patients when he had no part in the care of those patients.

23.     Dr. Lin and Mrs. Russell have engaged in unethical conduct by going into Dr. Zachariah's office and rifling through her files, including patient files for which they had no consent, and personal diaries in an effort to find information they can use against Dr. Zachariah. Recently, despite objections by several employees, Dr. Lin took it upon himself to develop negatives of pictures taken by Dr. Zachariah to see if they showed patient files even though there was no evidence they would.

24.     Dr. Lin and Dr. Van Buskirk have a reputation for retaliation against those who file or support others who file EEO claims or do not join in their efforts to insulate their management style. As a result of this reputation, a number of very good doctors and employees are afraid to come forward with information they have concerning discriminatory or retaliatory conduct by Drs. Lin and Van Buskirk. Moreover, a number of very good doctors have chosen to leave Bay Pines VAHCS, and the administration has had difficulty hiring good permanent replacements.

25.     To assist them in their efforts to retaliate, Dr. Van Buskirk and others have shown contempt for and have ignored the legal process. As part of an open, expressed hostility to the legal process, they have described efforts by employees to redress legal wrongs as efforts to let lawyers run the medical center. Dr. Zachariah has been denied due process and appellate rights

7

for nearly two years concerning alleged research improprieties.  For example, Dr. Zachariah has been denied access to documents she is entitled to have under rules and regulations applicable to actions being taken for alleged research improprieties.  She has also been denied appellate rights provided in those rules and regulations, and the government has repeatedly and improperly redefined those appellate rights.  For example, on August 9, 2007, the government set forth a new appellate procedure for actions taken in January and February 2006 which can be requested by Dr. Zachariah after she is terminated for conduct which she has tried to appeal for approximately  20 months.  While being denied her due process and appellate rights, Dr. Zachariah has been repeatedly punished for the same alleged research improprieties.   Dr. Zachariah and Dr. Gowski have also been denied an opportunity to confront accusers or even their accusations before receiving discipline including reprimands and other discipline.

26.     Additionally, response to document requests have been delayed, forcing motions to compel, and Drs. Patel and Lin have decided on occasion not to produce all documents sought during the administrative litigation process.  Similarly, various documents have been altered or taken from those in possession of the documents.

**B.     Pattern and Practice of Gender Discrimination**

27.     Dr. Van Buskirk and Dr. Lin and the MCD Hopkins have engaged in a pattern and practice of gender discrimination.  This has included a reduction in the number of women holding leadership positions throughout the Medical Service.    Those positions include chairpersons of committees, chiefs of sections and chiefs of services.  In addition, the percentage of male hires has significantly exceeded those of female hires in the Medicine Service.

28.     The administration has also refused to follow VA directives and policies entitling employees to take advantage of flextime and modified flextime even though those tours of duty

8

would be job appropriate. These tours have been developed in order to help the federal government, including the VA, recruit and retain qualified women and minorities. Nevertheless, with knowledge of the purpose of these programs, Drs. Van Buskirk, Lin, MCD Mr. Hopkins and others have refused to institute these policies.

## C. Dr. Cote

29. Dr. Cote has worked as a physician for the pulmonary and critical care medicine section since August 4, 1996. Her duties included providing medical care to inpatients and out-patients who are affected by pulmonary diseases and patients that require intensive care due to critical illnesses.

30. Dr. Cote had previously filed an EEO complaint in July, 2002 which was settled in November, 2003. She filed a second EEO complaint on September 15, 2004 against Dr. George Van Buskirk. The responsible management officials identified in the EEO claims, including Dr. Van Buskirk and Dr. Lin, were aware of her prior EEO activity. She has been treated in a hostile manner by them since filing the EEO complaints.

31. The September 15, 2004 EEO complaint against Dr. Van Buskirk was based on gender (female) discrimination and reprisal for prior EEO activity in failing to select her as the Chief of the Medicine Service. Part of her claim was that Dr. Van Buskirk had pre-selected Dr. Lin as the Chief of the Medicine Service. Dr. Cote had applied for the Chief of the Medicine Service position. Despite extensive credentials far superior to Dr. Lin, who was a family practice doctor with no in-hospital or specialty experience and no research or writing background, she was never even interviewed. Rather, in violation of department rules and regulations Dr. Van Buskirk pre-selected Dr. Lin as the Chief of the Medicine Service in or about July, 2004 without actually going through a competitive hiring process or consideration of other candidates. During

the course of her EEO claim, Dr. Van Buskirk falsely claimed that Dr. Lin was not pre-selected, when in fact he was. As a result Dr. Cote withdrew her EEO.

32.     Subsequently, Dr. Cote applied for the position of Chief of the Pulmonary Medicine Section. Once again, she was denied that position without any consideration of her candidacy and without being interviewed for the position. In fact, the purported decision makers were never even informed of her application by Dr. Van Buskirk. A male was also selected. Dr. Cote was not considered due to her gender (female) and reprisal for prior EEO activity.

33.     On or about August 4 and 19, 2005, Dr. Cote was given proficiency reports that unfairly and inaccurately rated her lower than she had been rated in previous years. Dr. Lin and the new Chief of Pulmonary were responsible and she received those unfair and inaccurate proficiency reports as a result of her gender (female) and for reprisal for prior EEO activity.

34.     Dr. Cote has also been subjected to harassment and a hostile work environment based on her gender (female) and reprisal for EEO activity including, for example, in the following additional instances:

i.      On or about May 31 and June 6, 2005, documents submitted by Dr. Cote to the Public Affairs Coordinator for the Bay Pines News regarding her professional accomplishments were ignored and no recognition was given for her achievements.

ii.     On or about August 30, 2005, Dr. Van Buskirk refused to sign a letter of intent required for Dr. Cote's NIH research grant application. He also interfered with her Chronic Obstructive Pulmonary Disease ("COPD") research clinics. Dr Cote is an internationally known expert on COPD. COPD has become a priority for veterans in other parts of the VA.

10

iii.     On or about September 1, 2005 a very experienced critical care physician that was scheduled to work with Dr. Cote for a month in the intensive care unit ("ICU") was reassigned to another unit by Dr. Van Buskirk and Dr. Lin, thus leaving her without critical ICU staff to provide patient care and a safe environment.

iv.     On or about September 12, 2005, after a patient death in the ICU, Dr. Cote asked her supervisor (Dr. Anderson) for assistance with patient care due to understaffing. However, no assistance was provided.

v.      Dr. Cote's authorized absence ("AA") for attending meetings where she acts as faculty and presents research data was reduced from ten days to five days which makes it impossible for her to conduct academic activities. Although AA was reduced for all MD's at Bay Pines VAHCS, she is one of a handful of doctors who are academicians at Bay Pines VAHCS.

vi.     Dr. Cote was also removed as the Chief of Medical Intensive Care Unit ("MICU") and replaced by a male physician who was employed at Bay Pines for only four months. Moreover, this male physician was not a fellowship trained intensivist like Dr. Cote.

### D.     Dr. Gowski

35.     Dr. Gowski began her employment at Bay Pines VAHCS in 1997. She left in 1999 to work at the University of South Florida College of Medicine. She recommenced employment at Bay Pines VAHCS in August of 2002 which continues to the present. In 2003 she was assigned as a hospitalist working in the cardiac care unit ("CCU") which is located in the Medical Intensive Care Unit ("MICU"). On July 5, 2005, she began treating patients in the MICU.

11

36.     Dr. Gowski's duty assignments were changed in August, 2005 without legitimate cause and over her objections.   She was assigned to a general hospitalist ward duty not commensurate with her training and experience. She is board certified in internal medicine and critical care medicine. She has special qualifications as an intensivist having completed a two-year fellowship in critical care medicine.  She was originally hired as a hospitalist, but her specialized training in critical care caused the former Chief of Medicine to assign her to the CCU. She received strong support from multiple colleagues in that area including cardiologists and pulmonologists. Numerous other CCU and MICU physicians objected to this change of her duties. Dr. Gowski requested meetings with her chain of command and was given conflicting and pretextual reasons as to why her duties were changed. For example, at one point she was told that her duty assignments were being changed because all hospitalists would be rotated. That did not happen.

37.     On August 12, 2005 she was told by Dr. Lin, that Dr. Frutchey said she had allegedly failed to follow patient advance directives and complaints were made by nursing. The claim that she failed to follow patient advance directives was untrue.  Moreover, Dr. Gowski had no patient complaints nor negative outcomes in this area.

38.     The aforesaid change in Dr. Gowski's duties was made because of her religious beliefs, including her pro-life view.

39.     Dr. Frutchey, the head of the Bay Pines VAHCS hospice care, looked into Dr. Gowski's handling of a case concerning an advanced directive in or around the summer of 2005. It was at this time Dr. Gowski was removed from the MICU.

40.     Although he had no criticisms of her handling of that case, Dr. Frutchey in fact falsely complained to Dr. Van Buskirk that Dr. Gowski allegedly imposed her pro-life views

12

on patients. Dr. Van Buskirk called Dr. Lin and told him what Dr. Frutchey said and told him to call Dr. Frutchey. After he called Dr. Frutchey, Dr. Lin mentioned Dr. Gowski's pro-life views to Dr. Patel and told him to take Dr. Gowski out of the MICU.

41.     Dr. Van Buskirk removed Dr. Gowski as chairperson of the Critical Care Committee although she had a year left before her term was over. Historically, a one-year membership on the Critical Care Committee was required before someone became a chairperson. However, Dr. Van Buskirk appointed a male physician to replace her as the new chair of that committee who had never even been a member on that committee.

42.     While chairperson of the Critical Care Committee, Dr. Gowski made several requests to Dr. Van Buskirk as Chair of the Medical Staff Executive Board concerning the need for upgrading defibrillators and adding other critical medical equipment at Bay Pines VAHCS. Many of these requests were repeatedly denied or not carried out.

43.     Dr. Gowski also experienced harassment on the bases of her gender (female) and religion (Catholic) including but not limited to the following instances:

i.      She was spoken to in an unprofessional manner by Ms. McGrew, a nurse manager, and Dr. Gowski's ROC concerning that incident was not investigated;

ii.     She was undermined by attacks on her character and unfounded complaints by certain nursing staff that her professional care was influenced by a pro-life agenda and she was not allowed to defend herself against those unfounded attacks and complaints;

iii.    She was accused without basis of not following advance directives for a patient receiving intensive care unit treatment;

iv.     She was denied office space and later moved to a small office space;

13

v.     Her duties were changed without consultation with her;

vi.    Dr. Gowski and the cardiologists and pulomonlogists were not permitted to meet with Dr. Van Buskirk concerning the change in the work duty assignment and she was not allowed back into the MICU even when it was recognized that no rotation system was in place.

vii.   Dr. Patel refused to give her Authorized Absence ("AA") in October, 2005 and October, 2006 in order to attend an annual national Cahtolic Medical Association conference of physicians regarding ethical issues with continuing medical education ("CME") credits.

44.    Dr. Gowski was discriminated against on the basis of reprisal for prior EEO activity regarding assignment of duties including but not limited to the following instances:

i.     On March 1, 2006 her rotation back into the MICU did not take place as scheduled;

ii     On March 29, 2006, Dr. Lin notified Dr. Gowski that she was relieved from her position as a member of the Critical Care Committee; and

iii.   Effective July 5, 2006 her duty assignment was changed from a scheduled rotation between the MICU and the telemetry ward to working on a general medicine ward (Ward 5A) which is the least acute care ward in the hospital.

45.    Dr. Gowski was subjected to harassment on the bases of gender (female), religion (Catholic) and reprisal for prior EEO activity including but not limited to the following instances:

i.     During a meeting on July 13, 2006, her immediate supervisor, Dr. Patel, told her that certain of her supplemental privileges which he had previously approved

14

were being denied, including many relating to areas of her special training in critical care.

ii.     On August 7, 2006 Dr. Patel provided Dr. Gowski with a copy of Dr. Gowski's final hospital privileges renewal listing which included denial of some of the supplemental privileges she previously held including some emergency care privileges;

iii.    As of August 1, 2006 she was passed over by Dr. Van Buskirk for the position of chairperson of the Code Blue Subcommittee even though the current chairperson was retiring and Dr. Gowski was the only physician on the subcommittee, a subcommittee that can deal with end of life issues;

iv.     On August 7, 2006, Dr. Patel issued her a letter of proposed reprimand from Dr. Lin dated July 27, 2006 relating to her asking questions about how the hospitalists were to deal with the increased patient care responsibilities the hospitalists were being given for neurological patients;

v.      On July 19, August 7, and August 16, 2006, Dr. Gowski was informed by fellow employees and physicians that Dr. Patel had "solicited complaints" against her with regard to her "behavior" in a staff meeting on July 18, 2006 during which she voiced patient care concerns about increased responsibilities that the hospitalists were being given for neurological patients; and

vi.     On August 22, 2006, she was informed that Dr. Patel was "soliciting complaints" from other health care providers concerning her work at Bay Pines VAHCS.

vii.    Dr. Lin refused to act on a complaint to him that Dr. Patel was yelling at Dr. Gowski in front of Dr. Cote during a discussion about renewal of privileges.

15

viii.     Beginning in December, 2006, Dr. Gowski received lower ratings on her proficiency reports under the category of clinical competence.     It was downgraded to satisfactory.

46.     Dr. Gowski was further subjected to discrimination on the basis of gender (female), religion (Catholic) and reprisal for EEO activity and harassment when she was given a proposed fourteen day suspension without pay, for alleged disrespectful and unprofessional conduct when she ordered a nurse to take a decompensating patient to the intensive care unit immediately because of concerns he might otherwise die.  When the nurse delayed taking the patient and was rounding the patient's belongings up so she would not have to make two trips, Dr. Gowski ordered the nurse to take the patient immediately because he was decompensating. Although the nurse admitted that she delayed taking the patient to intensive care because she was attempting to pack up the room, Dr. Lin issued a proposed suspension to Dr. Gowski, not the nurse, without ever interviewing Dr. Gowski or allowing her to defend herself against allegations by a nurse who should have been disciplined.

47.     Another basis for the proposed discipline was a second charge for disrespectful and unprofessional conduct by the same nurse.  Dr. Gowski followed hospital protocol in directing the nurse to call the physician on duty.  The nurse again accused Dr. Gowski of unprofessional conduct although she twice refused to follow Dr. Gowski's orders and was not disciplined for that.

48.     Each of these complaints by the nurse were used to support a proposed fourteen day suspension without pay of Dr. Gowski, even though Dr. Gowski was never interviewed concerning either subject beforehand.  Subsequently, the proposed suspension of fourteen days for efforts to protect patients was "reduced" to seven calendar days withpout pay, which began

16

on August 26, 2007. Nevertheless, this suspension goes on Dr. Gowski's permanent record and can be used as a basis to even more severe discipline the next time a charge is made. It is also something she will have to disclose to future employers and it will hurt her ability to obtain employment and harm her professional and career opportunities.

49.     On July 26, 2007, Dr. Gowski was  harassed as a result of gender (female), religion (Catholic) and reprisal for EEO activity when she was called to Dr. Patel's office for an alleged fact-finding. The fact-finding attempted to suggest that Dr. Gowski had been involved in an altercation or contentious argument with an emergency room doctor, Dr. Thomas Wells. Dr. Patel ignored statements to the contrary by Dr. Gowski and Dr. Wells himself and nevertheless proceeded to undertake a fact-finding, the purpose of which was to create a record to punish Dr. Gowski.

50.     On August 16, 2007, Dr. Patel gave Dr. Gowski a verbal counseling for mentioning at a hospitalist meeting that another doctor planned to leave which was allegedly confidential.  Dr. Gowski mentioned this information only after two other doctors disclosed similar, but even more confidential information, concerning doctors either leaving or being unavailable to work due to illness. The information provided by Dr. Gowski was already known by the other doctors and all of this information was being discussed only to make short staff scheduling decisions. However, only Dr. Gowski received a verbal counseling.

51.     When Dr. Gowski reviewed her personnel file after receiving the August 7, 2006 reprimand, she noted two inaccuracies. First, her file stated she had previously been terminated involuntarily without cause for alleged budgetary reasons when she had resigned to accept an academic position at USF. Second, the file stated that she took time off to be home with her second child which was not true. After pointing out these inaccuracies a year ago, on August 23,

17

2007, Dr. Gowski received a letter in which Mr. Hopkins recommended that Dr. Gowski be made liable for an alleged $18,000.00 debt to Bay Pines VAHCS, supposedly incurred eight years ago.

### D.  Dr. Zachariah

52.     Dr. Zachariah was hired in the neurology department at the Bay Pines VAHCS in December, 1989.  She previously worked at James Haley VA Medical Center from 1986 where she is still a consultant.  Dr. Zachariah was an Assistant Professor of Neurology  and the Chief of the Stroke Division at the University of South Florida Medical School when she was hired.  Dr. Zachariah has written numerous journal articles, presented abstracts to medical conferences and given many invited lecturer presentations in addition to being the principal investigator on numerous research studies.

53.     From 1996 to 2006 Dr. Zachariah was the Chief of the Neurology Service and Director of Stroke Division at the Bay Pines VAHCS.  She was also the Director of Multiple Sclerosis Clinic, a position which she obtained for Bay Pines VAHCS.  At present she is an Associate Professor of Neurology and a fellow of the American Academy of Neurology and Stroke Council.

54.     In August of 2003, Dr. Zachariah filed an EEO claim based on age, gender and racial discrimination, reprisal for EEO activity and harassment and hostile work environment which included claims that the Neurology Service was being changed to a Section in the Medicine Service; that the Neurology Ward was being closed; and that Dr. Zachariah's request for additional help for Neurology was denied in spite of an increased work load in Neurology. That claim was settled for damages and an agreement, *inter alia,* to keep Neurology as its own Service, as most Neurology departments are throughout the VA nationally.The settlement also

18

included an agreement, *inter alia,* to have an independent reviewer determine appropriate staffing levels and needs for the Neurology Service. After that determination was made, the Neurology Service was to be able to comment on it and the MCD would make a final decision. Ultimately, in violation of the agreement, Dr. Van Buskirk refused to do either. As alleged below, after Dr. Zachariah raised the prior EEO, he transferred Neurology under Medicine and removed her as the chief.

55.     By letter dated June 8, 2005, Dr. Zachariah asserted a breach of the agreement.     Bay Pines VAMC and the Department of Veterans Affairs Office of Resolution Management ("ORM") asserted that there was no breach.   Dr. Zachariah was told she needed to assert a new EEO claim on these matters.

56.     On the bases of race (Asian-Indian), gender (female), age (DOB: 6/5/53) and reprisal for prior and current EEO participation Dr. Zachariah has been treated in a disparate and harassing manner regarding her performance appraisal including but not limited to the following instances:

i.      On February 6, 2006, her performance appraisal was downgraded without basis to fully successful for the rating period October 1, 2004 through September 30, 2005. Dr. Zachariah had always been rated excellent or outstanding in the past.

ii.     On or about November 30, 2006, she learned that she was unfairly rated fully successful for the rating period October 1, 2005 to June 26, 2006. Her chief told her that Dr. Lin said nobody should be given a higher rating than what he (Dr. Lin) suggests.

19

iii.    On March 26, 2007 she learned that her colleagues received a larger performance bonus than she received. When Dr. Zachariah asked for the reason and evidence to support this disparity, none was given due to Dr. Lin's objection.

57.    On the bases of race (Asian-Indian), gender (female), age (DOB: 6/5/53) and reprisal for prior and current EEO participation Dr. Zachariah was discriminated in respect to the assignment of duties. For example, an alleged breach of Dr. Zachariah's prior EEO settlement agreement was discussed and mediated with Dr. Van Buskirk in the fall and winter of 2005. At that time Dr. Van Buskirk and Dr. Lin, unbeknownst to Dr. Zachariah, decided to move the Neurology Service under the Medicine Service and to discipline and ultimately terminate Dr. Zachariah due to her EEO activity. Dr. Zachariah was treated in a disparate and discriminatory manner and subjected to hostile work environment in respect to assignment of duties including but not limited to the following additional instances:

i.    On January 19, 2006, the Chairperson of the Institutional Review Board ("IRB"), a Board on which Dr. Van Buskirk sat, notified the MCD via memo that the IRB Committee agreed to an action plan which would administratively suspend Dr. Zachariah from conducting research at the Bay Pines VA Healthcare System involving human subjects for one year. The research involved a retrospective review of medical records relating to the effects of standard medication prescribed for reasons of medical treatment and not research. It has been found by reviewers that there was no evidence of social, psychological, physical or economic harm to any individuals involved. Moreover, the IRB breached its own regulations in handling Dr. Zachariah's research notification document. Handled properly, the research would have been determined to be exempt research or the reasons why it

20

was not have been explained. Despite request, Dr. Zachariah was not provided with access to pertinent documents; fundamental procedures were not followed; and required appellate rights were not afforded.

ii.     On February 1, 2006, the Chairperson of the Research and Development ("R&D") Committee, a committee on which Dr. Van Buskirk sat, indicated that the R&D Committee agreed with the IRB Committee action plan to administratively suspend Dr. Zachariah from conducting research at the Bay Pines VAHCS involving human subjects but for a period of two years.

iii.    On or about February 7, 2006, after the above referenced   mediation was completed, Dr. Van Buskirk formally refused to implement the recommendations cited during an external review of the Neurology Service.

iv.     On or about March 17, 2006, after a meeting of the Professional Standards Board (PSB), a Board which included Dr. Van Buskirk, Dr. Zachariah was notified that her clinical privileges were reduced from two years to one year "based on the cloud in research." She has been denied access to the information presented and the official reasons for this action.

v.      By memorandum dated May 31, 2006, Dr. Van Buskirk notified Dr. Zachariah of the realignment of the Neurology Service as a section under the Medicine Service, effective June 25, 2006.

vi.     On or about June 28, 2006, after the realignment of Neurology Service as a section under the Medicine Service, Mrs. Russell informed Dr. Zachariah that she would not be included in the rotation of staff as the Section Chief even though she had been the chief of the Neurology Service. A male was made Section Chief.

vii.     On or about July 2, 2006, Dr. Zachariah learned that she was only allowed to attend the faculty and neurology grand rounds at USF, where she was a faculty member, on a rotational basis with other neurologists, once a month although she was previously approved to attend the rounds on a weekly basis, which had been confirmed by her prior EEO settlement.

viii.    By letter dated September 29, 2006, Mr. Hopkins, the MCD, notified Dr. Zachariah that she had been identified as a participant in a tort claim, which was under review for possible substandard care, professional incompetence and/or professional conduct even though the facts made clear she could not have been responsible.

ix.      By letter dated January 17, 2007, Dr. Zachariah learned that her clinical privileges had been approved for only three months (January 17, 2007 – April 20, 2007), although they had typically been approved for two years.  She has been denied access to the information presented and the official reasons for this action.

x.       On or about March 30, 2007, Dr. Zachariah learned that the MCD terminated her appointment as the Work Group Leader for the stroke work group, even though she is the only stroke specialist at the Bay Pines VAHCS and she was the one who worked to get the Bay Pines VAHCS its certification.  Dr. Lin, a family practice doctor who has no specialty, let alone stroke or neurology training, made himself the stroke leader.  The real work has been given to a Caucasian neurologist who is a general neurologist.

58.     On the bases of race (Asian-Indian), gender (female), age (DOB: 6/5/53), and reprisal for prior and current EEO participation, Dr. Zachariah was treated in a disparate manner regarding pay and allowances including but not limited to the following instances:

i.      On or about March 15, 2006, Dr. Zachariah approached the Bay Pines Foundation ("BPF") for previously approved reimbursement for travel expense she had incurred.  She was told that her research accounts were frozen and she was not reimbursed for this previous travel.

ii.     On or about June 2, 2006, despite her interest and expertise, she was denied expenditures for a Multiple Sclerosis Conference, which had been transferred to Bay Pines VAHCS by the VA.

59.     On the bases of race (Asian-Indian), gender (female), age (DOB: 6/5/53), and reprisal for prior and current EEO participation, Dr. Zachariah was treated in a disparate manner in matters of time and attendance including but not limited to the following instance:

i.      On or about June 2, 2006, she was denied AA to attend a Multiple Sclerosis Conference and associated meeting.

60.     On the bases of race (Asian-Indian), gender (female), age (DOB: 6/5/53), and reprisal for prior and current EEO participation, Dr. Zachariah was treated in a disparate manner regarding disciplinary actions including but not limited to the following instances:

i.      By memorandum dated September 14, 2006, Dr. Lin issued her a reprimand with the charge of carelessness or negligence resulting in waste or delay for the delay in reading EEGs by another neurologist even though she had previously requested this issue be addressed in discussion with Dr. Van Buskirk more than a year before and she had not been the Neurology chief for months.

23

ii.     On or about October 27, 2006, Dr. Lin verbally counseled her for failing to immediately respond to a non-emergency nursing request concerning another doctor's patient made while she was in the middle of taking care of a neurological emergency. Indeed, the question which had arisen was from the patient's wife about whether the IV fluid ordered by another doctor contained enough nutrition for her husband.     This question should have been answered either by the hospitalist or a nurse, RN, or her nursing supervisor. Moreover, that supervisor chose to bypass Dr. Zachariah's supervisor and discuss the matter directly with Dr. Lin.

61.     On May 22, 2007, on the bases of race (Asian-Indian), gender, (female), age (DOB: 6/5/53), and reprisal for prior and current EEO participation, it was proposed that she be suspended for fourteen calendar days based on thirteen reasons. Ten of those reasons were a rehash of the alleged research improprieties which the Inspector General's ("IG") Office, who upon information and belief were called in by the administration for a criminal investigation, had already found had been "thoroughly addressed" more than a year before. The IG's report also stated the Bay Pines VAHCS had no evidence of harm to any individuals involved and most of its recommendations were to correct the VAHCS's policies. Moreover, efforts to appeal those actions had been completely thwarted as of that date. A formal grievance was denied on the basis that an appeal needed to taken under existing VA regulations. Dr. Zachariah also filed an appeal under existing VA regulations. That appeal was never acted upon. When Dr. Zachariah received the two week suspension based primarily on these same research issues, she complained about the fact that she had never been given her due process rights to challenge these items. At that time she received a letter saying, contrary to fact and the VA's prior assertion, that there

24

were no appeal rights under VA regulations and that she should, contrary to the VA's prior assertion, file a formal grievance within thirty days.

62.    Indeed, subsequent to receiving that letter purporting to give her formal grievance rights on something she had been previously denied those rights, Dr. Zachariah has been notified that she will be terminated on or sometime after September 7, 2007, for the conduct for which she was originally only to be suspended for fourteen days. She has been required to respond to that proposed termination before the due date for her to file a grievance under the formal grievance proceeding. The decision to terminate Dr. Zachariah was actually made nearly two years ago and subsequent actions were designed create a pretextual basis for the prior decision.

63.    In addition, the two week suspension was based on ROCs solicited by the Medicine Service and on the basis of patient information obtained by rummaging through her file drawers without obtaining consent from any patients. Dr. Zachariah, with the assistance of Sylvia Russell, had long kept work sheets in a file cabinet in order to help her treat her patients. The work sheets showed her where to inject various patients with Botox injections. Different patients react to shots given in different locations in different ways. In order to better help her patients, she had charted on the work sheets the location which the patients felt were best for the injections. Her patients were fully aware of this. Mrs. Russell and others used to pull these for Dr. Zachariah on the day of the Botox clinics. Not only Dr. Zachariah, but many other doctors maintain separate files for items like this in order to better treat patients. Nevertheless, Dr. Zachariah was singled out by the administration for punishment for having such work sheets. Those work sheets were taken from her office by Mrs. Russell and Dr. Lin without requesting the authorization of the patients. Dr. Lin, who had no treatment relationship with or authorization

25

from these patients, took those records, removed them from their doctor's possession and placed them in locations not intended to be an adjunct to patient care.

64.     Subsequent to receiving the proposed two week suspension, Dr. Zachairah photographed a set of documents, similar to the type she kept, which were kept in the new Chief of Neurology's (male) office complex concerning EMG readings. In doing so she made a concerted and successful effort to avoid a legible photograph of patient information, while attempting to establish that patient records relating to EMG reports were being maintained.

65.     As a result of her actions to show she was being selectively retaliated against, Dr. Lin changed the proposed two-week suspension to a proposed termination. The termination is based on race (Asian-Indian), gender (female), age (DOB 6/5/53) and retaliation for prior and current EEO activity. The alleged factual basis for the termination once again is based, in part, on charges for which she has never been given her due process rights to appeal or grieve. It is further based upon the improper rummaging through her offices to treat her in a disparate manner from that in which other doctors are treated and to retaliate against her efforts to defend herself from those baseless charges by pointing out that she is being punished in a fashion that other doctors are not. In fact, if Dr. Lin views a doctor or employee as a "team player" in his efforts to retaliate against other doctors, he will ignore far more significant patient record keeping failures than this manufactured one.

66.     In their efforts to terminate Dr. Zachariah, Dr. Lin and Dr. Van Buskirk have not only selectively gone after her, they have enforced "rules" not enforced against other doctors and imposed punishments which do not match any alleged wrongdoing. Dr. Lin also sought to develop pictures he claimed were of patient files without receiving the appropriate clearance before making the pictures.

26

67.     The pictures he made show no confidential patient information was visible on the photographs. However, in order to punish Dr. Zachariah, Dr. Lin claimed with no basis that such information must have existed. Dr. Lin also alleged that Dr. Zachariah was insubordinate for not giving him information which she clearly gave him.

68.     Plaintiffs have hired the undersigned law firm and agreed to pay them reasonable attorneys fees and costs.

**COUNT I**

69.     The Plaintiffs, Drs. Cote, Gowski and Zachariah sue R. James Nicholson, as the Secretary of Veterans Affairs, for retaliation under Title VII.

70.     The Plaintiffs incorporate by reference and reallege paragraphs 1 through 68 of the complaint.

71.     Each Plaintiff engaged in activity which is protected under Title VII.

72.     The Defendant was aware of each of their activities under Title VII.

73.     As a direct and proximate result of the protected activity each Plaintiff has suffered adverse employment actions.

74.     The retaliatory actions were taken by supervisory personnel within the Department of Veterans Affairs.

75.     The Department of Veterans Affairs has intentionally maintained these retaliatory and unlawful practices to the detriment of its employees.

76.     The retaliatory actions have created an intolerable hostile work environment.

77.     The Defendant at all relevant times, knew or should have known, of the retaliatory actions being taken against each Plaintiff.

78.   The Defendant failed to take necessary action to prevent or correct the retaliatory actions being taken and, in fact, ratified such conduct.

79.   The Defendant, through the supervisors of the Plaintiffs, including Drs. Lin, Van Buskirk, Patel and MCD Hopkins and others, has engaged in, directed, and/or ratified retaliatory conduct and frustrated the Plaintiffs efforts to obtain relief under Title VII.

80.   The Defendant, through acceptance of such conduct, has fostered an attitude among supervisors in Bay Pines that retaliation against employees in order to discourage protected EEO activity is an acceptable employment practice by supervisors at the Bay Pines VAHCS.

81.   Because of the willful actions of the Defendant and its supervisors, and as a proximate cause thereof, each Plaintiff has been and continues to be denied their right to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* Section 501 of the Rehabilitation Act of 1973, as amended, and 29 U.S.C. § 791, *et seq.*

82.   As a result of the foregoing, each Plaintiff has been damaged. Such damages include, but are not limited to discipline including termination from employment, suspension from employment, loss of pay, loss of benefits, loss of training, loss of committee or supervisory positions, loss of office space, research or clinic privileges, loss of an amicable work environment, loss of career and professional opportunities, harm to their professional reputations, humiliation, degradation, embarrassment, and severe emotional suffering. The Plaintiffs will continue in the future to suffer the same damages absent relief from this Court.

83.   The Plaintiffs have satisfied all conditions and precedent to the filing of this suit or have been prevented by the Defendant from satisfying such conditions.

28

WHEREFORE, the Plaintiffs request prospective relief, a judgment for damages, attorneys fees and costs and such other and further relief as this Court deems just and proper and for a trial by jury on all issues so triable.

## COUNT II

84.     The Plaintiffs, Drs. Cote, Gowski, and Zachariah sue R. James Nicholson, the Secretary of Department of Veterans Affairs for gender discrimination and disparate impact under Title VII.

85.     The Plaintiffs incorporate by reference and reallege paragraphs 1 through 68.

86.     The Defendant has followed a course of conduct which results in disparate treatment between men and women when it comes to supervisory or leadership positions.  Men comprise a significantly larger number and percentage of those receiving leadership and section, service or committee chief positions.  The Defendant's practice of disparate treatment in favor of men cannot be justified as a business necessity.

87.     In addition, the Defendant has followed a course which results in disparate treatment between men and women when it comes to employment actions and pay.    The Defendant's practice cannot be justified as a business necessity.

88.     As a direct and proximate result the Plaintiffs have been denied equal employment opportunity for wages, promotion, and other terms and conditions of employment by the Defendant because of gender (female).

89.     All of the above discriminatory actions were taken by the supervisory personnel within the Department of Veterans Affairs in order to deprive the Plaintiffs of employment and other employment action because of their gender (female).

90.    The Defendant has intentionally maintained these discriminatory and unlawful practices to the detriment of its employees.

91.    The above-referenced actions have created an intolerable hostile work environment.

92.    The Defendant at all relevant times knew, or should have known, of the above-referenced discrimination against the Plaintiffs.

93.    The Defendant has failed to take necessary action to prevent or correct the complaint of discrimination and, in fact, ratified such conduct.

94.    The Defendant, through the Plaintiffs' supervisors including Drs. Lin and Van Buskirk and MCD Hopkins and others, has engaged in, directed or ratified conduct and denied and frustrated the Plaintiffs' efforts to obtain relief under Title VII.

95.    The Defendant, through acceptance of the complained of conduct, has fostered an attitude among supervisors at Bay Pines VAHCS that gender discrimination is acceptable employment practice.

96.    Because of the willful actions of the Defendant and its supervisors, and as a proximate cause thereof, the Plaintiffs have been and continue to be denied their rights to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* Section 501 of the Rehabilitation Act of 1973, as amended, and 29 U.S.C. § 791 *et seq.*

97.    As a result of the foregoing, the Plaintiffs have been damaged. Such damages include, but are not limited to discipline including termination from employment, suspension from employment, loss of pay, loss of benefits, loss of training, loss of committee or supervisory positions, loss of office space, research or clinic privileges, loss of an amicable work

environment, loss of career and professional opportunities, harm to their professional reputations, humiliation, degradation, embarrassment, and severe emotional suffering. The Plaintiffs will continue in the future to suffer the same damages absent relief from this Court.

98.    The Plaintiffs have satisfied all conditions precedent to filing of this suit or they have been prevented by the Defendant from satisfying such conditions precedent.

WHEREFORE Plaintiffs request prospective relief, judgment for damages, attorneys fees and costs, and such other relief as this Court deems just and proper and for a trial by jury on all issues so triable.

## COUNT III

99.    The Plaintiffs, Drs. Cote, Gowski and Zachariah, hereby sue Defendant R. James Nicholson, as Secretary of the Department of Veterans Affairs.

100.   Plaintiffs incorporate and reallege paragraphs 1 through 98.

101.   Unless the above practices are enjoined, the Plaintiffs will suffer irreparable harm.

102.   There is: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless an injunction issues; (3) the threatened injury to the Plaintiffs is greater than any damage the proposed injunction may cause the opposing party; and (4) the injunction, is issued, will not disserve the public interest.

103.   Plaintiffs request the Court award them their attorneys fees and costs and enter preliminary and permanent injunctions enjoining the following practices, actions and conduct:

- a. The suspension or termination of Dr. Gowski for the matters for which she has been suspended;
- b. The suspension or termination of Dr. Zachariah for the matters for which she has been threatened or faces suspension or termination;

31

     c.  Violating Title VII or the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* as described above including retaliation against the Plaintiffs for EEO activity and discrimination based on gender, race and age.

     d.  Such other practices, actions or conduct that the court deems appropriate and proper to enjoin.

104.    Plaintiffs demand trial by jury of all issues so triable and such other and further relief as the Court deems just and appropriate.

## COUNT IV

105.    The Plaintiff, Dr. Gowski sues Defendant R. James Nicholson as Secretary of the Department of Veterans Affairs.

106.    Plaintiff incorporates by reference and realleges paragraphs 1 through 68.

107.    Dr. Gowski's supervisors at Bay Pines VAHCS discriminated against Dr. Gowski because of her religious beliefs as a practicing Catholic medical doctor.

108.    Dr. Gowski had a *bona fide* religious belief as a practicing Catholic medical doctor that conflicted with employment requirements at Bay Pines VAHCS as employed by her supervisors, who failed to make reasonable accommodation for her religious beliefs. As a direct and proximate result, Dr. Gowski has been denied equal employment opportunity for wages, promotion, assignment of duties, office space and other terms and conditions of employment by the Defendant because of her religious beliefs.

109.    The above discriminatory actions were taken by supervisory personnel within the Department of Veterans Affairs in order to deprive Dr. Gowski of the full terms and conditions of her employment and other opportunities because of her religion.

110. The Defendant has intentionally maintained these discriminatory, retaliatory and unlawful practices to the detriment of Dr. Gowski. The above-referenced actions have created an intolerable hostile work environment.

111. The Defendant at all relative times knew, or should have known of the above-referenced discrimination against Dr. Gowski. The Defendant failed to take necessary action to prevent or correct the complained discrimination and in fact ratified such conduct.

112. The Defendant, through Dr. Gowski's supervisors, including Drs. Van Buskirk, Lin and Patel and MCD Hopkins and others, has engaged in, directed, or ratified conduct and denied and frustrated Dr. Gowski's relief under Title VII.

113. The Defendant, through acceptance of such conduct has fostered an attitude among supervisors at Bay Pines VAHCS that religious discrimination is an acceptable employment practice by supervisors at Bay Pines VAHCS.

114. Because of the willful actions of the Defendant and its supervisors and as a proximate cause thereof, Dr. Gowski has been and continues to be denied her right to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* Section 501 of the Rehabilitation Act of 1973, as amended, and 29 U.S.C. § 791, *et seq*

115. As a result of the foregoing, the Plaintiff, Dr. Gowski, has been damaged. Such damages include, but are not limited to suspension, loss of pay, loss of benefits, loss of training, loss of committee assignments and leadership positions, loss of career and professional opportunities, harm to her professional reputation, loss of office space, loss of an amicable work environment, transfer to other duties, humiliation, degradation, embarrassment, and severe

emotional suffering. The Plaintiff, Dr. Gowski, will continue in the future to suffer the same damages absent relief from this Court.

116. The Plaintiff, Dr. Gowski, has satisfied all conditions precedent to the filing of this suit or has been prevented by the Defendant from satisfying such conditions precedent.

WHEREFORE, Plaintiff requests prospective relief, a judgment for damages, attorneys fees and costs, and for such other relief as this Court deems just and appropriate and for a trial by jury on all issues so triable.

## COUNT V

117. The Plaintiff, Dr. Zachariah, sues R. James Nicholson as Secretary of the Department of Veterans Affairs for racial discrimination under Title VII.

118. Plaintiff incorporates and realleges paragraphs 1 through 68.

119. The Defendant has followed a course of conduct which results in disparate treatment based on race when it comes to supervisory or leadership positions. Caucasians comprise a significantly larger number and percentage of those receiving leadership and section, service or committee chief positions. The Defendant's practice of disparate treatment in favor of Caucasians cannot be justified as a business necessity.

120. In addition, the Defendant has followed a course which results in disparate treatment based on race when it comes to employment action and pay. The Defendant's practice cannot be justified as a business necessity.

121. As a direct result and proximate result the Plaintiff, Dr. Zachariah, has been denied equal employment opportunity for wages, promotion, and other terms and conditions of employment by the Defendant because of race (Asian-Indian).

34

122.    The above discriminatory actions were taken by the supervisory personnel within the Department of Veterans Affairs in order to deprive the Plaintiff, Dr. Zachariah, of employment and other employment action because of her race (Asian-Indian).

123.    The Defendant has intentionally maintained these discriminatory and unlawful practices to the detriment of its employee.

124.    The above-referenced actions have created an intolerable hostile work environment.

125.    The Defendant at all relevant times knew, or should have known, of the above-referenced discrimination against the Plaintiff.

126.    The Defendant has failed to take necessary action to prevent or correct the complaint of discrimination and, in fact, ratified such conduct.

127.    The Defendant, through the Plaintiff's supervisors including Drs. Lin and Van Buskirk and MCD Hopkins and others, has engaged in, directed or ratified conduct and denied and frustrated the Plaintiff's efforts to obtain relief under Title VII.

128.    The Defendant, through acceptance of the complained of conduct, has fostered an attitude among supervisors at Bay Pines VAHCS that racial discrimination is acceptable employment practice.

129.    Because of the willful actions of the Defendant and its supervisors, and as a proximate cause thereof, the Plaintiff, Dr. Zachariah, has been and continues to be denied her rights to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* Section 501 of the Rehabilitation Act of 1973, as amended, and 29 U.S.C. § 791 *et seq.*

130.    As a result of the foregoing, the Plaintiff, Dr. Zachariah, has been damaged. Those damages include, but are not limited to termination from employment, suspension from employment, lost pay, loss of accrued benefits, loss of training, loss of an amicable working environment, loss of career and professional opportunities, harm to her professional reputation, humiliation, degradation, embarrassment, and severe emotional suffering.   The Plaintiff, Dr. Zachariah, will continue in the future to suffer these damages absent relief from this Court.

131.    The Plaintiff has satisfied all conditions precedent to filing of this suit or she has been prevented by the Defendant from satisfying such conditions precedent.

WHEREFORE Plaintiff requests prospective relief, judgment for damages, attorneys fees and costs, and such other relief as this Court deems just and proper and for a trial by jury on all issues so triable.

## COUNT VI

132.    The Plaintiff, Dr. Zachariah, sues R. James Nicholson as Secretary of the Department of Veterans Affairs for age discrimination under Title VII.

133.    Plaintiff incorporates and realleges paragraphs 1 through 68.

134.    The Defendant has followed a course of conduct which results in disparate treatment based on age when it comes to supervisory or leadership positions.   Younger employees comprise a significantly larger number and percentage of those receiving leadership and section, service or committee chief positions.   The Defendant's practice of disparate treatment in favor of younger employees cannot be justified as a business necessity.

135.    In addition, the Defendant has followed a course which results in disparate treatment based on age when it comes to employment actions and pay.  The Defendant's practice cannot be justified as a business necessity.

36

136.    As a direct result and proximate result the Plaintiff, Dr. Zachariah, has been denied equal employment opportunity for wages, promotion, and other terms and conditions of employment by the Defendant because of age (DOB: 6/5/53).

137.    All of the above discriminatory actions were taken by the supervisory personnel within the Department of Veterans Affairs in order to deprive the Plaintiff, Dr. Zachariah, of employment and other employment action because of her age (DOB: 6/5/53).

138.    The Defendant has intentionally maintained these discriminatory and unlawful practices to the detriment of its employee.

139.    The above-referenced actions have created an intolerable hostile work environment.

140.    The Defendant at all relevant times knew, or should have known, of the above-referenced discrimination against the Plaintiff.

141.    The Defendant has failed to take necessary action to prevent or correct the complaint of discrimination and, in fact, ratified such conduct.

142.    The Defendant, through the Plaintiff's supervisors including Drs. Lin and Van Buskirk and MCD Hopkins and others, has engaged in, directed or ratified conduct and denied and frustrated the Plaintiff's efforts to obtain relief under Title VII.

143.    The Defendant, through acceptance of the complained of conduct, has fostered an attitude among supervisors at Bay Pines VAHCS that age discrimination is acceptable employment practice.

144.    Because of the willful actions of the Defendant and its supervisors, and as a proximate cause thereof, the Plaintiff, Dr. Zachariah, has been and continues to be denied her rights to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended,

37

42 U.S.C. § 2000e *et seq.,* Section 501 of the Rehabilitation Act of 1973, as amended, and 29 U.S.C. § 791 *et seq.*

145.   As a result of the foregoing, the Plaintiff, Dr. Zachariah, has been damaged. Those damages include, but are not limited to termination from employment, suspension from employment, lost pay, loss of accrued benefits, loss of supervisory positions, loss of office space, loss of research opportunities, loss of training, loss of an amicable working environment, loss of career and professional opportunities, harm to her professional reputation, humiliation, degradation, embarrassment, and severe emotional suffering.  The Plaintiff, Dr. Zachariah, will continue in the future to suffer these damages absent relief from this Court.

146.   The Plaintiff has satisfied all conditions precedent to filing of this suit or she has been prevented by the Defendant from satisfying such conditions precedent.

WHEREFORE Plaintiff requests prospective relief, judgment for damages, attorneys fees and costs, and such other relief as this Court deems just and proper and for a trial by jury on all issues so triable.

## DEMAND FOR JURY TRIAL

The Plaintiffs, Drs. Cote, Gowski and Zachariah hereby demand a trial by jury on all issues so triable.

DATED: August 27, 2007                Respectfully submitted,

JOSEPH D. MAGRI
Florida Bar No.: 0814490
WARD A. MEYTHALER
Florida Bar No.: 0832723
MERKLE & MAGRI, P.A.
5415 Mariner St., Suite 103
Tampa, FL 33609

38

Tel. (813) 281-9000
Fax.: (813) 281-2223
Email: jmagri@merklemagri.com