**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CLAUDIA G. COTE, M.D.,
DIANE T. GOWSKI, M.D.,
SALLY ZACHARIAH, M.D.,
and ROXANNE LAINHART,

       Plaintiffs,

       v.                          Case No. 8:07-cv-01524-T-TBM

JAMES PEAKE, Secretary,
DEPARTMENT OF VETERANS
AFFAIRS,

       Defendant.
_____/

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

      Federal defendant, James Peake, Secretary of the Department of Veterans

Affairs, submits the following statement of undisputed material facts in support of his

motion for summary judgment or, alternatively, partial summary judgment.

**A.**    **Introduction and Parties**

      1.    This action is brought by plaintiffs Claudia Cote, Sally Zachariah, Diane

Gowski and Roxanne Lainhart pursuant to Title VII, 42 U.S.C. § 2000e-16, and the Age

Discrimination in Employment Act, 29 U.S.C. § 601, et seq.  Plaintiffs' Amended

Complaint was filed on January 15, 2008.  See Doc. 1 & Doc. 23.

      2.    Plaintiff, Claudia Cote, is a pulmonologist employed by the Department of

Veterans Affairs at the Bay Pines VA Healthcare System in St. Petersburg, Florida.  She

has worked at the Bay Pines VA since August 1996.  Exhibit A, Depo. of Claudia Cote

(hereinafter "Exh. A, Cote Depo.") at Exh. 1, p. 1.  Cote is board certified in

pulmonology.   Exh. A, Cote Depo. at 9:6-8.

      3.     Plaintiff, Diane Gowski, is a hospitalist employed at the Bay Pines VA.

She initially worked at Bay Pines from 1997 to 1999.  Exhibit B, Depo. of Diane Gowski

(hereinafter "Exh. B, Gowksi Depo.") at 12:12-16.  She returned to Bay Pines in August

2002, and was rehired as a hospitalist.  Exh. B, Gowski Depo. at 18:8-9 & 21:6-10.

Gowski is board certified in critical care medicine and internal medicine.  Exh. B, Gowski

Depo. at 9:12-13.

      4.     Plaintiff, Sally Zachariah, is a neurologist employed at the Bay Pines VA.

She has been employed by the VA since 1986, initially working at the James Haley

hospital in Tampa and moving to Bay Pines in 1989.  Exhibit C, Depo. of Sally

Zachariah (hereinafter "Exh. C, Zachariah Depo.") at 8:21-24.  Zachariah is board

certified in neurology.  Exh. C, Zachariah Depo. at 13:1-3.

      5.     Plaintiff, Roxanne Lainhart, is employed in the business office at the Bay

Pines VA.  She worked as the Administrative Office (or AO) for the Medicine Service

from March 2005 to March 2007.  Exhibit D, Depo. of Roxanne Lainhart (hereinafter

"Exh. D, Lainhart Depo.") at 14:13 & 24:7-12.

      6.     Dr. George Van Buskirk became the medical Chief of Staff at the Bay

Pines VA in July 2004.  Prior to that position, he was the Acting Chief of the Medicine

Service at Bay Pines for several months.  Exhibit E, Depo. of George Van Buskirk

(hereinafter "Exh. E, Van Buskirk Depo.") at 56:12-14.

      7.     Dr. Lithium Lin was hired at the Chief of the Medicine Service at Bay Pines

in the summer of 2004.  Exhibit P, Declaration of Lithium Lin (hereinafter "Exh. P, Lin

Decl.") at ¶ 2.  As the Chief of Medicine, he reports to Van Buskirk as the Medical Chief of Staff.

8.      The Medicine Service has various sections, each of which represents a medical specialty.  These include cardiology, pulmonology, neurology,  dermatology, oncology, nephrology, gastroenterology, endocrinology, infectious diseases, allergy, rheumatology, emergency medicine and hospitalists.   Lin oversees these sections as the chief of the service.  Exh. P, Lin Decl. at ¶ 2.

9.      Dr. Sharadchandra Patel is the Chief Hospitalist at the Bay Pines VA.  In that position, he supervises the hospitalists in the Medicine Service.  He reports to Dr. Lin.  Exh. H, EEOC Deposition (vol. I) of Sharadchandra Patel (hereinafter "Exh. H, Patel EEOC Depo. (vol. I)") at 3:21-22; 7:2-5.

10.      Wallace Hopkins is the Director of the Bay Pines VA.  He has been in that position since March 2005.  Exhibit G, Deposition of Wallace Hopkins (hereinafter "Exh. G, Hopkins Depo.") at 4:15 to 5:6.

**B.      Diane Gowski's Claims**

**1.      Job Assignments**

11.      When Gowski returned to Bay Pines in 2002, she was hired as a hospitalist.  It was her understanding, based upon statements made by the Chief of Medicine at that time, Dr. Harold Kennedy, that she would be permanently assigned to work in the critical care areas of the hospital.  Exh. B, Gowski Depo. at 20:19 to 22:20. Within a year of her rehire, Kennedy assigned Gowski to the cardiac critical care unit (CCU).  Exh. B, Gowski Depo. at 22:9-12; Exh. H, Patel EEOC Depo. (vol. I) at 15:22 to 16:9.

3

12.    During this time frame, Gowski was the only hospitalist assigned to the critical care areas of the hospital.  Exh. B, Gowski Depo. at 25:2-14.

13.    In the middle of July 2005, Gowski was treating a patient in the intensive care unit that had an advance directive not to be placed on life support.  Several other doctors were also involved in this patient's care.  While the patient's wife, who held a power of attorney, equivocated about her husband's treatment, the consensus of the treating doctors was that the medical treatment needed to be relaxed and palliative care instituted since the patient was terminal.  Gowski was of a different view and felt that something more could be done.  Exh. I, EEOC Depo. of John Frutchey (hereinafter "Exh. I, Frutchey EEOC Depo.") at 8:6 to 14:9.  An ethics consult was put in.  Exh. J, Frutchey EEOC Depo. at 12:3-13.

14.    Frutchey mentioned this event to Lin, observing the Gowski had not followed a patient's advance directive.   On or about August 12, 2005, Lin mentioned this at a meeting of pulmonologists.  Exh. B, Gowski Depo. at 99:5-18.

15.    On August 2, 2005, Patel notified Gowski that she would be rotating with several other hospitalists who had also expressed an interest in critical care rotations.  Beginning on September 1, 2005, she was assigned to work two months on ward 4A and then two months in the ICU.  Two other hospitalists also participated in this rotation system.  Exh. B, Gowski Depo. at 52:12 to 56:7 & Depo. Exhs. 5 & 23; Exh. F, Deposition of Lithium Lin (hereinafter "Exh. F, Lin Depo.") at 47:11-19.

16.    On September 1, 2005, Gowski started a two month rotation on Ward 4A.  Another hospitalist began a rotation in the ICU.  On November 1, 2005, Gowski was

rotated into the ICU for two months.  Exh. B, Gowski Depo. 58:6 to 59:9; 64:14-18; & Depo. Exh. 23.

17.    In January 2006, Gowski was scheduled to rotate back to 4A.  On December 7, 2005, she wrote to Lin, requesting that she rotate to CCU for 2 months beginning Jan. 1, 2006 in lieu of rotating to ward 4A; she did this due to alleged requests for help from the cardiology service.  Exh. B, Gowski Depo. at 71:5 to 72:5.

18.    On December 8, 2005, Patel responded by reiterating that assignments "will be dictated by the needs of the facility in serving our veteran population and not based on individual needs."  She was told she would begin work on ward 4A for 2 months in Jan. 2006.  Exh. B, Gowski Depo. at Depo. Exh. 5 (at page C-1-3).

19.    Beginning in 2006, the rotation into the ICU stopped for all hospitalists. Instead, Gowski and one other hospitalist rotated between ward 4A and the CCU.  Exh. B, Gowski Depo. 59:15-22; 67:14-68:12..

20.    Beginning on July 1, 2006, the hospitalists section was short by five physicians.  Due to this, Patel stopped all hospitalist rotations into the CCU and all hospitalists were assigned permanently to hospital wards.  Exh. B, Gowski Depo. 73:18 to 75:25. ; Exh. H, Patel EEOC Depo. (vol. I) at 24:17 to 25:18.

21.    On July 1, 2006, Gowski was assigned to ward 5A.   She had expressed interest in assignment to 4A, but Patel received complaints from doctors and nurses about having Gowski work on that ward.  Exh. H, Patel EEOC Depo. (vol II) at 39:11 to 41:14.

##### 2.    Critical Care Supplemental Privileges

22.    In April 006, Gowski submitted her paperwork for her hospital privileges at Bay Pines.  Doctors at Bay Pines renew their privileges every 2 years.  In addition to the core privileges for hospitalists, Gowski also requested supplemental privileges in the area of critical care medicine.  Exh. B, Gowski Depo. 237:14 to 242:1 & Gowski Depo. Exh. 12 & 13; Exh. F, Lin Depo. at 104:1 to 112:13.

23.    Patel and Lin initially approved all of the supplemental privileges that Gowski requested.  Exh. B, Gowski Depo. 243:10-17.  Her privileging package was then presented to the Professional Standards Board (PSB) by Lin as the Chief of the Medicine Service.  The PSB is comprised of the Chiefs from all of the Services at the hospital, and it is chaired by Van buskirk as the Chief of Staff.  The PSB asked for additional information on Gowski's request to hold certain supplemental privileges.  Exh. H, Patel EEOC Depo. (vol. II) at 7:4-20.

24.    On June 1, 2006, Gowski met with Patel regarding her privileges, and Patel notified her that the PSB did not approve all of her supplemental privileges.  Patel then reviewed Gowski's privileging package again, and denied some of the privileges and approved others.  Exh. B, Gowski Depo. at 286:4-23.  This exchange was heated and Patel raised his voice to Gowski; he later apologized for his conduct.  Exh. B, Gowski Depo. at 246:14-25.

25.    On July 15, 2006, Gowski sent a letter to Lin regarding her supplemental privileges, explaining why her critical care privileges should be approved.  Exh. B, Gowski Depo. at 290:16 to 291:16 to 292:3 & Depo. Exh. 14.  She opined that "for the

benefit of patient care . . . physicians who have competency in performing certain procedures . . . be allowed to maintain these privileges."  Gowski Depo. Exh. 14.

26.    The PSB eventually approved some of the supplemental privileges Gowski requested and denied others.  Exh. B, Gowski Depo. at 269:23 to 271:9; 280:1-25; Depo. Exh. 13; Exh. F, Lin Depo. at 110:23 to 111:13.

27.    Physicians employed as hospitalists do not have to hold critical care supplemental privileges in order to work as a hospitalist, even though they work in critical care areas after hours.  Exh. B, Gowski Depo. at 258:21 to 261:16; Exh. F, Lin Depo. at 108:3 to 109:3.

### 3.    Letter of Reprimand

28.    A hospitalists' meeting was held on July 18, 2006.  Since the Neurology Service had been merged into the Medicine Service in June 2006, one of the items on the agenda was the coverage of neurology patients by hospitalists.  Prior to this meeting, Gowski had sent an email to Patel, raising various questions about how neurology patients were going to be covered by hospitalists and what role neurologists would play in handling consults.  Gowski did not receive a response to her email questions, and she raised those concerns at the July 18 meeting.  Exh. B, Gowski Depo. at Depo. Exh. 16.

29.    After that meeting, several hospitalists sent email messages to Patel objecting to Gowski's behavior during the meeting and the way she treated Dr. Reddy, the neurologist who attended the meeting.   One email message described Gowski's behavior at the meeting as "misdirected, aggressive and . . . inappropriate."  Another stated, "[h]er demeanor was so negative and aggressive and, I feel it was offensive to

our colleagues who were present at the meeting." Another stated that, because of Gowski's behavior, the meeting was "unpleasant, undignified and destructive." Exh. P, Lin Decl. at ¶ 3 & Exh. 1 (bate page nos. 1207-9); also Exh. J, Depo. of Susan Gibson (hereinafter "Exh. J, Gibson Depo.") at 10:10-18; 20:6-12; & 24:20 to 25:8.

30.     On July 19, 2006, Gowski had a confrontation with another hospitalist, Dr. Shelby Shamas, regarding a patient that had been transferred from Shamas to Gowski. Shamas wrote an email to Patel about this event, complaining that Gowski was upset and insulting to her. According to Shamas' email, "I cannot remember exactly what words [Gowski] used, I just know that it is the first time in 2 years that I have had a colleague address me that way." Exh. P, Lin Decl. at ¶ 3 & Exh. 1 (bate page no. 1207).

31.     Based upon the complaints regarding Gowski's behavior at the hospitalists' meeting as well as Shamas' email, Lin contacted human resources about appropriate disciplinary action. After conferring with human resources, Lin issued Gowski a Proposed Letter of Reprimand on July 27, 2006. That proposal included two charges: 1) disruptive behavior at the hospitalists' staff meeting and 2) disrespectful and unprofessional conduct regarding her confrontation with Shamas. Exh. P, Lin Decl. at ¶¶ 4-5.

32.     On August 15, 2006, Gowski submitted a written response to Lin's proposed reprimand letter. Exh B, Gowski Depo. at 308:3-11 & Depo. Exh. 16; Exh. P, Lin Decl. at ¶ 5.

33.     After reviewing Gowski's response and considering the evidence used to support the proposed reprimand, Lin issued Gowski a formal reprimand letter on August

22, 2006.  That letter sustained the two charges in the proposal letter.  Exh. P, Lin Decl. ¶ 6.

### 4.    Suspension

34.    On March 5, 2007, four nurses signed a memorandum regarding events of March 3 and 4, 2007 where Gowski was alleged to have screamed at several nurses. The nurses' memorandum stated that Gowski's "verbal abuse towards the nursing staff has gotten completely out of control."  Exh. P, Lin Decl. at ¶ 7 & Exh. 4.

35.    The evidence gathered by Patel and presented to Lin included the statement signed by the four nurses, as well as copies of Gowski's previous performance evaluations, which discussed prior interpersonal problems.  In Gowski's evaluation for 2005 to 2006, Patel noted that "[a]nother raw area of concern during the past year has been interpersonal skills with both peers and ancillary medical staff particularly nursing."  A similar comment was contained in Patel's rating of Gowski for 2003 to 2004.  Moreover, Gowski's rating for the 2002 to 2003 rating period, which was done by Dr. Jocelyn David, the Chief Hospitalist before Patel, stated:

> Peer relationship with colleague and nursing is an area of concern.  Dr. Gowski has a tendency to overreact to issues brought by nurses instead of proving a solution.  On multiple occasions those issues had been blown out of proportion, causing difficulty with nursing staff.  This has been discussed with Dr. Gowski and adjustment of her part is necessary.

Exh. P, Lin Decl. at ¶ 7 & Exh. 4; Exh. B, Gowski Depo. at Depo. Exh. 22.

36.    Based upon this evidence, Lin, in consultation with Human Resources, decided that appropriate disciplinary action would be a proposed 14 day suspension. Exh. P, Lin Decl. at ¶ 8.

37.    On May 11, 2007, Lin issued a Proposed Letter of 14 Day Suspension to Gowski. That letter contained two charges against Gowski for disrespectful and unprofessional conduct arising out of the events of March 3 and 4. Exh. B, Gowski Depo. at Depo. Exh. 18; Exh. P, Lin Decl. at ¶ 8 & Exh. 5.

38.    The letter provided Gowski the opportunity to submit a written response, which she did on July 2, 2007. Exh. B, Gowski Depo. at 351:19-23 & Gowski Depo. Exh. 20.

39.    The proposed suspension was then referred to Wallace Hopkins as the hospital director. In assessing the action, Hopkins reviewed the evidence file prepared in connection with the charges, as well as Gowski's response. He also heard an oral presentation by Gowski and her attorney. Exh. B, Gowski Depo. at 356:2 to 357:18; Exh. G, Hopkins Depo. at 34:9 to 37:18; Exh. S, Decl. of Wallace Hopkins (hereinafter "Exh. S, Hopkins Decl.") at ¶ 7 & Exh. 3.

40.    Based upon all of the evidence, Hopkins sustained disciplinary conduct by letter of August 8, 2007, but he mitigated the proposed 14 day suspension to a 7 day suspension. Exh. B, Gowski Depo. at 357:20 to 358:13 & Gowski Depo. Exh. 19; Hopkins' Depo. at 34:9 to 39:30; Exh. S, Hopkins Decl. at ¶ 8 & Exh. 4.

**5.    Gowski EEO Complaints**

41.    Gowski initially contacted an EEO counselor on August 30, 2005, at which time she complained about her transfer out of the ICU, her demotion from chair of critical care committee, and the allegation that she ignored patient advance directives, all occurring over summer of 2005. The basis of the claims were gender and religion.

10

This was Gowski's first EEO contact.    Exh. B, Gowski Depo. at 39:10 to 41:22 & Gowski Depo. Exh. 3.

42.    Gowski amended her EEO complaint by letter on several occasions, and in an October 24, 2006 letter, the EEO summarized the claims of discrimination and retaliation that had been accepted for investigation.  Exh. B, Gowski Depo. at 42:20 to 43:13 & Gowski Depo. Exh. 4.

43.    Gowski did not contact an EEO counselor to complain about the 7 day suspension imposed by Hopkins on August 8, 2007.  Exh. B, Gowski Depo. at 229:3 to 231:10.

C.    **Sally Zachariah's Claims**

1.    **Merger of Neurology into Medicine**

44.    At the time Van Buskirk became the Chief of Staff at Bay Pines in July 2004, Zachariah was the Chief of the Neurology Service.  Other doctors in neurology at this time included Drs. Huda, Cruz, Reddy and Shafe.  Exh. C, Zachariah Depo. at 15:1-15.  Dr. Huda is a male from Pakistan; Dr. Cruz is a male from Puerto Rico and Dr. Reddy is a male from India.  Exh. C, Zachariah Depo. at 17:3-14.

45.    On October 2004, pursuant to the settlement of an EEO complaint filed by Zachariah against Dr. Parod Mohanty, the previous Chief of Staff at Bay Pines, an outside consultant came to Bay Pines to conduct an assessment of the Neurology Service.  Exh. C, Zachariah Depo. at 157:8 to 164:17 & Depo. Exhs. 8 & 9.

46.    Taking into consideration the report prepared by the outside consultant, Van Buskirk, Zachariah and the other neurologists began a  process of reworking the neurology clinic schedule in an effort to better organize clinics and reduce a substantial

backlog of patients waiting for appointments.  Exh. E, Van Buskirk Depo. at 33:15 to 34:20.  In 2004, some patients were waiting as much as one year for an appointment. Exh. C, Zachariah Depo. at 164:11-19.

47.     Ultimately, clinics were reorganized to improve efficiency, and the new schedules took affect.  Exh. E, Van Buskirk Depo. at 33:19 to 34:24.

48.     In addition to looking at the outpatient backlog in neurology, Van Buskirk also considered the inpatient beds used by that service.  When Van Buskirk arrived a Bay Pines in 2004, veterans who needed hospitalization were being diverted to other hospitals 50% of the time.  This was a problem of bed flow and bed capacity.  Exh. E, Van Buskirk Depo. at 18:16 to 22:7; 35:2 to 36:4.

49.     In light of both the backlogs in neurology and to improve inpatient bed flow, Van Buskirk decided to merge neurology into the Medicine Service.  Once neurology became a section within Medicine, neurological patients admitted to the hospital were assigned a hospitalist as their primary care doctor, and neurologists acted as consultants, freeing up their time for other responsibilities.  Exh. F, Lin Depo. at 71:21 to 72:8.  Other sections within the Medicine Service, such as cardiology and pulmonary, operated in the same manner.  Exh. C, Zachariah Depo. at 228:3 to 229:8. By assigning a hospitalist as the primary care doctor for all patients admitted, the result was an increase in efficiency, patient length of stays decreased and the diversion rate dropped to almost zero.  Exh. E, Van Buskirk Depo. at 18:16 to 22:7; 34:25 to 36:4; 41:2-15; Exh. F, Lin Depo. at 86:19 to 87:6.

50.     In a memorandum in May 2006, Van Buskirk announced that neurology was being merged into the Medicine Service.  Exh. C, Zachariah Depo. at Depo. Exh. 11.

51.     After neurology was merged into the Medicine Service, Lin rotated the section chief position of neurology among Drs. Huda, Cruz and Reddy.  He did not consider Zachariah for this position since she had already been the Chief of the Neurology Service.  Exh. C, Zachariah Depo. at Depo. Exh. 13; Exh. Q, Lin EEOC Statement at 30:1 to 31:16.

## 2.     **Research Suspension**

52.     Research projects at Bay Pines have to be approved, first, by the Institutional Review Board ("IRB") and, second, by the Research and Development Committee ("R & D Committee").  Exh. L, Deposition of Rachel McArdle (hereinafter "Exh. L, McArdle Depo.") at 109:12-14; Exh. M, Deposition of Joseph Langhans (hereinafter "Exh. M, Langhans Depo.") at 6:5 to 8:15.

53.     In 2003, Zachariah prepared an application for submission to the Research and Development Office to conduct research regarding the effect of botox injections on patients with headaches.   Exh. C, Zachariah Depo. at 245:5-23 & Zachariah Depo. Exh. 14.  The research proposal was intended as a retrospective review of charts of patients.  Exh. C, Zachariah Depo. at 245:19 to 247:22.

54     The application, which was signed by Zachariah as the Principle Investigator, was marked "new."  The application also had boxes for "expedited" and "exempt," but those boxes were not checked.   Exh. C, Zachariah Depo. at 261:1 to 262:11 & Depo. Exh. 14; Exh. M, Langhans Depo. at 121:22 to 122:13.  During this time

frame, Bay Pines did not have exempt research.  Furthermore, both new research and expedited research still needed committee approval.  Exh. M, Langhans Depo. at 21:13 to 22:19; Exh. L, McArdle Depo. at 22:4 to 25:1; 39:1-25.

55.    Zachariah claims that Dr. Joseph Langhans, the Chairman of the IRB, had orally approved the research in 2003 and told Zachariah to give the materials to Cynthia Tate in the Research and Development Office.  Exh. C, Zachariah Depo. at 253:13 to 260:14.

56.    Zachariah's research assistant delivered the package to Tate.  The materials were incomplete and the package was returned to the research assistant. Exh. K, Deposition of Cynthia Hullum Tate (hereinafter "Exh. K, Tate Depo.") at 9:3-21. According to Zachariah, her research assistant resubmitted the package to the Research and Development Office, and then came back and reported to Zachariah that everything was okay.  Exh. C, Zachariah Depo. at 262:20-25.

57.    The next time Zachariah heard there was a problem was when she received a November 7, 2005 letter notifying her that she had apparently conducted research without approval.  Exh. C, Zachariah Depo. at 248:6-24 & Zachariah Depo. Exh. 18.

58.    Zachariah admitted that she never received written approval for the research.  Exh. C, Zachariah Depo. at 248:6-8; 269:15 to 270:13.

59.    There is no oral approval for research at Bay Pines from the IRB or the R & D committee.  Exh. L, McArdle Depo. at 83:23 to 84:10; 103:15 to 105:7; 110:25 to 112:10; Exh. M, Langhans Depo. at 51:6-8.

14

60.    The Research and Development Office had no record of Zachariah submitting her protocol for approval.  Submissions are entered into the database once they are complete.  Exh. K, Tate Depo. at 9:3 to 10:11.  Her application, therefore, had never been submitted to the IRB for initial review nor channeled on to the R & C Committee for final approval.  Exh. M, Langhans Depo. at 89:4-8; 115:19-21.

61.    On January 12, 2006, the IRB met to consider Zachariah having conducted research without approval.  Zachariah appeared at this meeting and presented her version of what happened.  She insisted that she thought the research had been approved.  The committee voted unanimously to recommend that Zachariah be suspended from research for the period of 1 year.  Exh. C, Zachariah Depo. at Depo. Exh. 16; Exh. M, Langhans Depo. at 46:24 to 48:3.

62.    The IRB's recommendation was then forwarded to the R & D Committee. On January 30, 2006, the R & D committee considered the IRB's recommendation. Zachariah appeared at this meeting and presented her side of what had happened; she stated that she believed the research had been approved.  Exh. C, Zachariah Depo. at 252:25 to 253:3 & Zachariah Depo. Exh. 17;  Exh. L, McArdle Depo. at 64:4 to 66:15.

63.    Zachariah was excused, and the committee discussed the subject. Rachel McArdle, who was the Chairman of the R & D Committee, recommended a 5 year suspension.  Another member recommended a 2 year suspension.  Exh. L, McArdle Depo. at 51:3 to 52:19.

64.    The R & D committee voted unanimously (with one member abstaining) to uphold the IRB's recommendation, but to increase the suspension from 1 to 2 years for conducting research without approval.  This decision was based on the fact that

Zachariah was an experienced researcher who had previously been a member of the IRB and knew the procedures prior to conducting research. Exh. C, Zachariah Depo. at 253:4-7 & Zachariah Depo. Exh. 17; Exh. L, McArdle Depo. at 83:14 to 84:10; 110:18-24.

65.    The members of the R & D Committee who voted to suspend Zachariah for 2 years were both male and female; one member was African American and the other Asian American. Exh. L, McArdle Depo. at 146:7 to 148:9.

66.    On February 1, 2006, McArdle, as the chairman of the R & D committee, sent a letter to Zachariah notifying her of the 2 year suspension. Exh. C, Zachariah Depo. at 264:6-15 & Zachariah Depo. Exh. 19.

67.    Van Buskirk is a non-voting member of the R & D committee. He was present at the January 30, 2006 meeting, but did not contribute to the discussion. Exh. E, Van Buskirk Depo. at 90:6-22; Exh. L, McArdle Depo. at 57:8 to 58:24 & 149:2-17.

### 3.    Reduction in Duration of Privileges

68.    On January 8, 2006, the PSB agreed to limit Zachariah's hospital privileges from 2 years to 1 year. Exh. C, Zachariah Depo. 283:3-16.

69.    Prior to the arrival of Van Buskirk as the Chief of Staff, the PSB had routinely granted privileges to doctors working at Bay Pines for periods of 2 years. However, the by-laws were amended and permitted privileges to be granted for periods up to 2 years. After that change, the PSB renewed privileges for some doctors for periods less than 2 years. Exh. N, Deposition of Larry Atkinson (hereinafter "Exh. N, Atkinson Depo.") at 16:3 to 17:9; Exh. E, Van Buskirk Depo. at 71:10 to 72:10; Exh. O,

Deposition of Dominique Thuriere (hereinafter "Exh. O, Thuriere Depo.") at 80:3 to 82:11.

70.     Apart from Zachariah, other doctors at Bay Pines have had their privileges reduced to periods less than 2 years.   Exh. C, Zachariah Depo. 286:20 to 289:18; Exh. F, Lin Depo. at 103:1-25; Exh. N, Deposition of Larry Atkinson (hereinafter "Exh. N, Atkinson Depo.") at 123:21 to 124:24.

### 4.     **Proposed Removal and Subsequent Suspension**

71.     On August 3, 2007, Lin issued to Zachariah a letter of Proposed Discharge.  That letter contained 12 charges which formed the basis of the proposed action.  Exh. C, Zachariah Depo. at 302:19-25 & Zachariah Depo. Exh. 20.  The initial action had been a proposed suspension, but after additional evidence came to light, Lin requested that the proposed suspension be rescinded and a proposed removal be issued instead.  Exh. P, Lin Decl. at ¶¶ 13-19.

72.     In the proposal removal letter, the first 5 charges related to research improprieties stemming from Zachariah's botox research, which was never approved by the IRB and R & D committees at Bay Pines, and subsequent publication of an article without approval.  Exh. F, Lin Depo. at 88:14-23 & Zachariah Depo. Exh. 20.

73.     The additional charges in the proposal letter involved other actions taken by Zachariah, including:   a)  a confrontation she had with another doctor regarding a peer review question;  b) entering inappropriate comments in a patient's medical file; c) disrespectful conduct in the way she spoke to an administrative support assistant; d) failing to follow instructions; e) failure to follow the VA policy on taking photographs in the hospital; f) lack of candor in an investigation; and g) failure to safeguard patient

information.  Exh. C, Zachariah Depo. at Depo. Exh. 20; Exh. F, Lin Depo. at 88:8 to 99:12.

74.    The proposal gave Zachariah the opportunity to submit a written response, which she did.  Exh. C, Zachariah Depo. at Depo. Exh. 24.  She also provided an oral presentation to Wallace Hopkins, the hospital director who was the decision-maker on the proposal.  Exh. C, Zachariah Depo. at 343:5-11.

75.    In making his decision, Hopkins reviewed:  the proposed removal letter; the evidence file prepared by human resources, which contained all of the supporting evidence; Zachariah's written response; as well as the oral response presented by Zachariah and her attorney.  Exh. G, Hopkins Depo. at 31:11 to 33:15.

76.    Based upon that information, Hopkins did not sustain the first 5 charges in the proposal, which related to the research improprieties.  He felt that issue had been adequately dealt with through the suspension imposed by the R & D Committee in early 2006.  He also did not sustain charge 12, which related to failing to safeguard patient information, on grounds that the photographs developed by Zachariah were blurry and patient information was not discernible from the pictures.   He sustained the remaining charges, and, in so going, mitigated the discipline to a 14 day suspension.  Exh. C, Zachariah Depo. at 342:24 to 343:17 & Depo. Exh. 21; Hopkins Depo. at 31:11 to 33:15; Exh. S, Hopkins Decl. at ¶¶ 3-5 .

**5.    Zachariah's EEO Complaint**

77.    On February 17, 2006, Zachariah contacted an contacted an EEO counselor.  On April 2, 2006, she signed a formal complaint of discrimination, which complained about the suspension of her research by the R & D Committee, the PSB's

decision to reduce the duration of her privileges to one year, and the reduction of her performance evaluation from outstanding to fully successful. The EEO complaint alleged retaliation, harassment and race, age and sex discrimination. Exh. C, Zachariah Depo. at 28:18 to 30:5 & Depo. Exh. 1.

78.    By letters, Zachariah amended her EEO complaint on several occasions. The final acceptance letter sent to Zachariah, which identified the issues to be investigated by the EEO investigator, was dated April 4, 2007. Exh. C, Zachariah Depo. at Depo. Exh. 2.

79.    Zachariah did not contact an EEO counselor regarding the September 13, 2007 decision letter from Hopkins suspending her for 14 days. Exh. C, Zachariah Depo. at 344:11 to 348:10.

**D.    Claudia Cote's Claims**

    **1.    Claims in October 2005 EEO Complaint**

80.    In March 2005, Lin met with the physicians in the pulmonary section, and during that meeting he announced that he would be filling the position of the Chief of Pulmonary Section at some point in the future. At that time, Dr. Lynn Anderson was the Acting Chief of the section. Cote expressed her interest in that position, as did Anderson. Exh. A, Cote Depo. at 41:1-14.

81.    On May 5, 2005, Cote wrote a letter to Lin, officially applying for the position as chief of pulmonary. Exh. A, Cote Depo. at 40:8-17 & Depo. Exh. 1.

82.    Cote was not selected for the section chief position. Instead, Anderson was selected. He was placed in the section chief position as part of the settlement of a

federal court lawsuit between the VA and Anderson.  Exhibit A, Cote Depo. at 46:15-22 & Depo. Exh. 6; Exh. R, Lin EEOC Depo. at 14:1 to 16:15.

83.     In May 2005, Lin wrote a memo to Cote, requesting that she reduce the number of patients in her Chronic Obstructive Pulmonary Disease (COPD) clinic by transferring patients back to their primary care physicians.  Lin requested that Cote reduce her clinic to 200 patients.  At the time Lin wrote his letter to Cote, her clinic had about 700 patients.  Exh. A, Cote Depo. at 127:19-25 & Depo. Exh. 11.

84.     This request was part of the overall advance clinic access directive whereby specialists were asked to transfer patients back to primary care so new patients could be seen in the speciality clinics.  Exh. A, Cote Depo. at 122:21 - 123:8.

85.     Cote responded to Lin's request by a May 9, 2005 memo.  She requested that her  COPD clinic be left unchanged in order to provide the best patient care and that additional doctors be hired.  Exh. A, Cote Depo. at Exh. 11.

86.     On July 25, 2005, Cote sent a letter to Lin about reducing her clinic to 200 by December 1, 2005, stating that she cannot do so given the condition of some patients.  She stated that she could only discharge 20%.  Exh. A, Cote Depo. at Exh. 13.

87.     By the end of 2005, Cote had transferred patients back to primary care, but still had more patients than the 200 requested by Lin.  Exh. A, Cote Depo. at 131:19 to 132:25.

88.      Cote was not disciplined as a result of not reducing her clinic as requested by Lin.  Exh. A, Cote Depo. at 132:23 to 133:10.

89.    On May 31, 2005, Cote sent a communication to public relations at Bay Pines for publication in the VA news about an article she published. She did not receive any response. She eventually spoke to someone in the public relations office, and was told that all publications had to be approved by the Chief of Staff.

90.    Prior to Lin's arrival, doctors in the Medicine Service were given 10 days of administrative absence (AA) for purposes of research and academic activities. Lin cut that amount down to 5 days for all doctors in the Service. Exh. A, Cote Depo. at 141:21 to 142:15.

91.    On July 6, 2005, Lin signed Cote's performance appraisal for the 2004 to 2005 rating cycle, rating her high satisfactory. Since Anderson was, at that time, the Acting Chief of the Pulmonary Section, he was instructed to issue Cote's appraisal by Human Resources. Anderson rated Cote high satisfactory for the 2004 to 2005 rating cycle. Exh. A, Cote Depo. at 61:15 to 66:21 & Depo. Exh. 7 & 8.

92.    On September 13, 2005, Cote contacted an EEO counselor. She signed a formal EEO complaint of discrimination on October 24, 2005, alleging discrimination on the basis of gender and retaliation for prior EEO activity. Exh. A, Cote Depo. at 26:20 to 28:2 & Depo. Exh. 2.

**2.    Cote's Prior EEO Complaints**

93.    Cote had filed four previous EEO complaints at Bay Pines. On September 12, 2004, she filed an EEO complaint against Van Buskirk for retaliation, which was settled through mediation. Prior to that, Cote filed an EEO complaint on August 19, 2002 and December 10, 2002, both of which alleged discrimination and retaliation against Dr. Kennedy, the Chief of Medicine prior to the arrive of Van Buskirk. Those

21

complaints were consolidated.  The result was a Final Agency Decision finding against any discrimination and retaliation, and Cote did not pursue that case further.  She also field an EEO complaint in 1989 alleging gender discrimination against the former Chief of Respiratory Therapy.  Exh. A, Cote Depo. at 29:1 to 37:18 & Depo. Exhs. 3, 4 & 5.

**E.**     **Roxanne Lainhart's Claims**

94.     On January 10, 2005, Lainhart became a program analyst in the Medicine Service.  Lin was the Chief of Medicine at that time, and he is the one who signed the selection certificate for Lainhart's hire.  Exh. D, Lainhart Depo. at 13:21 to 14:4.

95.     Several months later, the Administrative Officer ("AO") in the Service transferred out.  In early March 2005, Lainhart became the Acting AO of the Service.  Exh. D, Lainhart Depo. at 14:13-15.  Lin placed Lainhart in the Acting AO position.  Exh. D, Lainhart Depo. at 18:17-19; 20:1-6.

96.     Lainhart held dual positions, performing the AO work and the program analyst work until a new program analyst could be hired.  Mitra Ephramian was hired into that position in June 2006.  Exh. D, Lainhart Depo. at 20:11-13.

97.     In March 2006, Lainhart became the AO for the Medicine Service.  She was no longer acting.  Her pay level was a GS-11.  Exh. D, Lainhart Depo. at 22:8-16.

98.     The AO for the Medicine Service is considered the executive to the Chief.  The AO oversees the functions of the office, reports to the executive office at Bay Pines, assists the Chief of the Service with monitoring performance measures for the Service, conducts performance evaluations, responds to action item requests from the executive office, and helps with the budget.  Exh. D, Lainhart Depo. at 23:8-16.

99    In June of 2006, Mitra Ephramian was hired as the program analyst in medicine.  Exh. D, Lainhart Depo. at 20:11-13.

100.    On March 19, 2007, Lainhart became a program specialist in what is now the business office at Bay Pines.  This was a promotion from the AO position, increasing from a GS-11 to a GS-12.  Exh. D, Lainhart Depo. at 24:7-14.

101.    Lainhart contacted an EEO counselor on March 9, 2007 to complain about retaliation and discrimination by Lin.  Exh. D, Lainhart Depo. at 30:24 to 33:13.

Dated: January 12, 2009                          Respectfully submitted,

                                                 A. BRIAN ALBRITTON
                                                 United States Attorney

                              By:       /s/ Scott H. Park
                                        Scott H. Park
                                        Assistant U.S. Attorney
                                        Identifying No. USA084
                                        501 W. Church Street, Suite 300
                                        Orlando, Florida 32801
                                        Telephone: (407) 648-7500
                                        Facsimile:  (407) 648-7588
                                        Email: scott.park@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2009, I electronically filed the foregoing **STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT** with the Clerk of the Court by using the CM/ECF system, which will send notice of the filing to the following CM/ECF participant:

Joseph D. Magri, Esq.
Merkle & Magri
5415 Mariner, Suite 103
Tampa, FL 33609


_____/s/ Scott H. Park_____
Assistant United States Attorney