UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CLAUDIA G. COTE, M.D. CASE NO: 8:07-CV-1524-T-TBM
DIANE T. GOWSKI, M.D.
SALLY B. ZACHARIAH, M.D.
and ROXANNE LAINHART,

     Plaintiffs,

VS.                  Tampa, Florida
                     June 16, 2009
JAMES PEAKE, Secretary,     9:00 a.m.
DEPARTMENT OF VETERANS
AFFAIRS,

     Defendant.
_____/

VOLUME TWO
EXCERPT OF JURY TRIAL PROCEEDINGS
(Testimony of Roxanne Lainhart Bronner)
BEFORE THE HONORABLE THOMAS B. MCCOUN, III
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

Counsel for Plaintiff:   JOSEPH D. MAGRI, ESQUIRE
                WARD A. MEYTHALER, ESQUIRE
                Merkle & Magri, PA
                5415 Mariner Street
                Suite 103
                Tampa, Florida  33609
                (813)281-9000
                jmagri@merklemagri.com
                Wmeythaler@merklemagri.com

Counsel for Defendant:    SCOTT H. PARK, ESQUIRE
                U. S. Attorney's Office
                501 W. Church Street
                Orlando, Florida  32805
                (407)648-7500
                scott.park@usdoj.gov

CLAUDIA SPANGLER-FRY, OFFICIAL U. S. COURT REPORTER

1                          ERIK K. STEGEBY, ESQUIRE
                          U. S. Attorney's Office
2                          400 N. Tampa Street
                          Suite 3200
3                          Tampa, Florida  33602
                          (813)274-6303
4                          kenneth.stegeby@usdoj.gov

5                          JAMES J. KELLY, ESQUIRE
                          Senior Staff Attorney
6                          Department of Veterans Affairs
                          673-02 Building 32, Room 144
7                          13000 Bruce B. Downs Blvd.
                          Tampa, Florida  33612
8                          (813)910-4063

9     Court Reporter:         CLAUDIA SPANGLER-FRY, RPR, CM
                          Official Court Reporter
10                         801 North Florida Avenue
                          15th Floor
11                         Tampa, Florida  33602
                          (813)301-5575
12                         cookiefry@aol.com

13

14

15

16

17

18

19

20

21

22

23

24

25

1      EXCERPT OF PROCEEDINGS

2      June 16, 2009

3      * * * * * *

4      THE COURT:  All right.  Call your first

5  witness.

6      MR. MAGRI:  Roxanne Lainhart Bronner.

7      THE COURT:  Mr. Magri, we'll move that for you.

8  Someone could get hurt.

9      Okay, you can begin, Mr. Magri.

10  Thereupon,

11      ROXANNE LAINHART BRONNER,

12  having first been duly sworn to tell the truth, the whole

13  truth, and nothing but the truth, was examined and

14  testified as follows:

15      THE WITNESS:  Yes, I do.

16      THE CLERK:  Please take a seat in the witness

17  box.

18      Please state your name and spell your last for

19  the record.

20      THE WITNESS:  My name is Roxanne Lainhart,

21  L-A-I-N-H-A-R-T, and if you're going to add Bronner, it's

22  B-R-O-N-N-E-R.

23      DIRECT EXAMINATION

24  BY MR. MAGRI:

25  Q.   Good morning.

1  A.    Good morning.

2  Q.    I may, in this questioning, in fact, I'm almost

3  sure that I will, more often refer to you as Roxanne

4  Lainhart.

5  A.    That's fine.

6  Q.    As much as the exhibits and whatnot refer to you in

7  that fashion.  I apologize, but I think it might be less

8  confusing.  But what do you do?

9  A.    My current position is a program management analyst

10  for the Business Office Service.

11  Q.    And how long have you had that position?

12  A.    A little over a year, a year and two months.

13  Q.    All right.  Can you take us through your

14  background?  Tell us how you ended up coming into Bay

15  Pines and --

16  A.    Sure.  I attended the University of Kentucky for

17  about a year and a half, almost two years, and then

18  transferred over to LCC, which is Lexington Community

19  College, to complete my respiratory therapy program.  At

20  that time, it was a two-plus-two program with UK, which

21  would have meant I would have gotten a Bachelor's of

22  Science.  My second year, UK decided there were only

23  three of us that were going to be fulfilling this

24  two-plus two program, so they did away with it.

25        So I went ahead and started looking for other

1    scholarships, got a VA scholarship.  Upon my graduation

2    from Lexington Community College at the University of

3    Kentucky, I got employed at Bay Pines VA, had to have a

4    VA position as conditions of my VA scholarship, and

5    actually got hired in March of '95.  I didn't graduate

6    until May of '95, so they had to wait and I actually

7    started my position there May 15th of '95, as a research

8    coordinator.

9        Then, in August of '95, a respiratory therapist

10   position came available.  I was still doing research, but

11   was working in a respiratory therapy position as a

12   research coordinator.  I worked up until -- from '95

13   through January 10th, as a respiratory therapist at Bay

14   Pines VA Health Care System.

15       And then, through that time, I went ahead and went

16   back to school, completed my Bachelor's of Science, it

17   wasn't a BA, it was a Bachelor's of Science in health

18   care administration.  And then furthered my studies and

19   went to graduate school to where I earned my MBA and I

20   graduated with my MBA in May of 2004.

21   Q.    Were these programs that you took while you were

22   working?

23   A.    Yes, while I was working, they were at night after

24   work, usually from 6:00 to 10:00 p.m.

25   Q.    All right.  Now, after -- you say you got your MBA

1  when?

2  A.    May of 2004.

3  Q.    Okay.  And through that period, you'd been working

4  as a respiratory therapist?

5  A.    Yes.

6  Q.    Then what happened?

7  A.    Uh, from May of 2004, through really January, I was

8  starting to look for other jobs as part of what I was

9  considering a career advancement.  I had high aspirations

10 of moving up within the organization, and possibly moving

11 either into an associate director or maybe even becoming

12 a director somewhere.  But my goals were very high, so I

13 did start looking for management or administrative

14 positions, and around October, November of 2004, I

15 applied for the program analyst position in the Medicine

16 Service.

17 Q.    And you got that, right?

18 A.    Yes.

19 Q.    And when did you start that?

20 A.    I started in the Medicine Service January 10th of

21 2005.

22 Q.    All right.  And did you -- how long were you a

23 program analyst?

24 A.    All the way through till -- I was working a dual

25 role, but I was a program analyst from January of 2005

1  through June 26th of 2006, and even there some thereafter

2  because I worked with the program analyst.

3  Q.    And that's a GS what, what level?

4  A.    Well, the program analyst was supposed to be an 11,

5  but prior to that, Dr. Lin had come to me and stated that

6  the AO who was in the service at that time, for whatever

7  reasons, wanted it dropped down to what's an incline or a

8  target position, so it was actually posted as a 9, target

9  11, and he wanted to make sure I was still going to

10  apply.  And I did have some reservations and some

11  concerns because I wanted to move up, that was my next

12  goal, was to move up and to start the proceedings for

13  that.

14  Q.    Anyway, when you started, it was a 9 with a target

15  of an 11?

16  A.    With a target of an 11, yes.

17  Q.    Okay.  At some point, did -- you indicated that you

18  had a dual role.  At the time you started, you were just

19  a program analyst, right?

20  A.    Yes.

21  Q.    And what -- your duties were, just generally, don't

22  tell us all of them, just give a general idea of what

23  they are.

24  A.    As a program analyst, it's basically reviewing

25  statistical program management reports, running reports,

1    looking at data, data analysis, things like that.

2    Q.    Okay.  And at some point, did Dr. Lin give you

3    additional responsibilities?

4    A.    Yes, in March of '05, his AO was transferred out of

5    the service, and then I assumed the acting admin officer,

6    or AO position, in addition to my program analyst.

7    Q.    Okay.  And what changes in your duties did that

8    entail?

9    A.    That entailed supervising admin staff of about

10   eight to nine or 10 admin staff, in addition to the

11   didactic functions of the operations of the service.

12   Q.    All right.  And when you started -- you started

13   that, I think you indicated, in March of '05?

14   A.    March of '05.

15   Q.    And your GS at that point?

16   A.    Was still a 9.

17   Q.    Okay.  Did that change?

18   A.    It did not change until 2006.

19   Q.    Okay.  When in 2006, did it change and what did it

20   change to?

21   A.    It was -- it changed to a GS 11, as the target

22   indicated that it would, but it changed in March of 2006,

23   'cause I was appointed as the acting AO, so instead of

24   having it change in January, it changed in March.

25   Q.    All right.  Did you ever -- so you became the

1  accounting AO in March, did you -- of '05.  Did you ever

2  become the permanent AO?

3  A.    Yes.

4  Q.    When?

5  A.    March of '06.

6  Q.    And your GS was an 11?

7  A.    It was an 11.

8  Q.    All right.  Now, the previous AO, you said, had

9  transferred out?

10  A.    Correct.

11  Q.    And do you know why that was?

12  A.    There were some interoffice relation problems

13  between Dr. Lin and Mrs. Peggy Renner and she had made

14  some comments about Dr. Lin and he wasn't speaking to

15  her, she wasn't speaking to him unless there had to be

16  some type of communication.

17  Q.    What were those?

18  A.    She had made the comments of -- that were

19  slanderous about Dr. Lin, calling him Dr. Van Buskirk's

20  puppet.  There was another comment that she made that was

21  very racially motivated, he -- she actually called him "a

22  slant-eyed chink," and I did tell her at that point in

23  time that I did not appreciate hearing those types of

24  slanderous remarks, that he was our boss and please

25  refrain from that.

1  Q.    Okay.  Did you -- all right.  But in any event, she

2  left?

3  A.    Yes, she was transferred due to the inner workings

4  of Dr. Lin and Dr. Van Buskirk.  Dr. Lin did ask me and

5  the office staff to write up Reports of Contact on her.

6  Q.    All right.  And --

7  A.    So he could use it in -- to help get her

8  transferred.

9  Q.    Right.  And in -- did you believe that was

10  appropriate given what you had heard?

11  A.    Yes, given what I had heard, I wrote up what I had

12  heard and had given it to him.

13  Q.    Okay.  And other people on the staff did the same?

14  A.    One other person did.  The other person that was

15  asked, 'cause there was only two people in the office at

16  the time, did not feel comfortable writing it up, so --

17  the other person's name was Cindy Fusco.

18  Q.    That wrote it up?

19  A.    That wrote it up as well.

20  Q.    Okay.  Now, was Cindy Fusco a -- what was her

21  position?

22  A.    She was the executive secretary to Dr. Lin and

23  still is.

24  Q.    Okay.  And is she -- how long -- is she a long time

25  Federal employee?

1  A.   Yes, 30 plus years, I don't know the exact number,

2  but she's been there 30 plus years.

3  Q.   All right.  Over the years, have you had

4  conversations with her about her feelings about

5  derogatory remarks of the type that you have heard and

6  her position with regard to those kind of issues?

7  A.   Yes.

8  Q.   All right.  And was she a -- was she someone who

9  believed in the Federal policies and guidelines with

10  regard to that, then?

11  A.   Yes.

12  Q.   Now, you became permanent in March of '06?

13  A.   Correct.

14  Q.   How long did you hold that permanent position

15  and -- excuse me, let me just clear something up.  Is

16  there a point where you -- someone else became involved

17  with the program analyst slot?

18  A.   Yes, that was actually in -- it's a two-fold part,

19  April 17th, a Ms. Mitra Eframian had moved up, but she --

20  she had applied and was selected.  She did move up to our

21  service area, but she was still in her health systems

22  management training, so she was still working for the

23  Director and Dr. Van Buskirk in addition to being in our

24  service.  So she wasn't fully doing the program analyst

25  duties, she was doing some of them.  So I was still

1 having to do those roles in addition.

2 Q.     How long did that last?

3 A.     June 26th is when Ms. Eframian started as the

4 actual program analyst, so she was to resume duties.  I

5 did train her, and then we worked together as much as we

6 were supposed to work together at that time.

7 Q.     Okay.  Now, how long did you hold the position of

8 administrative officer?

9 A.     I was there in the Medicine Service as the AO until

10 March -- the official date was March 19th, but I did not

11 leave the service until March 23rd, because I had to

12 clear office and complete self appraisals.

13 Q.     Okay.  And where did you go?

14 A.     I had taken a position as a program specialist, it

15 was under the Information Resource Management Service,

16 but then got transferred under the Business Office

17 Service.

18 Q.     Okay.  Was Dr. -- did you talk with Dr. Lin about

19 doing that before it happened?

20 A.     No.

21 Q.     Is there a reason why?

22 A.     Yes.  Do you want me to elaborate?

23 Q.     What is it?

24 A.     The reason why is because he had already threatened

25 to push me out in September of '06.  The hostile

1  environment and the working conditions had progressively

2  gotten worse and he had, over this time period from

3  September through the time I had left, was making it very

4  difficult for me, and even offering me other jobs,

5  offering to wait panels for other jobs, slandering my

6  name to physicians within the facility, to the front

7  office, in addition to numerous of other things.

8  Q.    We'll get into a lot of those as we do, but with

9  regard to --

10  A.    Not telling him?  I just -- if I told him --

11        THE COURT:  Let him ask the question and then

12  you can answer it.  Go ahead.

13  BY MR. MAGRI:

14  Q.    Yeah.  I wanted to focus on why it is you didn't

15  tell.

16  A.    Okay.  I did not tell him because he told me to be

17  sure to inform him when I had applied for another job, so

18  that he would not grumble to the person who was calling

19  for my reference.  And I told him that he was not

20  permitted to say anything about me.  He could -- by HR

21  regulations, there was only certain things that he was

22  permitted to state.  And he told me just to be sure to

23  inform him when I did apply so that he would not slip up

24  and grumble about me.

25        So, at that point, I wasn't going to put him as a

1    reference, and I did on the application write, and I

2    highlighted on the application, "Please do not contact my

3    supervisor.  Contact me prior to contacting him."

4    Q.    Okay.  Now, the difficulties that had come up

5    that -- which caused Dr. Lin to tell you he was going to

6    push you out in September of '06, did he ever tell you --

7    give you an understanding of what those difficulties or

8    those things related to?

9    A.    Initially, no, but as time prevailed and when I

10   held that position, it was because I was too regulatory,

11   and I opposed -- and when I would advise and I would

12   challenge or oppose him on certain things that he was

13   either requesting of me or wanting to be done, that

14   alluded to him then taking the actions that I guess we'll

15   discuss.

16   Q.    Okay.  Well, what did those actions -- what subject

17   areas did those relate to, those things where he felt you

18   were too regulatory?

19   A.    Uh, following no fear, for one, having the

20   physicians -- of course, all the physicians --

21          THE COURT:  What is no fear?

22          THE WITNESS:  There is no fear.

23          THE COURT:  What is no fear?

24          THE WITNESS:  I'm sorry, I misunderstood.  No

25   fear is the No Fear Act and it basically states that any

1  employee who raises concerns or issues over any work

2  place concerns, or any type of whistle blowing, shall not

3  have any type of retaliation, including EEOs, there

4  should not be any retaliation against them.

5  BY MR. MAGRI:

6  Q.    Okay.

7  A.    So, all employees have to sign this, that they have

8  read and understood this.

9  Q.    All right.  When you say "EEOs," you're referring

10  to equal opportunity complaints?

11  A.    Correct.

12  Q.    Complaints?

13  A.    Yes.

14  Q.    And those relate to this Title VII discrimination

15  that we've heard talked about; is that correct?

16  A.    Yes.

17  Q.    Or to retaliation?

18  A.    Correct.

19  Q.    Now, did you ever ensure that Dr. Lin signed one of

20  those forms?

21  A.    Yes, I had to actually give him the form and he

22  signed it, and then I had to send it down to the front

23  office so that they had it in their file.

24  Q.    All right.  Now, with regard to EEOs, I think I --

25  and no fear, I think I kind of interrupted you when you

1 mentioned "no fear."  You were telling us the subject

2 areas that caused Dr. Lin to turn on you and you started

3 off by mentioning "no fear."  I think I interrupted you,

4 so could you continue to tell us if there's something

5 else?

6 A.    The subject areas would vary from -- initially

7 started out with just inquiring about employees, which I

8 didn't think too much about because he was a new

9 supervisor, he had already informed me he was new with

10 little management experience, and he was asking about

11 employees and I didn't really think too much about it.

12 But the employees he was asking about were the ones who

13 had prior EEO complaints.

14 Q.    Okay.  With regard to EEOs, when did you first hear

15 management talking about EEOs and how they were going to

16 approach them?

17        THE COURT:  Can we be more specific than

18 "management"?  Identify who we're talking about, please.

19 BY MR. MAGRI:

20 Q.    Okay.  When did you -- who is the first management

21 person that you recall hearing speak about them?

22 A.    With the new management that came on approximately

23 four to five years ago, it was the Hospital Director,

24 Mr. Wallace Hopkins, and I believe it was at the town

25 hall meetings that he had where he wants to introduce

1    himself to --

2         THE COURT:  Give me the people's names here, at

3    this point, ma'am.  When you say "management," I'm trying

4    to identify who you are talking about.  That's important

5    the me.  Mr. Hopkins and who else?  The question was, who

6    in management was talking about EEOs.  I want to know who

7    you were talking about before we go into that.

8         THE WITNESS:  Oh, he had asked me who the first

9    person was, so it was Mr. Wallace Hopkins.  Do you want

10   me to go into the others or -- Dr. Lin had also spoken to

11   me about it, Dr. Van Buskirk, who did not look highly

12   upon people who had filed EEOs, and that he would take

13   actions to deter them and retaliate against them and ruin

14   their reputations.

15   BY MR. MAGRI:

16   Q.   That was for the purpose of deterring EEOs?

17   A.   Correct.

18   Q.   Now, with regard to Mr. Hopkins, you mentioned that

19   he made some remarks at a public gathering.  What were

20   they?

21   A.   He gave a lot of remarks, but the one that

22   references the EEO was that he had stated that the

23   facility had a lot of EEO complaints, and that he was

24   wanting to fully get rid of all the EEOs, especially the

25   frivolous ones, and they were not going to settle them.

1    Q.    Did you have -- when did you begin to have

2    conversations with Dr. Lin about EEOs?

3    A.    It was about approximately spring to early summer

4    of '05.  The first comment that Dr. Lin had made was in

5    regards to Dr. Cote, and he had said that she was

6    problematic to the facility because she had an EEO case

7    and that we needed to start reducing her clinics.  It had

8    nothing to do with what the IG findings were, that was

9    separate and it had nothing to do with the Advanced

10   Clinic Access at that point.

11   Q.    Okay.  Are you familiar with Advanced Clinic Access

12   in those initiatives?

13   A.    I do have some knowledge, I'm not by far means an

14   expert on it, but yes.  At that time, it was only being

15   implemented in the primary care setting, it was not being

16   implemented anywhere in the Medicine Service at that

17   time.

18   Q.    Okay.  Now, you've -- with regard to Dr. Cote,

19   Dr. Lin wanted what to happen?

20   A.    He wanted to reduce the number of clinic slots

21   available in her COPD clinics, and so he asked me to look

22   into that and to start reducing.

23   Q.    Did you explain to him -- you had been a

24   respiratory therapist, correct?

25   A.    Correct.

1  Q.    Were you familiar with Dr. Cote's practice?

2  A.    Yes, I worked very closely with all the

3  pulmonologists and especially Dr. Cote and she has a very

4  successful COPD clinic, she sees the sickest of the COPD

5  patients.  And she does do research, which I know is part

6  of the issue that was being brought up, but the IG had

7  stated that there was a -- could be a confusion of --

8  between the delineation of the actual clinics set up for

9  veterans and the actual clinics that were set up for

10  research patients.

11      Dr. Cote's patients, a lot of them were in her

12  research.  So, I could see where there might be some

13  confusion created, but those patients were scheduled into

14  the research clinic.  I think it was called the 5-D Cote

15  Research.  She did have her own COPD clinic, so if one of

16  her research patients who might not have been scheduled

17  in her 5-D COPD clinic came in who needed to see her,

18  because these patients typically, as Mr. Park has stated

19  and I think you have stated as well --

20  Q.    Well, what Mr. Park says is not evidence.

21  A.    No, no, I'm just saying --

22          THE COURT:  This is how we're going to do it.

23  One person speaks at a time.  Do me a favor.  Listen

24  closely.  This trial is going to last long enough without

25  us unduly extending it.  Listen carefully to his question

1   and try to answer just the question.  He'll come with

2   another question, I promise you.  So just answer what he

3   asks you, if you would, and that will speed this up a

4   little bit.  But don't talk over each other, please.

5            THE WITNESS:  Okay.

6            THE COURT:  When you do --

7   BY MR. MAGRI:

8   Q.    Mr. Park gets a chance to put his evidence in and

9   we'll await that.  But the thing is, so, from your

10  standpoint, just respond to the case -- the questions

11  based on your historical knowledge.

12       Now, with regard to Dr. Cote, did you explain to

13  Dr. Lin what you understood of her practice, et cetera?

14  A.    Yes, I did.  I explained that I had a concern that

15  if we reduced her clinics as far as he was wanting to

16  reduce them, that -- my concern was that the veterans who

17  needed to get in to see Dr. Cote would not have the

18  opportunity.

19  Q.    All right.  Now, you indicated that one of the

20  first times you heard a direct expression about EEOs was

21  in relation to Dr. Cote and reducing her clinic, and I

22  think you've told us that, correct?

23  A.    Correct.

24  Q.    During that -- this approximate period of time, was

25  he asking you questions about any other employees that

1  had EEOs?

2  A.    Yes.

3  Q.    Tell us about that.

4  A.    As I stated, he was just asking, being a new

5  director, about employees and those names were, outside

6  of Dr. Cote, they were Dr. Durr, Dr. Zachariah,

7  Dr. Carranza, who had filed from previous, and he was

8  just collecting, just speaking to me about, you know,

9  issues.

10      Like with Dr. Durr, his concern was, what do you

11  know about the computer incident?  I wouldn't think

12  anything about it.  I would just tell him what I knew.

13  He wanted to know how he was disciplined.  I wasn't for

14  sure of the complete disciplinary action because I wasn't

15  in the Medicine Service, but I had known that some form

16  of discipline had taken place.

17      With Dr. Cote, he was asking about the IG and the

18  research.  With Dr. Carranza, he was wanting to know,

19  again, what type of physician, why he took on the prior

20  administration, those types of things.

21  Q.    Okay.  Now, did there come a time when these

22  conversations progressed with him?  Well, let me

23  specifically turn.

24      During that '05 period, that early summer '05

25  period, was there any conversations you had with him

1  concerning Dr. Gowski in any way, shape or form,

2  regardless of whether it is EEO or not?

3  A.    Yes, there was a concern that was brought up

4  regarding her pro-life views in the ICU, that had taken

5  place over the weekend.

6  Q.    Tell us about that, but start off by telling us

7  where you were, who was present, and then what was

8  discussed.

9  A.    Okay.  Dr. Lin had just been in morning meeting.

10  Q.    What is a morning meeting?

11  A.    The morning meeting is he meets with Dr. Van

12  Buskirk, as well as the four other main service chiefs.

13  Q.    Who are they?

14  A.    The four others are Dr. Frutchey, Dr. Wright,

15  Dr. Atkinson and Dr. Thuriere and Dr. Lin is the last.

16  Q.    Okay.  All right.  So, Dr. Lin --

17  A.    He comes up, he calls for Patel to come down to the

18  office and then he calls me into the office, and he

19  states that he just got out of morning report and that

20  Dr. Van Buskirk is upset, that Dr. Frutchey had spoken to

21  him, and Dr. Frutchey was upset with Dr. Gowski because

22  he, at that time, had felt that she went against a DNR

23  order and prolonged a patient's wishes by altering the

24  wife's views.

25      Dr. Van Buskirk requested that Dr. Lin speak with

1  Dr. Frutchey, which Dr. Lin did.  He got Dr. Frutchey on

2  the phone and Dr. Frutchey stated that he wanted

3  Dr. Gowski removed from the ICU on the basis of her

4  pro-life views and pushing them onto the wife.

5  Q.    How do you know that?

6  A.    'Cause I was in the room.

7  Q.    And?

8  A.    As well as Dr. Patel and Dr. Lin.

9  Q.    And was Dr. Frutchey in the room or was he --

10 A.    No, no, he on the phone.

11 Q.    Okay.  And did -- was -- did -- well, how do you

12 know what Frutchey said, was it on speaker phone?

13 A.    It was on speaker.

14 Q.    All right.  So, there was the reference to her

15 pro-life views and not carrying out some patient's

16 wishes?

17 A.    Correct.

18 Q.    And for those reasons, he wanted what?

19 A.    Dr. Gowski, Dr. Gowski to be removed from the ICU.

20 Q.    Okay.  So, then what happened?

21        THE COURT:  Let me interject here.  Ma'am, tell

22 me, you may have said this and I missed it, but this is

23 important to me, also, what date, when is this happening?

24        THE WITNESS:  It's around the summer of '05, I

25 want to say around July of '05.

1      THE COURT:  Around July of '05, when this

2  conversation takes place?

3      THE WITNESS:  Yes.

4      THE COURT:  Okay.  Thank you.

5      THE WITNESS:  You're welcome.

6  BY MR. MAGRI:

7  Q.    Okay.  What happens next, after the -- is there a

8  discussion after the -- does the phone call end?

9  A.    The phone call ends.

10  Q.    Anything else relating to this that was discussed?

11  A.    That was pretty much the premise of the discussion.

12  Dr. Lin then orders Dr. Patel to remove Dr. --

13  Q.    That's it, that's the next question.  So, what

14  happens then, after the call ends?

15  A.    Okay.  Dr. Lin orders Dr. Patel to remove

16  Dr. Gowski from the ICU.

17  Q.    Okay.  And what did Dr. Patel say?

18  A.    He said, okay, he was going to do that, and he

19  would look at -- look at a rotation basis of rotating the

20  hospitalists down through the ICU.

21  Q.    Okay.  Now, did anything further happen in that

22  meeting?

23  A.    There were discussions between Dr. Lin and

24  Dr. Patel voicing their views on Dr. Gowski being too

25  pro-life, and Dr. Lin had asked me to go downstairs and

1  solicit Reports of Contact from the nurses and/or

2  physicians who might have been working down there.

3  Q.    To document what?

4  A.    To document that she had gone against the patient's

5  advance directive.

6  Q.    All right.  Now, did you have any discussion with

7  them -- well, let me step back.  You indicated that they

8  were voicing their opinions about Dr. Gowski being too

9  pro-life?

10  A.    Right.

11  Q.    What were they saying?

12  A.    That she was too pro-life, she was imposing her

13  views onto patients.  And I did speak up and state that I

14  had worked with Dr. Gowski, and in working with her in

15  the past, I had never seen her impose any of her views,

16  you know, whether it be pro-life or pro-choice or not for

17  life, whatever her views were.  I had never seen her do

18  that, she very much cared for the patient and wanted to

19  do everything that was best for that patient.

20       So, I did not understand where they were coming

21  across saying that she was imposing the pro-life views

22  because they hadn't even done an investigation.  They

23  didn't speak with Dr. Gowski about any of this.  So

24  they're taking a physician's word and then, instead of

25  speaking to the employee, they're moving forward with

1  taking action and then having me follow up with the

2  investigation, which I did.

3  Q.    What was -- what was your investigation?

4  A.    That it was not true.

5  Q.    No, that was the -- what did you do for the

6  investigation?

7  A.    I'm sorry.  I thought you wanted to know what the

8  findings of it were.  I had to go down to the ICU and

9  speak to the nurses and the physicians, and I did look in

10  CPRS at the patient's chart, could not find anything that

11  was out of the ordinary, spoke to a couple of the

12  physicians who were also taking care of that patient, as

13  well as the nurses, could not get any ROCs.  There wasn't

14  a reason to have a Report of Contact.

15      I came back upstairs, informed Dr. Lin, and he

16  instructed me again to go back down and get the ROCs.

17  So, I did challenge him at that point, 'cause I already

18  had looked at the patient's chart, I had presented the

19  information to him, but there really wasn't anything.

20  The attending on record was even stating that there was

21  not anything.  He ordered me, so I did, I went back

22  downstairs and talked to the nurses and, at that point,

23  was not able to get anyone to write anything against

24  Dr. Gowski.

25      Regardless of what they thought of her, they did

1  not write any ROCs pertaining to that particular instance

2  because it didn't occur.  There wasn't any documentation

3  of it.  And then come to find out a few days later -- I

4  did go back up to Dr. Lin and tell him that.  Let me

5  backtrack.  I did go upstairs and tell Dr. Lin, and

6  that's when he ordered Dr. Patel to go down.

7  Q.    What did he -- I want to come back to him ordering

8  Dr. Patel down there, but I want to address something

9  that you mentioned there and that deals with -- you

10 mentioned something about despite problems Dr. Gowski had

11 had with the nurses.  Based on your experience with

12 Dr. Gowski in the past, what can you tell us about

13 Dr. Gowski's cares, concerns and interactions with people

14 concerning the patients or the work environment?

15 A.    Dr. Gowski is very thorough, in working with her in

16 the past from a clinical perspective.  She does order

17 tests, she will stay late and check and follow up on her

18 patients.  So, a lot of times, the nursing staff, if it

19 means extra work -- even from a respiratory standpoint,

20 if it meant extra work, they may not like it, but we

21 still had to ultimately do it.

22      So, because Dr. Gowski would stay late and follow

23 up and make sure and either call the therapist to make

24 sure that this ABG was done, or follow up on her ABG

25 reports, or follow up with nursing with labs, or the

1  nurse for the -- to make sure that the CTs had been done,

2  there begins this brewing of -- it's this creation of

3  extra work.

4      They don't understand why she's staying late, but

5  the reason she's staying late is because she's actually

6  one of the ones that truly -- not that the others aren't,

7  but she's truly concerned about her patients and she

8  follows up on every one of her patients, and I don't have

9  anything bad to say about her as far as her patient care.

10  Q.    All right.  Now, so you're in the meeting and

11  you've told Dr. Lin for the second time now that you

12  can't get any Reports of Contact and you can't find any

13  evidence that she failed to follow an event that's

14  directive, correct?

15  A.    Correct.

16  Q.    So he now orders Dr. Patel to go down?

17  A.    Yes.

18  Q.    What did he say?  How did that happen?  Tell us

19  about it.

20  A.    He said, Patel, go down to the unit and speak to

21  the nurses and see if you can get the ROCs, and so

22  Dr. Patel said okay.  Now, I don't know whether he

23  collected any, I didn't follow up with him to find out,

24  but while he --

25  Q.    Have you ever seen any?

1   A.    No, I've never seen any.

2   Q.    Now, you started to say -- did you have any

3   conversation with Dr. Lin about Dr. Patel?

4   A.    Yes, I have.

5   Q.    And what was that?

6   A.    There's been a couple conversations, but on that

7   particular day, I did tell Dr. Lin just to be cautious of

8   who he trusts in Patel.  There were already starting to

9   be rumors that Dr. Patel was becoming and -- was becoming

10  a mole and that I told Dr. Lin that he would be -- I

11  called him a scoundrel and -- I did call Dr. Patel a

12  scoundrel and that just to be careful 'cause as he's

13  working with you, he will walk you to the water and

14  before you know it, your head would be in the guillotine

15  and off.

16      Dr. Lin stated that he knew that Dr. Patel was a

17  scoundrel, that he was going to use him to basically

18  disseminate information or to gather information as he

19  deemed necessary.  And he knew that he was being termed

20  "the mole" and he was going to use him as a mole.  He

21  said that at any time that he wanted Dr. Patel removed,

22  that he could ask him and Dr. Patel would step down.

23  Q.    Okay.  All right.  Now, you indicated that there

24  was this effort to get you to do Reports of Contact.  Did

25  you ever hear from Dr. Lin about Dr. Frutchey's position

1  on this again?

2  A.   Yes, it was --

3  Q.   Tell us about that and tell us when, who was

4  present and what was discussed.

5  A.   It was a couple days later, within a few days to a

6  week, I was called back into the office with Dr. Lin and

7  Dr. Patel was in there.  Dr. Patel was in his office

8  every day just after morning reports, and he had

9  mentioned that Dr. Frutchey -- he just had come up from

10  morning reports and that Dr. Frutchey had found -- had

11  basically found out that what was initially deemed that

12  she had gone against the DNR was not true, that she did

13  everything that she was supposed to do, that she did not

14  try to persuade the wife and family.

15      In fact, there were other physicians working on

16  this gentleman as well, and that the wife had her own

17  concerns about removing the patient and so, it wasn't

18  Dr. Gowski that was pushing any of that.

19  Q.   Okay.  Now -- so did that change the decision?  Did

20  Dr. Gowski get to continue to work in an area of her

21  training?

22  A.   No.

23  Q.   Okay.  Now, in -- did you have an understanding,

24  based on these conversations, as to why she didn't get to

25  stay?

1  A.    The understanding was that they did not care,

2  "they" being Dr. Lin and Dr. Patel, because they had

3  voiced it.  They did not care for Dr. Gowski, they stated

4  that on several occasions, and they were going to get her

5  removed from the ICU at that point and they weren't going

6  to put her back in.

7  Q.    When you say they didn't care, did that relate in

8  any way to her pro-life views?

9  A.    Yes, they did talk about her pro-life views.

10  Q.    Did they express any hostility to her pro-life

11  views?

12  A.    There was an animus toward it, because I remember

13  having a discussion, and you have to understand that

14  these discussions were going on that entire week, that

15  when they were discussing Dr. Gowski's pro-life view, at

16  this point, I raised my belief because I was concerned

17  that they were missing the point, you know, that it

18  wasn't that she was pro-life, it's just she was doing her

19  job.

20      And I said, look, I'm Catholic, I'm a Christian, I

21  don't go around imposing my views, and that shocked

22  Dr. Lin.  He said, I didn't know you were that religious,

23  and I said, well, yes, but it doesn't make me pro-life or

24  pro-choice or -- I just don't go around imposing things

25  on people.

1    So, her doing her job should be just her doing her

2  job, and I said she is an intensivist, that she was

3  trained to work in the intensive care unit.  I'm trying

4  to understand why she wasn't going back down.  Their

5  views were she was not going to be put back down based

6  upon her pro-life views, and that they had already made

7  the decision and a decision that she was going to be

8  removed from the ICU, and they would start a rotation

9  schedule which Dr. Patel was going to work on.

10 Q.    All right.  Now, when Dr. Lin came up after the

11 morning meeting and it was determined that Dr. Frutchey

12 found that Dr. Gowski no longer -- or that he was

13 inaccurate when he had said she failed to follow the

14 advance directives of a patient -- by the way, is there a

15 difference -- let me step off of that.  As we throw these

16 terms around, I want to make sure that we understand

17 them.

18    Is there a difference between a DNR and an advance

19 directive, if you know?

20 A.    Yes, I do know and, yes, there is a difference,

21 Q.    Okay.  What is that?

22 A.    A DNR is the explicit wishes of the patient in the

23 event that his or her breathing should stop and/or heart

24 should stop, that he or she wishes not to be

25 resuscitated.  An advance directive contains the patient

1  wishes as they go along, if they want nutritional

2  support.  The DNR can be incorporated in that advance

3  directive, and if it is, it will either say yes or no, or

4  DNR, no DNR, but it is a part of that advance directive.

5      So, we really follow what the patients want,

6  especially at the VA, we really follow what the veterans

7  want.  Does that help clarify a little bit?

8  Q.    Okay.  But if there's a DNR, that's an actual order

9  that is in the file?

10  A.    That is an order, yes.

11  Q.    Whereas the advance directive, is that -- that's

12  not an order in the file, correct?

13  A.    It is in the patient's chart, that there's an

14  advance directive, it's like a little flag for advance

15  directive on file that you can click on, but the DNR

16  order is an actual order.

17  Q.    One has to read the advance directive to see what

18  the specifics of it are?

19  A.    Correct.

20  Q.    Okay.  Now, the -- so, after Dr. Lin comes up and

21  tells you that Dr. Frutchey has discovered that she

22  didn't fail to follow an advance directive, did he

23  indicate that Frutchey or Van Buskirk had changed their

24  position with regard to Dr. Gowski's staying in MICU?

25  A.    No, he didn't state that Dr. Van Buskirk --

1  Q.    Did he state anything about that or did he just --

2  A.    No, not to my recollection.

3  Q.    Okay.

4  A.    I can't recall at this point.

5  Q.    All right.  Now, based on your dealings with

6  Dr. Lin and the things that he does, does Dr. Lin -- has

7  Dr. Lin expressed to you his belief about his

8  relationship to Dr. Van Buskirk in terms of what needs to

9  be done?

10  A.    Yes.

11  Q.    Okay.  I can tell that I -- that wasn't -- I was

12  trying not to be leading.

13          THE COURT:  Are you finished with the matter of

14  Dr. Gowski on this instance?

15          MR. MAGRI:  For this instance I am.

16          THE COURT:  Okay.  Let's go ahead and break now

17  for lunch then.  Ladies and gentlemen, we'll stand down

18  for lunch now until 1:30.  Thank you very much.

19          (Jury out at 12:20 p.m.)

20          Do either side wish to have the rule invoked?

21          MR. MAGRI:  Yes.

22          THE COURT:  We've got so many witnesses and I'm

23  not familiar with any of them.  I'm going to leave it up

24  to the lawyers to advise the witnesses not to discuss the

25  cases among themselves until it's over, so please do so.

1    Keep them out of the Courtroom, if you would.

2          All right, we'll stand down till 1:30.  Thank

3    you.

4          (Thereupon, a luncheon recess was taken.)

5          All right.  Thank you, sir.  Ready to proceed?

6          MR. MAGRI:  Yeah, pretty much.  One thing, Your

7    Honor.  We have some exhibits that I think I might as

8    well offer -- not offer, introduce now.  I don't think

9    there's an objection to them.

10          THE COURT:  Mr. Meythaler?

11          MR. MAGRI:  Well, at least there wasn't one

12    sent over to us.

13          THE COURT:  Why don't you just identify what

14    we're talking about here and then see if we can agree on

15    them.

16          MR. MEYTHALER:  All right.  It's Exhibits 5 --

17          THE COURT:  These are Plaintiffs' Number 5?

18          MR. MEYTHALER:  Plaintiffs' 5, 6, 9, 11, 12,

19    13, 14, 40, 45 -- I'm sorry, not 45 -- 46, 47, 48, 49,

20    57, 81 -- 80, then 81, 82, 83, 84, 85, 86, 89, 93, 94,

21    95, 105, 106, 113-A, 113-B, 117, 118, 119, 120, 120-A,

22    121-A, 129, 137, 140, 150, 153, 154, 163, 165, 166, 167,

23    168, 204-A, 204-B, 204-C, and the last one, which is not

24    on the list, is 648.

25          THE COURT:  648?

1          MR. MEYTHALER:  Yes.

2          MR. MAGRI:  That's an exhibit that was admitted

3 during the deposition of a Dr. Vandormael, and I think

4 the -- I'm being facetious when I say this, but there was

5 probably two hours of cross-examination on it.

6          But it's a memo she wrote to Dr. Van Buskirk

7 that relates to Dr. Vandormael, and so it's going to come

8 in with his depo, and we have just given it the number of

9 648.

10          THE COURT:  Go back to your list.  You said 49,

11 and then was it 57 or 67?

12          MR. MEYTHALER:  After 49, it was 57.

13          THE COURT:  All right.  What does the Secretary

14 say about these?

15          MR. PARK:  I was just checking one thing, Your

16 Honor.  I think that is fine.

17          THE COURT:  Including this last 648 memo?

18          MR. PARK:  Yes, Your Honor.

19          THE COURT:  All right.  They'll be admitted.

20          (Thereupon, Plaintiffs' Exhibits 5, 6, 9, 11,

21          12, 13, 14, 40, 46, 47, 48, 49, 57, 80, 81, 82,

22          83, 84, 85, 86, 89, 93, 94, 95, 105, 106,

23          113-A, 113-B, 117, 118, 119, 120, 120-A, 121-A,

24          129, 137, 140, 150, 153, 154, 163, 165, 166,

25          167, 168, 204-A, 204-B, 204-C, 648 were so

1    designated for EVIDENCE.)

2    Let's bring the jury back.

3    (Jury in at 1:43 p.m.)

4    Ladies and gentlemen, I've just, in your

5  absence, admitted a number of exhibits that may be shown

6  to you over the course of the trial.  They were admitted

7  without objection by the Secretary, so rather than go

8  through that with your -- in your presence, we did it

9  outside of that.  But there are a number of exhibits now

10  that have been introduced.

11    All right, let's proceed, Mr. Magri.

12    MR. MAGRI:  Thank you, Your Honor.

13  BY MR. MAGRI:

14  Q.    Good afternoon.

15  A.    Hello.  Can you hear me?  Okay.  I wanted to make

16  sure that -- people were concerned that they couldn't

17  hear me, so I wanted to make sure that this is working

18  now.

19  Q.    I can hear you better.  Can you hear me?

20  A.    Yes.

21  Q.    Good.  Okay.  When we broke, I believe we were --

22  we had just gone past the Dr. Gowski incident where she

23  was initially -- where she was removed, the decision was

24  made to remove her.

25    After that, were there any meetings that involved

1 | other doctors, cardiologists or pulmonologists or --

2 | A.    Meetings with -- in regards to Dr. Lin?

3 | Q.    Well, just tell us what meetings you understand

4 | took place, that's all.  That's what I'm -- I'm trying

5 | to -- what meetings do you have an understanding took

6 | place, if any?

7 |        THE COURT:  Why don't you lead her a little bit

8 | into where it is you --

9 | BY MR. MAGRI:

10 | Q.    Okay.  After Dr. Gowski -- it became announced that

11 | Dr. Gowski was going to be removed, were there meetings

12 | where the cardiologists and pulmonologists stated they

13 | had objections?

14 | A.    Oh, yes.  Once the cardiologists and the

15 | pulmonologists had found out that Dr. Gowski was going to

16 | be removed from assisting them in the ICU, then

17 | collaboratively they did try to discuss it with Dr. Lin

18 | and had written memos, and I think even the

19 | cardiologists -- I can't answer for the pulmonologists,

20 | but I know that the cardiologists had even tried to speak

21 | to Dr. Van Buskirk and Mr. Hopkins about her removal.

22 | Q.    Okay.  Were they trying to get her back?

23 | A.    Yes, they were trying to get her back.

24 | Q.    All right.  Did Dr. Lin say anything to you about

25 | those meetings?

1  A.    No, he didn't state anything to me about those

2  meetings.

3  Q.    All right.  Now, with regard to that period of

4  time, and I believe we're in the summerish -- part of the

5  summer of '05, what else happened, or what happened next

6  based -- let me just step back here.

7      There's many things that happened throughout this

8  period of time; is that correct?

9  A.    That is correct.

10  Q.    And the -- many of them are happening

11  simultaneously involving different people, right?

12  A.    Correct.

13  Q.    What I'm going to try to do nonetheless is ask you

14  what happened next, and you tell me as best you can what

15  event you think is next, and hopefully, through this

16  process, we'll cover them.  Okay?  So, what happened

17  next?

18  A.    Well, in regards to Dr. Gowski, she had presented a

19  Catholic Medical Association seminar, conference to

20  attend, and I was called into the office, Dr. Lin --

21  actually into Dr. Lin's office and Dr. Lin and Dr. Patel

22  was discussing the attendance, of whether Dr. Gowski

23  should be permitted to attend this.

24      The discussion went that, based on her -- based on

25  the Catholic being mentioned on the actual conference

1  itinerary, that they thought this would be assisting her

2  in her pro-life views and it was denied.

3  Q.    Had the conference been approved for credits by the

4  American Medical Board or whatever that board is?

5  A.    Yes.  I was given the pamphlet to look at and I

6  reviewed it.  It did discuss they were going to be

7  discussing end-of-life issues, there were probably going

8  to be some decisions, I'm sure, related to religious --

9         THE COURT:  Ma'am, let's try to stick with what

10  you do know and the facts.  Okay?  Don't speculate on

11  what it may have involved.

12         THE WITNESS:  Okay.

13  BY MR. MAGRI:

14  Q.    All right.  So, with regard to the -- what you do

15  know is, you know that there had been an approval of it

16  for continuing education credits?

17  A.    Yes.

18  Q.    Is the -- but it was objected to by Dr. Lin and

19  Dr. Patel?

20  A.    And Dr. Patel.

21  Q.    And the basis for that was?

22  A.    In support of her religious views.

23  Q.    Okay.  Did they have any discussion about that

24  wherein they commented on her views?

25  A.    They had mocked her views, some being jovial, just

1  making jovial comments, and again, I raised the issue

2  that I didn't think it was appropriate, that her views

3  were her views and this really had nothing to do with her

4  attending this conference, but my view was just

5  dismissed, so...

6  Q.    All right.  What happened next as it pertains to

7  these EEO matters?  Were you asked to get involved in any

8  others at that point in '05?

9  A.    Well, there was a couple.  Dr. Zachariah I was

10  aware of.  I was also asked to assist with Dr. Lynn

11  Anderson's, his was actually being settled in August of

12  '05.  I was asked to assist him in finding a management

13  program to attend.  He was placed on a one-year

14  probationary period and was appointed as the Section

15  Chief of Pulmonary.  So, Dr. Lin requested that I assist

16  him in trying to improve his management skills.

17  Q.    Okay.  Did he feel he was deficient in management

18  skills?

19  A.    Yes, he did, he and Dr. Van Buskirk both did.

20  Q.    What did they say about that?

21  A.    Through Dr. Lin, that -- Dr. Lin relayed that

22  Dr. Anderson was a poor manager and that he needed to

23  have his management skills worked on, so he wanted me to

24  work with him.

25  Q.    So, in other words, without -- unless -- you were

1  being told that unless he took a course on management

2  skills, he wasn't qualified, in their view, to be the

3  manager of Pulmonary?

4  A.    Well, the answer to that is, I was just told that I

5  was to assist him in finding a management program to

6  attend.  I don't know if that was part of their

7  settlement or not.

8  Q.    Okay.  Now, with -- are you familiar with a

9  doctor -- with cases involving a Dr. David Johnson or Pam

10 Trimble, Pamela Trimble?

11 A.    Yes, in regards to Dr. Johnson --

12        THE COURT:  Let me interject.  The answer to

13 that question was yes.  Do you have another question?

14 BY MR. MAGRI:

15 Q.    Yes.  Who was Dr. David Johnson?

16 A.    Dr. David Johnson is the Section Chief for the

17 Infectious Disease Section.

18 Q.    Okay.  And what did -- what did -- what did Lin ask

19 you about in relation to Dr. Johnson?

20 A.    Just pulling client profiles, looking at his

21 profiles

22 Q.    What's that about?  What do you mean when you say

23 that?

24 A.    That I have to go into his actual clinics and look

25 to see how many patients are scheduled to make sure that

1    he is busy, that patients are being seen, that there

2    aren't any open slots, things like that.

3    Q.    Wait a minute.  What is Advanced Clinic Access, if

4    you know?

5    A.    As I stated before, I just have a very brief view

6    on it, but Advanced Clinic Access is -- it's a creation

7    of virtual clinics so that patients, when they're seen,

8    then they can be scheduled and they're put in this

9    virtual clinic, that they get notified in the mail, they

10    get called, and the veteran is supposed to call back to

11    actually schedule his appointment, or his or her

12    appointment, I should say.

13    Q.    Well, these virtual clinics are just one aspect of

14    Advanced Clinic Access, right?

15    A.    I think so.

16    Q.    But the virtual clinics you're talking about, what

17    is that -- what is a virtual clinic?

18    A.    I don't -- I didn't have to work with the virtual

19    clinics too much so…

20    Q.    Okay.  So, do you know if it had anything to do

21    with wait lists?

22            THE COURT:  Counsel, she has answered the

23    question.  Wait till you get a better witness to explain

24    that.  Let's move on.

25    BY MR. MAGRI:

1    Q.    Okay.  Now, with regard to Dr. Johnson, do you know

2    from your conversations with Dr. Lin if this -- if he was

3    looking at Dr. Johnson's clinic profiles to improve the

4    efficiency of -- he was in charge of Infectious Disease;

5    isn't that correct?

6    A.    Correct.

7    Q.    Was this part of some effort to improve the

8    efficiency of Infectious Disease?

9    A.    He never -- Dr. Lin never relayed that to me.  He

10   did relay that Dr. Johnson had filed an EEO against him,

11   and we were looking at the clinics.  He wanted me to

12   start looking at the clinics.

13   Q.    Is that something he did with other people who had

14   filed EEOs?

15   A.    Yes.

16   Q.    And what would this course take?  What would

17   happen?

18   A.    Depending on the situation, he would look to make

19   sure that their -- that they are filled, and sometimes if

20   they weren't, he would rearrange the clinic so that there

21   would be more patient access to it, or if there was too

22   much, there was a backlog, then he would look at

23   increasing the size.

24   Q.    Did he criticize the doctors if they had problems

25   in those areas?

1  A.    Uh, sometimes, yes.

2  Q.    Did the doctors ever complain about what he was

3  doing to you?

4         MR. PARK:  Objection, calls for hearsay.

5         THE COURT:  Sustained.

6  BY MR. MAGRI:

7  Q.    Did -- you mentioned Pamela -- do you know where

8  Dr. Johnson went to medical school, by the way?

9  A.    No, I don't.

10  Q.    With regard to Pamela Trimble, did she have an EEO?

11  A.    Yes, she did.  She was under nursing service,

12  though, at that time, but she worked in the cath lab.

13  Q.    All right.  And who ran the cath lab?

14  A.    Dr. Michel Vandormael.

15  Q.    All right.  Now, had Dr. Vandormael been involved

16  in trying to change the Dr. Gowski move?

17  A.    Yes.

18  Q.    All right.  And what was Dr. Vandormael's

19  relationship, or how was he getting along with Dr. Lin,

20  if you know?

21  A.    He opposed him, especially for the removal of

22  Dr. Gowski.  As for anything else, at this time, I don't

23  know of anything.

24  Q.    Okay.  There was a point in time when -- do you

25  know, or if you don't, just tell us that, whether or not

1  there was a dispute over moving the cath lab under

2  Medicine?  Do you know?

3  A.     Moving the nurses under the cath lab?

4  Q.     Yes.

5  A.     Yes, there was, but that was at a later time.

6  Q.     Okay.  All right.  Now, did you have -- did you get

7  involved in looking into the area of research?

8  A.     Yes, I was asked by Dr. Van Buskirk to work with

9  Dr. Harvey Abrahams on a research task force.

10  Q.     When was this?

11  A.     Do you mind if I look at my list, 'cause I don't

12  remember the exact --

13         MR. MAGRI:  Your Honor, Roxanne Lainhart has --

14  we've introduced them into evidence -- extensive

15  calendars and notes that make reference to certain

16  meetings, and she actually, to save time, made -- jotted

17  down a list of them, which I've given to the other side,

18  that -- 'cause there's no possible way she could remember

19  these times.

20         THE COURT:  That's what you're looking at up

21  there, right.

22         THE WITNESS:  Yes.

23         THE COURT:  Okay.  Let's move forward.

24  BY MR. MAGRI:

25  Q.     Okay.  Approximately when did this occur?

1  A.    Okay.  It was actually -- I had a meeting with

2  Dr. Van Buskirk in his office with several other people

3  on May 18th of '05, and then on June 7th of '05, the

4  research task force met with their conclusions.

5  Q.    All right.  What was that all about, if you know?

6  A.    We were meeting to discuss if -- to look at

7  research within the facility, to see if there were any

8  violations, any -- I'm sorry, my brain just went -- maybe

9  where there might be some conclusion between the

10 delineation of actual clinics versus patients being

11 scheduled into research, and the outcome of that was that

12 there wasn't anything that we could find.

13 Q.    Okay.  Now, that sounds similar to the problem that

14 came up with Dr. Gowski, the concern, rather, that came

15 up with Dr. Gowski?

16 A.    True.

17 Q.    And the -- did -- now, did the -- did I use the

18 phrase -- did I say Dr. Gowski?

19        THE COURT:  Yeah.

20        MR. MAGRI:  I meant Dr. Cote,

21        THE WITNESS:  Yes, Dr. Cote.  I'm sorry.

22 BY MR. MAGRI:

23 Q.    Yeah.  The thing is, with regard to Dr. Cote, that

24 was one of the issues that had come up with her, right?

25 A.    Yes.

1  Q.    All right.  Now -- but they didn't find a problem?

2  A.    No.

3  Q.    Okay.  Now, this was in June that they completed

4  this, right?

5  A.    Yes, June 7th of '05.

6  Q.    All right.  Did -- we haven't talked about

7  Dr. Zachariah at all.  Did her name come up in this '05

8  period at all?

9  A.    Yes, it did.

10  Q.    All right.  In what fashion?

11  A.    Towards the mid to late summer, Dr. Lin had asked

12  me again about what I knew about Dr. Zachariah, what type

13  of doctor she was, if I knew about her research, and I

14  told him that I knew her briefly and had spoken, that I

15  knew that she had had an EEO case, a prior one because he

16  was starting to move toward -- he had mentioned,

17  actually, the possibility of having Neurology Service

18  move under the Medicine Service and that raised signals

19  with me.  And I did question him on that because this was

20  the second time that another service was being requested

21  to be moved under the Medicine Service under the auspices

22  of Dr. Lin.

23  Q.    What was the other?

24  A.    It was the Primary Urgent Care.

25  Q.    Okay.  And why did this concern you?

1    A.    Because both of those services had employees that

2    had prior EEOs and were viewed as being problematic to

3    the facility and Dr. Van Buskirk was requesting to

4    Dr. Lin that these services be moved under.

5    Q.    Did you say anything to Dr. Lin about that?

6    A.    Yes, I did.

7    Q.    What?

8    A.    I did ask him as -- you know, I forewarned him

9    that -- to check the stat sheets on Dr. Zachariah's EEO,

10   because I knew she had one in 2004, and just to be

11   careful, you know, before realigning, 'cause I didn't

12   know what the stat sheets were for her prior EEO, and I

13   wanted to know why Dr. Van Buskirk was wanting these

14   services moved under us.  Why he was -- he did refer to

15   them as problematic children or problematic babies, as

16   these services, 'cause why was he wanting to move these

17   two particular services that had problems underneath

18   Dr. Lin.

19   Q.    And what discussion followed?

20   A.    Dr. Lin just stated that this is what Dr. Van

21   Buskirk is wanting and that we would do it.  He would

22   state that he would talk to Dr. Van Buskirk and then he

23   would come back to me and say, well, this is what Dr. Van

24   Buskirk wants, so we're going to do this.

25   Q.    Did you relay any concerns to him that you'd heard

1  from other people about Dr. Van Buskirk?

2  A.    As far as?

3  Q.    Had you received any information from anyone about

4  the -- about being able to trust Dr. Van Buskirk?

5  A.    Yes.  In, I want to say, late summer, early fall, I

6  think there was -- of '05, there was a JCAHO, an

7  announced visit, and --

8  Q.    JCAHO being?

9  A.    It's now called the Joint Commission, but at the

10  time it was the Joint -- I can't think of what it stands

11  for, for accrediting hospital organizations, Joint

12  Commission of Accrediting Hospitals, at the time it was

13  JCAHO, but now they're just called the Joint Commission.

14  I'm sorry, I forgot where I was.

15  Q.    So, they were coming in?

16  A.    Oh, yes.  JCAHO was coming in, and after I had

17  returned from the visit, I was pulled to the side by then

18  Joy Easterly, who was the chief executive nurse, and told

19  me to forewarn Dr. Lin about Dr. Van Buskirk, and I said

20  okay, you know, not really realizing what was going on.

21  She said --

22        MR. PARK:  Objection, Your Honor, calls for

23  hearsay.

24        THE COURT:  Pardon me?

25        MR. PARK:  I'll object, it's hearsay testimony

1  based on what Joy Easterly is telling her.

2       THE COURT:  Sustained.

3  BY MR. MAGRI:

4  Q.    Okay.  Tell us what, if anything, you relayed to

5  Dr. Lin?

6  A.    Okay.  I relayed to Dr. Lin exactly what was

7  stated, that he could not trust Dr. Van Buskirk, and

8  Dr. Lin then replied to me that he was very loyal to

9  Dr. Van Buskirk, that he understood and was protected by

10  Dr. Van Buskirk.

11  Q.    Did he tell you where he knew Dr. Van Buskirk from?

12  A.    Yes, he --

13  Q.    What did he say?

14  A.    Dr. Lin stated that he worked at the Orlando VA and

15  that's -- actually Dr. Van Buskirk had hired him.

16  Q.    Okay.  When you say the "Orlando VA," is that a

17  hospital like Bay Pines is?

18  A.    They're now separated from the Tampa VA, but they

19  were -- at one time, they were one of the out-patient

20  centers for the Tampa VA, but they're on their own now.

21  Q.    Okay.  But at that point, they were an out-patient

22  clinic?

23  A.    Yes.

24  Q.    All right.  Now -- so they worked together over in

25  Orlando.  Did he tell you anything else?

1  A.    Yes, Dr. Lin informed me that Dr. Van Buskirk had

2  actually hired him and selected him as the Chief of

3  Medicine, and had offered him -- Dr. Lin said that he did

4  not want to come, but he did come over because of loyalty

5  for Dr. Van Buskirk, and that Dr. Van Buskirk offered him

6  relocation expenses and a bonus to move over here.  So he

7  and his wife moved over.

8  Q.    Do you know who hired Dr. Lin in Orlando?

9  A.    Dr. Van Buskirk.

10  Q.    Okay.  And so, the Chief of Medicine you're talking

11  about is over here, right?

12  A.    Yes, at Bay Pines, yes.

13  Q.    All right.  What was Dr. Lin's background?  What

14  was his specialty?

15  A.    Family practice, I'm not for sure if he had

16  internal medicine training or not, but he was family

17  practice.

18  Q.    Okay.  Now, did the conversation continue -- did

19  you discuss Dr. Lin's managerial experience?

20  A.    Yes, that Dr. Lin, early on in '05, when I first

21  started, had discussed with me that he had little

22  managerial experience and he said that didn't matter

23  because he had the support and protection of Dr. Van

24  Buskirk.

25  Q.    Did he have specialty training?  Do you know what I

1    mean by "specialty training"?

2    A.    No.

3    Q.    Did he have training in one of the specialty -- the

4    areas of hospital medicine practice, like a hospitalist

5    or one of the in-patient --

6    A.    Not to my knowledge.

7    Q.    Okay.  Did he -- did Dr. Lin tell you what he felt

8    about Van Buskirk when it came to trust?

9    A.    He did relay to me that he thought that Dr. Van

10   Buskirk was jealous of him, but because he had a loyalty

11   to him and Dr. Van Buskirk had hired him, he thought that

12   that loyalty went a long way with him, so he just trusted

13   Dr. Van Buskirk and knew that he would be protected.

14   Q.    All right.  So, what all that added up to was he

15   trusted Dr. Van Buskirk?

16   A.    Yes, and that he would not put him in jeopardy, is

17   what he stated.

18   Q.    Okay.  Now, the -- all right.  I believe -- so you

19   had this conversation with him at around the time that he

20   was talking to you about Dr. Zachariah?

21   A.    Yeah, it was around, yeah, mid summer, late summer,

22   Indian summer as I call it, but I guess it's considered

23   August.  I guess it's still summer here.

24   Q.    All right.  Did the conversation with Dr. Zachariah

25   progress?

1  A.    Yes, in October --

2  Q.    Please explain that.

3  A.    Okay.  In October of 2005, the decision --

4  Q.    When you say "October of 2005" --

5          THE COURT:  Would you let her answer your

6  question before you interrupt her.

7          MR. MAGRI:  All right.  Sorry.

8          THE COURT:  Let's move this thing along.  We'll

9  be here two months, not two weeks.  Go ahead.

10         THE WITNESS:  October, 2005, Dr. Lin had stated

11 that the decision to move the Neurology Service under

12 Medicine, that that was pretty much confirmed and so the

13 talks had begun then as to how the transition was going

14 to occur.

15 BY MR. MAGRI:

16 Q.    Okay.  Is it -- did he -- did you have an

17 understanding of why Neurology was being moved under

18 Medicine?

19 A.    Yes, Dr. Lin had stated to me that Dr. Van Buskirk

20 was tired of dealing with Dr. Zachariah, he could not

21 deal with her anymore, he did not like her, and that

22 because of her EEO he wanted her moved.

23 Q.    Okay.

24 A.    So -- okay.  Do you want me to elaborate or --

25 Q.    Now did -- did that -- now, did that eventually

1    happen?

2    A.    Yes.

3    Q.    When?

4    A.    June of '06.

5    Q.    All right.  Now, between those time periods, did

6    any other events come up that you want to separately talk

7    about?

8    A.    Uh, in '05, uh --

9    Q.    Let me focus you.  Was there a -- did -- was there

10    a point where Dr. Vandormael was terminated?

11    A.    Yes, Dr. Vandormael was terminated in February of

12    '06.

13    Q.    All right.  And at that point in time, he filed an

14    EEO?

15    A.    I don't think he had filed an EEO at that point in

16    time.  I'm not for sure when -- he did file one, but I

17    don't recall when he had filed one.

18    Q.    Okay.  All right.  Now, were you involved in that

19    termination?

20    A.    Yes, I was.

21    Q.    In what way?

22    A.    I was asked to stay by Dr. Lin to assist with going

23    down to the cath lab.  There was fear of a coup taking

24    place downstairs in the cath lab.  When the cath lab

25    nurses and the other cardiologists had found out that

1  Dr. Lin had just been terminated, that Dr. Vandormael --

2  I'm sorry, not Dr. Lin had been terminated, I'm sorry --

3  when Dr. Vandormael had been terminated, that he had gone

4  to speak to his staff and they were quite upset, and so

5  they were all gathered down in the cath lab.

6      I was asked to stay to help, to assist with his

7  removal, and so we had calls to the front office who

8  asked -- 'cause I'm saying, why don't we just call the

9  police to assist with this if this is going to be a

10  problem.  But we had the police there to do rounds,

11  'cause they still did not leave.  I did have to walk down

12  with Dr. Lin to the cath lab to request keys.

13  Q.    Did you write a memo relating to Dr. Vandormael?

14  It's not going to show up very well.

15  A.    Yes, I was asked by Dr. Van Buskirk and by Dr. Lin

16  to work with Dr. Bazinski and follow him to make sure --

17  follow his cases to make sure he did only certain cases,

18  and then also to make sure that he was not being what

19  they thought was harassed by the other cardiologists.

20      So, Dr. Bazinski had come to me with complaints of

21  things that he had heard.  I presented them to Dr. Lin.

22  Dr. Lin instructed me to put it in an e-mail to Dr. Van

23  Buskirk.  So I -- everything that Dr. Bazinski had

24  reported to me, I did put it in an e-mail to Dr. Van

25  Buskirk.

1  Q.    And that's -- did you do -- is that the beginning,

2  at least, of the report -- was it a Report of Contact

3  dated February 8, 2006?

4  A.    Yes.

5  Q.    All right.  Now, is the material that's contained

6  in this document, which has been marked as Exhibit 648,

7  is that information that you obtained from Dr. Bazinski?

8  A.    Yes, it is.

9  Q.    All right.  And is -- does that indicate in the --

10  hold on one second.  It may be hard for you to read that.

11  Can you read that as it is now?

12  A.    Yeah, I can make it out.

13  Q.    All right.  Just read the first two lines, 'cause

14  I'm not sure the jury can.

15  A.    I'm not sure if I can.

16  Q.    I'm going to hand you this.  Do we have another

17  copy of this up there?

18  A.    I don't have a copy.

19  Q.    Flip to 648 right there.  Do you have it?

20  A.    Yes.

21  Q.    Is that the e-mail?

22  A.    Yes, it is.

23  Q.    Can you read the first two lines?

24  A.    "I feel it's necessary to inform you of today's

25  encounter when Dr. Bazinski.  Returned to the cath lab.

1  Dr. Bazinski was confronted, verbal attacked by

2  Dr. Vandormael, Dr. Bialow and Pam Trimble was crying."

3  Q.    Okay.  Now, that's information you were given by

4  Dr. Bazinski?

5  A.    Yes.

6  Q.    And you conveyed that information to Dr. Van

7  Buskirk?

8  A.    Yes, in this e-mail.  I had conveyed all this to

9  Dr. Lin prior.

10  Q.    There's a number of other things that are set forth

11  in this Report of Contact, and are those things that you

12  also heard from Dr. Bazinski?

13  A.    Yes.

14  Q.    Now, were you asked to do any further investigation

15  into this?

16  A.    No, no.

17  Q.    In any event, Dr. Vandormael was terminated,

18  correct?

19  A.    Correct.

20  Q.    Now, the date of that is February of '06, correct?

21  A.    Yes.

22  Q.    All right.  During this period of time, had issues

23  come up with -- involving Dr. Gowski's -- Dr. Gowski and

24  her privileges, if you know?

25  A.    Uh, they were being reviewed and she was actually

1  up for renewal and Dr. Lin -- or actually Dr. Patel had

2  signed off on them, Dr. Lin had signed off.  It went to

3  the PSB and it came back across my desk again for

4  revision.

5      So I had to ask Dr. Patel as to what privileges he

6  did not think that Dr. Gowski was needing, and so he had

7  to sign off on those.  Dr. Lin then signed off.  It went

8  back down to the PSB and it came back across my desk

9  again and then they had removed.

10 Q.  Do you know who signed off on the various things

11 for the PSB?

12 A.  Dr. Van Buskirk was the final signature.

13 Q.  Okay.

14 A.  I think.

15 Q.  As far as -- you indicated that Dr. Zachariah was

16 to be -- that Neurology was to be moved under Medicine in

17 June?

18 A.  Yes.

19 Q.  Did that happen?

20 A.  Yes, they were moved June 26th of '06.

21 Q.  Okay.  And after that, did an issue come up with

22 regard to EEGs?

23 A.  Yes, I was asked to look at the EEG backlog and to

24 find out what was going on.  I worked with the EEG techs

25 to found out how many.  I was then asked by Dr. Lin to

1   contact a former employee who -- by the name of John

2   Cliatt, 'cause I guess Dr. Lin had somehow found out, and

3   I don't know how, but that he had sent e-mails to

4   Dr. Zachariah, 'cause Dr. Lin had told me this.  So he

5   wanted to speak to doctor -- or to Mr. Cliatt regarding

6   these e-mails.

7        Mr. Cliatt did confirm that, yes, he had sent

8   e-mails to Dr. Zachariah, and Dr. Lin obtained the

9   permission to pull or retrieve those e-mails if he could,

10  and Mr. Cliatt agreed.

11       So, Dr. Lin requested that I contact IRM to see if

12  this could be done.  I had to contact John Williams, so I

13  spoke to John Williams.  John Williams is the chief of

14  information management, resource management, and John

15  Williams called me back and began to tell me the process,

16  and I said, hold on, let me send you in to Dr. Lin.  I

17  did not want to be --

18  Q.   Ultimately, were some e-mails retrieved, if you

19  know?

20  A.   I do not know.  I just know that Dr. Lin had spoken

21  to Mr. Williams about the process.

22  Q.   At that time, during the summer of '06, can you

23  recall how many EEGs were undictated, if you know?

24  A.   I used to know.  I don't know right now how many

25  were undictated.

1  Q.    Okay.  Well, we have records that will show that.

2  Were there other areas, other imaging that had backlogs

3  at that time?

4  A.    Yes, Cardiology had an echo backlog.

5  Q.    What was it?

6  A.    It was almost 1,000.

7  Q.    Did any other departments have backlogs?

8  A.    Sleep had numerous backlogs.

9  Q.    What was that?

10  A.    At one point, it was over 1,500.

11  Q.    Okay.  Anybody else?  Any others?

12  A.    Those are the two that come readily to my mind.

13  I'm sure there were, there were so many things that were

14  going on at the time with me keeping up with those.

15  Q.    Are you aware of anybody being disciplined because

16  the -- of the echocardiogram backlog?

17  A.    No.

18  Q.    Was -- are you aware of anyone being disciplined

19  because of the Sleep backlog?

20  A.    No.

21  Q.    Now, you've indicated that -- you've said that

22  Dr. Patel was used as a mole, and what do you mean by

23  that term?

24  A.    That he would -- depending on what was requested of

25  him, that he would either disseminate information to

1  staff, whether good or bad, he would go out and try to

2  retrieve information about employees, albeit Reports of

3  Contact, just finding out information to report back to

4  Dr. Lin, so those types of --

5  Q.    Okay.  All right.  In the June of '06 time period,

6  Dr. Gowski was being moved to a permanent position.  Do

7  you recall that?

8  A.    Yes.

9  Q.    What can you tell us about that?

10 A.    Dr. Gowski's office used to be in the MICU

11 residents sleep room, or the MOD sleep room, and we had

12 to move her out and find her an office, and so I had to

13 work with that.

14      And then, they were also trying to relocate her

15 from the ICU, working in the ICUs, that's the intensive

16 care units, up to 4-A.  There were Reports of Contact

17 written against Dr. Gowski and ultimately she did not end

18 up on 4-A.  She ended up being placed on 5-A.

19 Q.    This would have been around the point where she had

20 rotated, she had been rotating?

21 A.    She was supposed to have been rotating.  The design

22 was to set up initially --

23 Q.    But did she?

24 A.    No, she never got back to the ICU.

25 Q.    Okay.  Did -- was there a time when the CCU, the

1  cardiac side became more in need of people?

2  A.    Yes, they were short staffed.

3  Q.    All right.  Did -- throughout '05 and '06, was

4  there a shortage in Cardiology -- of doctors in

5  Cardiology?

6  A.    Yes, there was an extreme shortage in Cardiology.

7  Q.    After Dr. Vandormael was terminated, did any

8  doctors leave thereafter?

9  A.    Uh, from Cardiology?  Not immediately, but within,

10  you know, several months, by the end of '06, they did.

11  Q.    Okay.  Now, did the -- was there a shortage in

12  Cardiology, to your knowledge, through '06, into '07?

13  A.    Yes.

14  Q.    To your knowledge, was there a shortage in the

15  hospital area?

16  A.    For the same time frame?

17  Q.    Yeah.

18  A.    Yes.

19  Q.    Okay.  And so, that would have been in what years

20  and --

21  A.    In 2005, that we had five or six hospitalists leave

22  within a few months of each other for various reasons,

23  either he or she and/or their spouses had gotten

24  fellowships, that type of thing, so they were leaving, so

25  it left us really short.

1          And then, in '06, physicians that -- we were

2    actively recruiting for hospitalists and having a hard

3    time recruiting for them, and we did -- we were able to

4    hire a few of them, and by '06, a couple of them did end

5    up leaving the hospitalist service, and I don't know if

6    they were replaced, 'cause I ended up leaving the service

7    in March of '07.

8    Q.    Okay.  So, the -- there may have been a couple down

9    in '06, because of the ones that left?

10   A.    Yes.

11   Q.    All right.  And do you know why they left?

12   A.    Yes, out of fear of being targeted or retaliated.

13   Q.    Do you know that, or is that just something that

14   you heard?

15   A.    That is what the fear is throughout the Medicine

16   Service, these were the rumors that were flying around

17   the service.  Dr. Abraham, Dr. Jeffrey Abraham, who is

18   the Chief of ER, and Dr. Jennifer Pearson, both are

19   afraid to testify.

20   Q.    Okay.  They were in ER, weren't they?

21   A.    Yes, they were in the ER.

22   Q.    I'm focusing on the hospitalists at this point.

23   A.    Right.  They were the ones that were also feeling a

24   lot of the --

25   Q.    Okay.  But I want to stick on the ones that I focus

1  on as we go.  Okay?

2  A.    Okay.

3  Q.    Now, the thing is, with regard to this '06 move by

4  Dr. Gowski up to the floors, did you -- were you involved

5  or did you hear any conversations between Dr. Lin and

6  Dr. Patel concerning that?

7  A.    Yes.

8  Q.    Could you tell us approximately when they would

9  have occurred, if you can recall, who was present and

10  what was discussed?

11  A.    It was Dr. Lin and Dr. Patel.  As I stated, Dr. Lin

12  and Dr. Patel met almost every day, if not every day, and

13  there were discussions between Dr. Patel and Dr. Lin

14  about getting complaints on Dr. Gowski and some of the

15  physicians not wanting her to work on 4-A.

16      So, Dr. Lin requested to get the Reports of Contact

17  on Dr. Gowski, which Dr. Patel did.  At the time, I

18  hadn't seen them, until a much later point.

19  Q.    Okay.  Now, was there any discussion about the

20  contents of those, if there was?

21  A.    I didn't hear what the content was, no.

22  Q.    Okay.  Now, at almost this same time, Neurology is

23  being moved under Medicine.  Was a -- it became a

24  section, correct?

25  A.    Yes, once it was moved under Medicine Service, it

1  became a consultative service, so a section under us.

2  Q.    Okay.  And how many -- or who was going to be the

3  section chief, if you know?

4  A.    At the time it was moved under us, it was decided

5  to rotate the section chiefs within Neurology.

6  Dr. Zachariah was not to be included in that rotation.

7  There was --

8  Q.    Do you know why?  Was it said why?

9  A.    It wasn't said why, it was just said that --

10  Dr. Lin stated that she was not to be included in the

11  rotation.  So, it did rotate through, I think there was

12  one doctor that didn't want to participate and I don't

13  recall if he actually did it or not, but it did rotate

14  through.  Then Dr. Reddy ended up being the section chief

15  and I think is still the section chief today.

16  Q.    Okay.  Now, with regard to Dr. Gowski, did there --

17  are you familiar with -- do you have any firsthand

18  knowledge of an incident for which she was reprimanded

19  that occurred at a hospitalist meeting?

20  A.    I don't have any firsthand knowledge, no.

21  Q.    Okay.  Did you have a discussion with Dr. Lin about

22  that?

23  A.    No, not having firsthand knowledge, I wouldn't.

24  Q.    Throughout this period of time, you've identified a

25  number of instances.  Did you have -- did you have -- had

1    you reached an opinion about whether Dr. Lin, the things

2    he was doing was complying with EEO law?

3         MR. PARK:  Objection, Your Honor, it calls for

4    a lay opinion.  It's not proper.

5         THE COURT:  Yeah.  Do we need her lay opinion

6    on that?

7         MR. MAGRI:  Well, I think she is appropriate to

8    give it, she is the administrative officer.

9         THE COURT:  Okay.  Is the answer to that yes or

10   no?

11        THE WITNESS:  Yes, there is --

12        THE COURT:  Thank you.  Do you have another

13   question?

14   BY MR. MAGRI:

15   Q.    With regard to that, did you -- did you counsel

16   Dr. Lin concerning it?

17   A.    Yes.

18   Q.    Did there come a point in time where that had a

19   negative impact?

20   A.    Yes.

21   Q.    Approximately when did that occur?

22   A.    Uh, it was starting in -- the first isolated

23   incident was in April of '06, and then, by August of '06,

24   there were more talks from Dr. Lin to me, he was

25   discussing issues with me.

1  Q.    Okay.  Issues of what sort?

2  A.    He began to become very hostile and I wasn't for

3  sure as to why he was becoming hostile with me.  He began

4  making -- called me into his office and making comments

5  that -- on office professionalism, which is something I

6  preached to my staff the whole entire time, to be

7  professional and respectful and courteous regardless of

8  who comes in and how they're acting.  But he's calling me

9  on office professionalism and I'm not understanding why

10  he's calling me on office professionalism.

11      He stated that I was being insubordinate and I was

12  yelling at the staff.  And I didn't know where he was

13  coming from 'cause I've never yelled at anyone,

14  especially the staff or the physicians, and he told me

15  that that would not be tolerated.  So I asked him what he

16  was talking about, and he just stated to me the same

17  thing over and said that, basically, that he was not

18  going to tolerate me yelling at anyone.

19      I said, give me examples, because I -- I'm sorry, I

20  haven't been yelling at anyone.  Who have I been yelling

21  at?  He felt that I was yelling at him.  And I said, in

22  what manner?  I mean, he and I did have discussions, and

23  especially when I opposed him, a lot of times -- early on

24  it was fine, we had a very good professional

25  relationship.

1        But as time went on, the more I opposed, or if I

2   tried to advise him, he would dismiss what I said or just

3   reject it altogether and then began to turn on me.  And

4   then, I was being called in quite often and you'll see

5   that on the blotters.

6   Q.    The blotters you're referring to are calendars?

7   A.    Yeah, my desk calendar, the desk blotter.

8   Q.    I know we have that around here somewhere.

9        MR. MAGRI:  Your Honor, I'm approaching with

10  Exhibit 40.  I'm going to hand the witness the exhibit.

11  I also have a copy here if you want to see it.

12       THE COURT:  40 is already in.  Let's go.

13       MR. MAGRI:  Yes, I just wanted to make sure

14  there was no objection before I showed it to the jury.

15  BY MR. MAGRI:

16  Q.    Exhibit 40 is -- just tell us what it is.

17  A.    Oh, I thought you -- okay, sorry.  Exhibit 40 was

18  my desk calendar that I kept on my desk.  It basically

19  was, as a supervisor, on the right-hand side I would keep

20  sick leave or annual leave requests on, or if employees

21  were going to be out.  It had meetings that I might have

22  to attend, some impromptu type meetings that maybe not --

23  maybe that weren't scheduled that I would just have

24  because people would walk into my office because I had an

25  open door policy.  It would have tasks that I would do.

1   It also has the time that I worked.

2       You'll see sometimes on the left-hand side new

3   physicians for new employee orientation, or if there was

4   something that was going on, like trainings that needed

5   to be on.  So, it was basically an accumulation of what I

6   did.

7       Now, it's not a total because I couldn't write

8   everything down, there was just too much going on.  But

9   if I had time or there was something I really needed to

10  focus on, I wrote it down.

11  Q.    Okay.  This first calendar in January of '05, it

12  says at the bottom?

13  A.    EEO is the law.

14  Q.    Every page of this calendar has some other

15  statement at the bottom of it; is that correct?

16  A.    Yes.

17  Q.    And those -- do they -- do they all relate to some

18  aspect of the work environment, sexual harassment, EEO

19  for everyone?

20  A.    Yes.

21  Q.    Now, was that -- was that calendar -- was the

22  makeup of this calendar, did it change over time?  You

23  had just started to indicate that it did.

24  A.    Yes, it did begin to change.  There would be things

25  on there, say that if Dr. Lin called me into his office,

1  let's say on 8/30, discussing office professionalism, I

2  would write that on there because I wasn't for sure why I

3  was being called in.

4  Q.    Okay.  Just in a general sense, did the level of

5  your recording events in that calendar change at some

6  point?

7  A.    Yes.

8  Q.    Approximately when?

9  A.    August of '06.

10  Q.    Why?

11  A.    Because the increase in the hostility toward me

12  increased and my workload began to increase and --

13  Q.    What do you mean by that?

14  A.    That there were -- he was calling me into the

15  office and I wasn't for sure as to why I was being called

16  into the office, discussing things that I didn't know

17  where he was coming from.  And I can talk about those if

18  you want me to.

19  Q.    I will, but I'm interested right now about the

20  workload?

21  A.    The workload he increased, my e-mails exponentially

22  increased.

23  Q.    What does that mean?

24  A.    Meaning in Outlook, I would have normally, say,

25  anywhere between 80 to 100 to 120 e-mails typically.

1  Q.    In what period of time?

2  A.    Well, within normally a day because the Medicine

3  Service is such a large service.  So trying to go through

4  them and get everything -- some things you have to

5  prioritize, but if they were things from the front

6  office, you'd have to address those immediately.  Some

7  things were things that you had to follow-up on.  But the

8  e-mails increased to where I was getting 300 e-mails,

9  lots of requests from Dr. Lin.

10      You can look and see that there's documentation

11  where I have documented that I've worked 300 e-mails,

12  answered mostly Dr. Lin's, you know.  The assignments

13  that I would be assigned were starting to increase and

14  were starting to change, which that's fine, but to the

15  veracity of not being able to complete them like I'm used

16  to completing assignments.

17      I'm used to working at them and getting them done

18  and it was to the point that there was no way that any

19  human person could ever get this amount of work done, and

20  it was expected that I was to get these done.  I was

21  being ordered to get certain things done.

22  Q.    But why did that -- why did that trouble you?  Why

23  did you -- did you talk with Dr. Lin about it?

24  A.    I tried to, yes, in August and September, I tried

25  to come to some resolve to figure out what was going on.

1  I even went to him and said, look, we can't work like

2  this, what is going on.  And he actually told me that he

3  wasn't talking to me anymore, that I was argumentative,

4  that I was pushy, and that I needed to push my admin

5  staff to work harder.  That was just one of the talks.

6  Q.    All right.  Did -- and there's more?

7  A.    It goes on and then --

8  Q.    Just let me just hop to something else.

9  A.    Sure.

10  Q.    Now, is there a -- do you believe that Dr. Lin was

11  doing this on purpose for a reason?

12  A.    Yes, I do.

13  Q.    What was that?

14  A.    It was his goal to push me out.

15  Q.    And how do the two relate?  How does it relate?

16  A.    It relates because I had opposed and I had advised

17  him and since I was not coming around to what they

18  consider their way of thinking, that all the opposition

19  and being called a no girl, and they wanted a can do

20  girl, they were going to push me out or try to intimidate

21  me to do what they wanted me to do.

22  Q.    How does the work tie in to pushing you out, the

23  extra work?

24  A.    That is part of the process, that they will

25  inundate you with work as a means to try to either push

1  you out, set you up to fail.

2  Q.    It sounds like you're thinking about other examples

3  where that kind of thing has happened.  I mean, have you

4  seen them do that with regard to other people?

5  A.    Well, I know of Dr. -- I can speak of

6  Dr. Vandormael, if you'd like.

7  Q.    Well, sure.

8  A.    Okay.

9        THE COURT:  I don't know if it's sure or not.

10  Is there any relationship to this doctor and these

11  ladies' claims, Dr. Vandormael, other than the fact that

12  he was terminated?

13        MR. MAGRI:  He's a witness in this -- that has

14  been deposed in this -- for this trial.

15        THE COURT:  Is there any relevance to this?

16  You all are awful silent over there, but I want to keep

17  us focused.  We have got a lot of claims by four

18  different Plaintiffs.

19        MR. MAGRI:  Dr. Vandormael was a doctor who was

20  terminated after filing an EEO.

21        THE COURT:  No, as I understand it, he filed

22  one later, but --

23        MR. MAGRI:  No, she doesn't know that.

24        THE COURT:  Is there any relevance to this?

25        MR. PARK:  Your Honor, he was --

1          THE COURT:  Yes or no?  If you agree it's

2   relevant, I'll be quiet and let you all proceed, but

3   otherwise, I don't think we need to go down trails that

4   just don't pertain to this case.

5          MR. PARK:  His EEO complaint came after he was

6   terminated, so on that basis, although he -- I'll let

7   Mr. Magri explain.

8          THE COURT:  That's what your witness has

9   testified to.

10          MR. MAGRI:  That's not it.

11          THE COURT:  Relevant or not?  Do you all take

12   the position it's relevant?  If so, I'll let it come out.

13          MR. PARK:  No, I don't believe so.

14          THE COURT:  Let's come to sidebar here, please.

15          (Thereupon, the following sidebar conference

16   was had:)

17          Your witness testified that he was terminated,

18   and she didn't know when, but later he filed an EEO.

19          MR. MAGRI:  That's not true.

20          THE COURT:  Well, you've been asking the

21   witness to talk about it.  If she doesn't have the facts

22   right, she is not the witness to talk about it.

23          MR. MAGRI:  The only thing that concerns me

24   here is, he clearly filed an EEO, he was also a witness

25   in some other EEOs before he was terminated.  He's been

1  deposed.  What he filed after was a whistle blower and

2  so -- and she's just confused.  But the fact of the

3  matter is she actually has calendar entries about

4  Vandormael's EEO in December, before he was terminated.

5       But you know, I really don't want to get

6  into -- I don't need to get into Vandormael with her

7  except she's using him as an example for why giving --

8  putting pressure in these ways.  He said to her that he

9  was being pushed out.

10       THE COURT:  Okay.  I think it's a collateral

11  area and she's not the witness to talk about this.  If

12  she's confused on the facts, even by your admission,

13  she's not the right witness to be talking about it.  If

14  that doctor comes in and somehow it's relevant, maybe

15  we'll hear about it.  But I think her testifying in this

16  regard involves a huge amount of hearsay and it's

17  entirely collateral.  So I'm sustaining my own objection

18  to it.

19       (Thereupon, the sidebar conference was

20  concluded.)

21  BY MR. MAGRI:

22  Q.   Okay.  I was asking you about why you believe that

23  your increased workload was indicative of a desire to

24  push you out.  Why do you believe yours is indicative of

25  that?

1    A.     Well, mine is because, as I stated, that I had

2    opposed and challenged them on previous regulatory

3    issues, ethical issues regarding EEO claims, trying to

4    fire veterans that were returning from either Iraq or

5    Afghan and not wanting to pay them, trying to push other

6    physicians out by asking them based -- 'cause the

7    physician is wanting -- had maybe stated that they had a

8    desire to retire that were older, that they -- Dr. Lin

9    wanted this physician gone.  So, because I had raised

10   these claims, it was now decided that I was no longer

11   doing what they wanted me to do.

12   Q.     Okay.

13   A.     So they were going to push me out of my position.

14   Q.     Okay.  But my question is, how does the -- what was

15   your concern about an increased workload that you would

16   have trouble doing; how does that tie in?

17            THE COURT:  Does she really need to explain it

18   further?  She said it got to the point where she couldn't

19   do it.

20            THE WITNESS:  Yes, you just get to a point

21   where you --

22   BY MR. MAGRI:

23   Q.     Were you concerned that your inability to do the

24   job would ultimately be held against you?

25   A.     Yes.

1  Q.    Okay.

2  A.    Sorry, I guess I wasn't understanding.

3  Q.    Pardon?

4  A.    I said, sorry, I guess I wasn't understanding what

5  you were saying.

6  Q.    Okay.  Well, the -- now, during that period, this

7  is in the August or September time period, did other

8  things happen?

9  A.    Yes.

10  Q.    Tell us about it.

11  A.    August 30th, I was called in and accused of being

12  very discriminative with a high degree in regards to

13  Mitra Eframian and I wasn't for sure what he was

14  referencing.

15  Q.    Who is Mitra Eframian?

16  A.    She is the program analyst in our --

17  Q.    She came up in April of '06?

18  A.    She came up in April, but actually started as the

19  program analyst June 26th of '06.

20  Q.    Okay.  And had you had difficulties with Mitra

21  Eframian?

22  A.    There were some, nothing that was really out of the

23  ordinary.  I thought things were fine.  I did have to --

24  on a couple of occasions, I did speak to her about her

25  dress code and the inappropriateness of it, and then I

1  did have to address it with Dr. Lin.  Dr. Lin told me to

2  handle it.

3      I told him what the issues were because we had

4  addressed another female that had a similar type of dress

5  code issue and that we couldn't have the dichotomy going

6  on in the service, especially if we address one dress

7  code with a female, we have to address it with another.

8      He agreed and told me to take care of it.  I did, I

9  just wrote it up as a verbal warning.  It was just a

10  warning 'cause she had already been informed three times

11  about her dress code verbally from me.  And Dr. Lin

12  looked at it, his name was even in the verbal warning and

13  he approved it.  So, I called her in and just gave her

14  another copy of the dress code and addressed that issue

15  with her.

16      She became tearful and thought that I was picking

17  on her.  I said that I was not picking on her, that we

18  have a dress code and you represent the Medicine Service

19  so you should dress a certain way.  Coming in with your

20  purple thong hanging out of your hip-huggers is not

21  appropriate.

22      So, that was a representation and that's not the

23  type of representation we wanted for the service.  So I

24  had asked her to at least put a jacket on.  If she wanted

25  to wear that, that was fine, but to please have a sweater

1  or a jacket on.

2       So, then she went to Dr. Lin and then, that's when

3  she cried to him and then I started getting called in,

4  saying that I was being -- discriminating against her, I

5  was jealous of her, that she possessed beauty that I did

6  not have to get the jobs done.

7  Q.   In other words, he was saying that she was

8  beautiful and that enabled her to get the job done?

9  A.   Correct.

10 Q.   Whereas you weren't and --

11 A.   That I didn't possess the beauty, evidently, and I

12 couldn't get the work done.

13 Q.   Did you think that was an appropriate

14 characteristic to be pointing to?

15 A.   Do I think that was appropriate?  No.

16 Q.   All right.

17 A.   And I did tell him that wasn't appropriate, but it

18 went on.  And then, as of September 21st, that's when he

19 called me in and said he was going to push me out of the

20 service.

21 Q.   When was this?

22 A.   September 21st of 2006.

23 Q.   Tell us about that conversation.

24 A.   I actually received a little sticky note on my

25 front door -- on my door to meet with Dr. Lin at 9:30.

1  And I went to Cindy and I said, do we know what this

2  meeting is about?  And she said, I can't tell you, he's

3  asked me not to say anything.  I said, can you forward me

4  the e-mail, 'cause she showed me and it was in some

5  encrypted subject matter.  I said, what is this

6  concerning?  She said, I don't know, he wouldn't say.

7  So, I said okay, and at 8:30 I actually got to meet with

8  him.  I was a little nervous, I wanted to find out what

9  this meeting was about.

10  He told me to come on in, that he could meet with

11  me and told me to sit down, that I was not to speak, I

12  was just to listen.  And he started off by saying that I

13  was insubordinate and he was going to push me out, that

14  he had the support of Dr. Van Buskirk to push out his AO.

15  And I asked him if Dr. Van Buskirk had really told him

16  that, and he swore to it, and he said that he was

17  protected by Dr. Van Buskirk and that he would support

18  his decision to push out his AO.

19  I said, well, what is the basis for all this?

20  Where is this coming from?  And again, he told me that I

21  needed to talk less and listen more.  He was going to

22  diminish my authority.

23  And there was a girl in the office by the name of

24  Melissa Gibson who was also looking to get promoted, and

25  there was a Pulmonary position that was coming available

1  and so, she actually did apply and did get that position.

2  But she and Mitra were friends, and I never had really

3  any problems with my employees, or so I thought.  I mean,

4  there were some little, bitty things, but nothing that I

5  perceived as being problematic, true problematic.

6      But he told me that if Melissa left, he was going

7  to hold me responsible and I needed to make sure I did

8  everything that I could that she didn't leave.  I did try

9  to tell him that she was looking for a job for promotion,

10  she wanted to get ahead.

11      She had come to me and had actually spoken to me

12  about going back to school, and she wanted my advice on

13  how to do this.  So I'm giving her, Melissa, advice to

14  how to further her education and how to get tuition

15  reimbursement and she's a veteran and all these things.

16  I'm speaking to her.  So, it wasn't making sense as to

17  why he's talking to me about Melissa, but okay.  I stated

18  that I would try to retain her, that we had a position

19  coming available.

20      He informed me that people were complaining about

21  me, that the doctors and the admin staff were

22  complaining, that I was yelling at the staff, I was

23  yelling at the doctors.  And I said, well, who?  Give me

24  names.  And he said, I'm not going to give you names, he

25  said, 'cause all they would do is lie to you.  And I

1   said, well, that doesn't make any sense.  If they're

2   complaining, then why won't you tell me?  And he went on

3   to state that they would just lie to me, that they

4   weren't my friends, that they acted like they liked me,

5   but they really didn't, and I said okay.

6       And then he also made the statement that I would

7   confront them and that I would retaliate against them,

8   which was -- threw me back.  I'm thinking, what are you

9   talking about, and I was shocked 'cause -- I really was

10  shocked when he made that statement to me and I wanted to

11  know where all this was coming from.  And he just kept

12  going on telling me that I needed to listen and he told

13  me that he had informed Dr. Van Buskirk that I argue,

14  that I talk back, that I'm insubordinate, that I yell,

15  I'm defiant.  He needs a can do girl, not a no person.

16      And he asked about how Joanne Elkins knew about

17  Mitra being upset and wanting to leave.  I said, well, I

18  don't know.  I said, I know that she works with quality

19  systems and she was in the front office with the

20  director's office, I'm sure she worked very closely with

21  Joanne Elkins.  Maybe they're friends.  I don't know.

22      So, he told me that Mitra was indispensable, and

23  again said that I had a hatred toward Mitra, which I

24  didn't.  I elaborated that I was a Christian and that I

25  wanted the best for everybody.  I didn't hold any

1 animosity toward anyone.

2     And he was going on to tell me that he was the boss

3 and that, yes, I did.  And so regardless of what I

4 stated, he would just dismiss any comment that I would

5 make to try to rebut or defend against his comments.  And

6 he did tell me that I needed to improve on my management

7 skills with the program support assistants, which were my

8 admin staff, and they had made -- and I told him that

9 they had made great strides over the past -- since I had

10 first come on, and he didn't want to hear it, that the

11 section chiefs were complaining.

12     I said, really, 'cause they were early -- when I

13 first came on, they really were and I have it on -- it's

14 even on the blotters, and I would address it and I

15 addressed it with him and told him that there are -- as

16 the supervisor, I know my employees' strengths and

17 weaknesses, their KSAs, knowledge, skills and abilities,

18 and I know who is the strongest and who is the weakest.

19 Those I work with, I know what they can do and what they

20 can't do.  And I said, I haven't heard of any further

21 complaint, and if there are, send the section chiefs to

22 me.

23     And he then went on to ask me -- he told me I was

24 passive/aggressive, and I did offer a chuckle like this

25 'cause even now it makes me think, what are you talking

1    about when you're calling me all this and saying all

2    this, what I'm thinking at the time, is inane stuff to

3    me.  And he says, I think you have an anxiety disorder,

4    and he asked me, do you have an anxiety disorder.  And I

5    said, no, I do not have an anxiety disorder and you

6    cannot ask me that.  And he said, well, I think you do

7    and you need EAP.

8        EAP is an Employee Assistance Program that's there

9    for employees for many reasons if they want to go speak

10   to someone.  But management will also use it if they have

11   a problematic child -- a problematic employee, that they

12   will send to try to correct whatever is going on.  So, I

13   knew that, I knew I did not need EAP and I wasn't going

14   to go to EAP, and I told him that.  And he claimed that

15   he thought that I did.

16       After I declined, he went on and stated that he did

17   realize that I was overwhelmed, and to please work on

18   managing the program support assistants and offered me

19   EAP again, and again I declined it.  He said that he was

20   just trying to help me and that I should consider it, and

21   that he was embarrassed because he has an AO that talks

22   back.  I was the worst AO in the entire facility, which I

23   knew that wasn't true because I know some of the other

24   AOs.  So, I thought, okay, you can think whatever you

25   want, but I don't know where you are getting all this.

1  So, basically, he just dismissed me after that and --

2  Q.     From the meeting?

3  A.     From the meeting with him.

4  Q.     All right.  And then what happened?

5  A.     I went to my office, I was tearful, I was upset and

6  I did cry.  I wasn't for sure where this was coming from,

7  why I was being spoken to like this.  I was a

8  hard-working employee and wasn't for sure what was going

9  on.  And so I thought, okay, I will call and have an

10  appointment made with Dr. Van Buskirk, that is his boss,

11  and try to find some resolve, thinking you're two adults,

12  he is the next in line.  I'll hopefully get some resolve

13  from Dr. Van Buskirk because, up to this point, Dr. Van

14  Buskirk and I had worked together, but nothing really --

15  there was no reason for me to think otherwise except for

16  what Dr. Lin had told me about having the support of

17  Dr. Van Buskirk.

18       So I called down and Cindy Anderson said she

19  wouldn't make the appointment.  Cindy Anderson was the

20  secretary at the time.  She actually became the program

21  analyst for the Chief of Staff, but she was the secretary

22  to Chris Zamberlin then, her name is now Chris Brown, her

23  married name.  And she would have to check with Dr. Van

24  Buskirk.

25  Q.     Did you set up a meeting?

1  A.    Yes.

2  Q.    Did you talk to Chris Zamberlin concerning the

3  meeting?

4  A.    Yes.  I couldn't get into Dr. Van Buskirk, I had to

5  go through Chris Zamberlin.  I met with Chris Zamberlin

6  on the 21st, and discussed in confidence with her, and I

7  was tearful and I was a little afraid to even go down

8  there because I wasn't for sure what was going on.

9       And the issue that I brought up was that he can't

10  push me out, I hadn't -- I did not have any disciplinary

11  actions against me, my evaluations had always been very

12  good.  I wasn't for sure where this was coming from.  And

13  I --

14  Q.    What do you mean by that, when you say you're not

15  sure where it's coming from?

16  A.    I'm not for sure why Dr. Lin was bringing all these

17  accusations against me.

18  Q.    You mean the basis of them?

19  A.    The basis, yes.

20  Q.    Okay.

21  A.    I told her about the conversation that occurred and

22  that -- I did speak about Dr. Tantranond, the things that

23  he was asking me to do, like not paying Dr. Tantranond,

24  who was a physician that was retiring.

25       Dr. -- there was another instance with Dr. Sadik.

1  She told me to write up an ROC and to document

2  everything, which is what I did when I got -- I had

3  already documented it on a little yellow sticky when I

4  was in Dr. Lin's office, the conversation that had

5  occurred.  But I said okay, and she offered a 360 degree

6  evaluation which evaluates your management styles and

7  things, but she would talk to Dr. Van Buskirk and get

8  back to me.  I got a call --

9  Q.    That's a sticky, one of those stickies that is

10  dated September --

11  A.    21st.

12  Q.    21st.  Okay.  I think we've introduced that.

13  A.    Okay.

14  Q.    204-B.  Okay.

15  A.    So, in the interim, while I was down with Chris,

16  Dr. Lin had stopped Cindy Fusco and asked her how I was

17  doing and she said, how do you think she's doing, she's

18  upset.  And he said that -- he told Cindy that --

19         MR. PARK:  I object to this.  This is hearsay,

20  I think is coming from Cindy Fusco.

21         THE COURT:  Counsel, maybe you should stand up.

22  I'm having a hard time hearing you when you're making --

23  what is the objection?

24         MR. PARK:  I think this is hearsay.  I believe

25  it's Dr. Lin's testimony coming to her from Cindy Fusco,

1  if I understand what she is testifying about.

2          MR. MAGRI:  We're offering it for the affect on

3  the hearer.

4          THE COURT:  Back up and ask the question again,

5  if you would, please.

6  BY MR. MAGRI:

7  Q.    Okay.  Is there a point where you were told what

8  Dr. Lin was saying?

9  A.    Yes.

10  Q.    Okay.  And did that have an affect on you that day

11  in terms of things that you --

12  A.    Yes, it did.

13  Q.    Okay.  Can you tell us what you were told?

14  A.    Dr. Lin had approached Cindy after the meeting --

15          THE COURT:  Tell us what affect it had on you,

16  ma'am.

17          THE WITNESS:  I'm sorry.  The effect is that I

18  was upset, that he wanted to make sure that I understood

19  the seriousness of it.  Well, I did understand the

20  seriousness of it, so that was the effect.  I understood

21  the exact seriousness of where this was going and I was

22  hoping to find some resolve.

23  BY MR. MAGRI:

24  Q.    Okay.  Did you have any conversations with Dr. Lin

25  later that day?

1    A.    Yes.

2    Q.    Who did that -- what did those conversations relate

3    to?

4    A.    At the end of the day, I went to Dr. Lin to inform

5    him about leave requests and the change of Dr. Schmiedt,

6    Marcus Schmiedt, who is one of the cardiologists

7    scheduled on our duty, and then Dr. Lin answered all the

8    questions.  Then he began talking to me like we were

9    professional confidants, like nothing had ever happened.

10        He spoke to me in regards to Zachariah's reprimand,

11   Dr. Johnson's lawsuit.  There was a CMO position in Fort

12   Myers that Dr. Schleitler, who was the Chief of Dental,

13   was going to be taking until they could fill it.  And

14   then he also mentioned Chris Zamberlin having an agenda

15   waiting to become the associate director.

16   Q.    Okay.  What did he say to you about Dr. Zachariah?

17   A.    That she was going to be reprimanded.

18   Q.    Okay.  And what did that relate to?

19   A.    Her research.

20   Q.    Was it -- do you know if it's the research or the

21   EEG or -- was she reprimanded, do you know?

22   A.    I don't know that she was reprimanded.  They had

23   talked about reprimanding her.

24   Q.    Okay.  All right.  The thing is -- and there was

25   another individual that was mentioned?

1  A.    Yes, several, Dr. Johnson's lawsuit 'cause he had

2  an EEO.  I don't remember the content of that.

3  Q.    Was he asking you to do anything that evening with

4  regard to Dr. Zachariah?

5  A.    Not on that evening, no, he was just talking in

6  generalities.

7  Q.    Okay.  All right.  And then what happened?

8  A.    I got an appointment the next morning with Dr. Van

9  Buskirk.  Cindy Anderson had called up and wanted to make

10  sure that it was okay that Dr. Lin attended, and I said,

11  sure, I have nothing to hide.  We both went down at 10:00

12  o'clock.

13  Q.    Who is "we both"?

14  A.    Dr. Lin and I.  We didn't go together, we went

15  separately, but we were both there by 10:00 for the

16  meeting, and the meeting was not good.  This was when I

17  found out that Dr. Van Buskirk does support Dr. Lin and

18  the actual degree of support.

19  Q.    How so?

20  A.    That I was not permitted to really speak.  He said

21  that he had received e-mails from Dr. Lin and from Mitra

22  stating how I had yelled at the staff, and that I was

23  insubordinate, I was insecure, and that -- also

24  defensive, and that he understands as to why Dr. Lin has

25  sent him these e-mails because he wanted to find a

1  resolve to this as to what happened the day before with

2  Dr. Lin and I.

3      And I did ask him and told him that Dr. Lin had

4  stated he was going to push me out, and that he had

5  supported him.  And Dr. Van Buskirk turned to Dr. Lin and

6  he said, Lithium, did you say this?  And Dr. Lin stated,

7  no, I didn't say it like that.

8      And then, that's when Dr. Van Buskirk proceeded to

9  tell me that he's known Lithium for over 15 years and he

10  doesn't lie, and basically that I had come to a

11  crossroads and I needed to make a decision either to stay

12  in the service or not to stay in the service, and -- or

13  to move on.

14      And I told him that I wanted to stay and the

15  conversation, you know, went on from there, but the

16  bottom line is it wasn't good, and he did offer me -- I

17  did tell him about the anxiety.  Dr. Lin asked me that,

18  and Dr. Van Buskirk turned around and asked Dr. Lin, did

19  you ask her that, and he said -- he lied, he said, no, I

20  did not.

21      And I said, you lied, it's right here, I have it on

22  the sticky.  Then Dr. Van Buskirk said, see, you're being

23  defensive and you're insecure, but this would -- if you

24  do have an anxiety disorder, this would explain your

25  behavior.  I said, well, sir, you can't say that.

1  Q.    Did he look at the sticky?

2  A.    He glanced at it.  I did show it, he just glimpsed

3  at it and didn't really pay attention.  He didn't care

4  what I had to say, or his mind was already -- had been

5  made up.

6  Q.    Okay.  Did you bring up the EEO conversations?

7  A.    No, I didn't.

8  Q.    Why not?

9  A.    Why not?  Because I am now fearful as to what's

10  going on, not understanding what's going on, and now I

11  know that I can't even take it to the next level of

12  administration.  If Dr. Van Buskirk truly supports

13  Dr. Lin, why am I going to bring up claims of EEO

14  retaliation to the same person that is giving me direct

15  orders from his boss?

16  Q.    Okay.  Now, is there anything else that you want to

17  talk about from that meeting or can we move on?

18  A.    The only other thing real quick is that I did --

19  the meeting did not go well.  I called Chris Zamberlin to

20  speak to her.  She agreed it did not go well.  I asked

21  for advice 'cause she wanted to know the commitment.  She

22  said that really it showed that Dr. Lin and I -- she

23  didn't feel the commitment was there and that it's not so

24  much ability.  She discussed my MBA, that it had nothing

25  to do with my ability and having my graduate degree, that

1  it's more interpersonal and that we needed to work on our

2  interpersonal skills.

3      I said okay and she offered to paraphrase.  So, she

4  said, go in and tell Dr. Lin that you spoke to me and

5  present the paraphrasing.  So, I did, I asked if I could

6  meet with him and he gave me the opportunity to meet with

7  him, and I presented this information like Chris Brown

8  had instructed me.

9      And Dr. Lin did agree that we would, you know, try

10  to work on our interpersonal skills and try to paraphrase

11  what one another said so that there was not this

12  interference in our communication.  And it only lasted

13  for a few days, then it went right back to what it was

14  before.

15  Q.    Okay.  Why didn't you accept the notion that you

16  were at a crossroads and go down a different crossroad as

17  a result of that meeting?

18  A.    That was a difficult decision because I did think

19  about it, I did think about maybe taking a different

20  crossroad and -- or a different pathway, but sometimes

21  you just have to stay and do what you think is right.

22      And I thought by staying and doing what I thought

23  was right and still trying to maybe advise and work in

24  the system with Dr. Lin, that maybe I could get through

25  and do my job.

1       It ultimately didn't end up that way, but I wanted

2   to do the right thing so -- and I liked where I worked.

3   So, I made the choice, which was a difficult one to make,

4   knowing what I was going to be put through.

5   Q.    When you say you liked where you worked, what do

6   you mean by that?

7   A.    I liked working in the Medicine Service, that was

8   my background.  I'd been in Medicine, I have a clinical

9   background, I understood the doctors, I knew the inner

10  workings of --

11  Q.    How did you get along with the section chiefs?

12  A.    Fine, to my knowledge.  Little did I know,

13  according to Dr. Lin, they didn't like me.  But they were

14  the ones that were calling me for assistance with things,

15  and poor relation problems, time keeping issues, setting

16  up meetings, you name it.  I was there to assist them.  I

17  was the PR person, which I explained to Dr. Lin.  He

18  didn't want to hear it.

19      So they knew that they could always come to me.

20  They couldn't always get in to Dr. Lin for various

21  reasons, but they knew that I was always available.  I

22  was the responsive one, which is what I should have been.

23  I'm there to help the service.

24  Q.    Did you ever have a sense that the kinds of things

25  Dr. Lin was saying were actually the case?

1  A.    No.

2  Q.    Okay.  Following that meeting, what happened on

3  that front?

4  A.    Uh, after that, I would keep getting called into

5  the office.  You'll see on the blotters that things

6  increased in October, September/October.  I was getting

7  called -- I remember on October 13th, Dr. Lin was

8  actually out --

9  Q.    Is this based on you -- is this based on -- you've

10  made like -- have you made like notes?

11  A.    Yeah, I just went through the blotter and made

12  quick reference notes for me so I wouldn't have to keep

13  flipping through the pages.

14  Q.    So you don't remember these dates without looking

15  at this --

16  A.    Not without looking at it, no, no, no.  I'd have to

17  reference this.

18  Q.    So you'd have to go --

19  A.    Except for September 21st, I do remember that

20  because that one was profound to me, but outside that,

21  no, I'd have to go back and look.

22  Q.    All right.

23  A.    But there's different things that went on.  Dr. Lin

24  was asking me if I was looking for another job, and I

25  said no.  He said, well, you should consider looking for

1 another job, but I'm not pushing you out.  I said okay.

2     Then he offered me -- Mr. Steve Garrett, who was

3 the Chief of Respiratory Therapy at the time, was going

4 to be retiring the following year and he offered me that

5 job.  He also had requested that Cindy Fusco befriend me

6 to keep tabs on me, to see how I was doing, to see what I

7 might be doing.

8 Q.    Cindy Fusco being his secretary?

9 A.    His secretary.  And then to disseminate information

10 to and from.  He would a lot of times use her to come and

11 talk to me about taking and applying for the Chief of

12 Respiratory Therapy's position when it came available,

13 which I declined at the time.

14     And I was getting calls from Chris Zamberlin on

15 10/13.  Dr. Lin happened to be out that day, but I got a

16 call from her about taking a job in Education.  I didn't

17 know where this call was coming from and why she was

18 doing this because I had already stated to her that I was

19 going to stay within Medicine, so why was she calling to

20 offer me another job.  The writing was becoming very

21 clear to me, I was now being targeted and I was going to

22 be pushed out.

23     Also on this date -- I told her that I didn't want

24 the job, but she told me to consider it, to think about

25 it.  Also on this date was when the first flat tire

1  occurred.

2  Q.    What date is that?

3  A.    10/13 of '06.  I didn't think too much about it.

4  We had already had an e-mail that vandalism was

5  occurring, so I didn't think too much about it.  I

6  called, had my car taken to the garage.  They couldn't

7  find anything, no loose valves, they had taken off the

8  rim, there were no leaks.  They said they didn't know

9  what had happened.  I said okay.  That following Monday,

10  when Dr. Lin came back, I had --

11  Q.    Was he gone on that -- at that time?

12  A.    He was gone on the 13th, that day he was out.  On

13  16th of October of '06, he -- I informed him in the

14  morning that -- of the conversation that occurred between

15  Ms. Zamberlin, at that time, on that Friday.  And he told

16  me that he doesn't want me to go anywhere, that they're

17  scheming and plotting and for me not to go anywhere.  And

18  I'm like, why are they scheming and plotting?  He's like,

19  let me find out.

20      Okay.  At 1400, or 2:00 o'clock that afternoon,

21  Dr. Lin calls me into his office and he tells me that the

22  front office is scheming and plotting against me, and for

23  me to lie low and that he is going to give me the 12.

24  Q.    Now, you mentioned a 12.  What do you mean, GS-12?

25  A.    GS-12.

1 Q.    I'll ask you about that in a minute.  Finish the

2 conversation.

3 A.    Sure.  And he was going to give me the GS-12

4 because all the AOs were either 12s, or if they weren't,

5 they were getting promoted to the 12.  He said because

6 it's a hard job, not because I was fantastic, but he

7 thought that I was a hard worker, so that was the reason

8 he was going to give it to me.

9 Q.    Have you finished that conversation?

10 A.    Yes.

11 Q.    We've talked about a GS-9, a GS-11 and now a GS-12.

12 Just for those who don't work for the Government, what

13 does that mean?

14 A.    Those are your pay scales, basically it's a grade

15 scale for your pay, and if you are a GS employee, they

16 have wage grade employees.

17 Q.    The higher the GS level, the higher your pay?

18 A.    Yes, and then there's steps, you know, like raises

19 that you can get.  There's steps that go along with that.

20 Q.    That also comes with -- people at higher grade

21 levels are viewed as having a little more

22 responsibilities or --

23 A.    Yes.

24 Q.    Okay.

25 A.    Generally, yes.

1  Q.    All right.  So, what happened next?

2  A.    I called Annie Anderson.  I take that back.  On

3  10/18 -- Dr. Van Buskirk was routinely coming up after

4  the September 22nd meeting, he was coming up weekly now

5  and checking on my mood, going into Dr. Lin's office and

6  checking on my mood, asking how I was doing.

7       Dr. Lin would call me in and tell me that Dr. Van

8  Buskirk had just left and was pointing over to my office

9  asking how she was doing.  And he would tell Dr. Van

10 Buskirk -- what he would tell me is that he told Dr. Van

11 Buskirk I was doing fine, which didn't make sense if the

12 front office is calling me trying to get me to take

13 another job.  But okay, he's my boss, so okay.  I'm

14 taking all this in.

15      So, Dr. Van Buskirk walks up on the 18th, meets

16 with Dr. Lin again to check on my mood.  At 11:15, I'm

17 called into Dr. Lin's office and instructed to take the

18 Education position.  And I said I was not interested in

19 the Education position and --

20 Q.    Did he mention the GS-12?

21 A.    No, not on the 18th, no.

22 Q.    What was the Education position again?

23 A.    I'm not for sure exactly what the Education

24 position was, I didn't even look at it.  I wasn't

25 interested in it and I didn't look at it.

1  Q.    Why?

2  A.    Because I wasn't interested in transferring out of

3  my current position.

4  Q.    Why?

5  A.    Because I was there to do my job and I was going to

6  do my job and I wasn't going to be intimidated and pushed

7  out of my job.  So, Education then was used as a dumping

8  ground, they'll rotate it, but at that point in time,

9  Education was the dumping ground for employees who they

10  wanted to transfer or move from one service to another.

11  I think now it's Quality Systems, but back then it was

12  Education.

13        And he said that Dr. Van Buskirk had requested to

14  transfer me and he told Van Buskirk that, no, he wanted

15  to keep me, but I should consider taking the Education

16  position.  So I told him, no, I wasn't interested.  And

17  he said that HR is holding the position and had been.

18        So, as soon as I left his office, I called Annie

19  Anderson in HR and informed her of the Education

20  position, which I don't have the MP -- there's a vacancy

21  announcement number that goes along with those.  But she

22  knew which one I was talking about and I told her not to

23  hold it any longer, to proceed with completing the SERVS,

24  which is a certification that they give to the service

25  chiefs for recruitment and hiring.

1    And then, in between now and then I get another

2  flat tire, this is when the second flat tire happens.  It

3  was actually -- I need to go back.  It was actually on

4  the 16th, but I called Triple A, they come out, they give

5  me enough stuff to pump my tire up and get me back to the

6  garage.  The garage says again nothing is wrong, there's

7  no nails, there's no screws, the seal is fine, there's no

8  valve leaks.

9    And I asked them to take that tire and rotate it to

10  the back.  It was the front left tire, and I asked them

11  to take it and rotate it to the right back.  And they

12  said, why, that will throw your car off if we don't

13  rotate the tires equally.  I said, just do as I ask.  I

14  said, don't ask why, just do as I ask.  They did it.

15  Q.    Had it been the same tire the previous two times?

16  A.    Yes, it was the same tire the previous two times.

17  That's the reason I asked them to do this.  So, the third

18  flat tire occurs, and again --

19  Q.    Which tire?

20  A.    The front left again.

21  Q.    Okay.

22  A.    So, I go back to the garage, they pump it up, and

23  the next day I come in and I speak to Dr. Lin as soon as

24  he was back from morning report.  I went -- I wasn't even

25  going to his office anymore, I was standing at his

1   doorway because I didn't want anymore conversations with

2   the door closed or anything with he and I.  But I wanted

3   him to know that I wasn't trying to be an alarmist and I

4   understood that there was vandalism on the campus, but

5   I've had three flat tires in a two-week time frame.

6       And I said, now, the one thing that you don't know

7   is that I had taken the front left tire and had rotated

8   it to the back right tire.  And I said, if this happens

9   again, I'm going to report it, and he looked up.  It

10  never happened again.  Don't know, circumstantial, but I

11  never had another flat tire.

12  Q.    All right.  And then what happens?

13  A.    It continues to escalate from there, I mean, the

14  same stuff, me being called in.  Not too much occurred in

15  November, just the workload is increasing, e-mails, the

16  same type of things.  I'm getting more and more work,

17  more and more policies, things I have to take care of.

18  So I'm just trying to survive at this point.  I realize

19  what's going on and I'm just trying to survive and do my

20  job to the best of my ability.

21      There were times -- well, I'll get into that later.

22  But anyway, on 12/6, I'm ordered to take over the

23  Cardiology.  Usually the section chiefs managed their

24  schedules for their employees.  Because there was a

25  problem within Cardiology with physicians and overlapping

1  and taking time off and with there being a shortage of

2  cardiologists, sometimes we'd be without cardiologists.

3  You can't really run a hospital without a cardiologist.

4       So, I was asked to take over that schedule and that

5  I had to make a report and report it to Dr. Lin, and that

6  I was going to be held accountable, and if there was any

7  time that there was not at least two cardiologists there,

8  I was going be disciplined, so...

9            THE COURT:  Why don't we stop there and take an

10  afternoon break.  Ladies and gentlemen, take 15 minutes,

11  please.

12            (Jury out at 3:30 p.m.)

13            Okay.  Stand at ease for 15 minutes.

14            (Thereupon, a brief recess was taken.)

15            Okay.  Let's bring the jury back.

16            (Jury in at 3:50 p.m.)

17            Okay.  Thank you.  Let's press on here.

18            MR. MAGRI:  Okay.

19  BY MR. MAGRI:

20  Q.    Just before the break, you were talking about

21  things that had happened to you in the September and

22  October and November time period, and you indicated that

23  those -- that you believed those were coming at a time

24  Dr. Lin turned on you.  Do you recall that?

25  A.    Yes.

1  Q.     Now, you indicated that you had been complaining or

2  counseling him with regard to EEOs.  Can you tell us

3  what, during that period of time, you had been counseling

4  him about?

5  A.     I had been counseling him on regulations regarding

6  EEO violations and the retaliation, potential retaliation

7  of EEOs of these employees, specifically Dr. Zachariah

8  and Dr. Gowski.  He, being Dr. Lin, had asked me to speak

9  to both of them on numerous occasions to get them to

10 resign, that it would look better for them to resign than

11 to be terminated from the Federal Government.  I declined

12 to do that, and he would continue, like I said, on

13 numerous occasions to ask me to do that and --

14 Q.     When you say terminated, did he indicate why they

15 were going to be terminated?

16 A.     Because they had prior EEO complaints and that he

17 was used as the lynch man, especially referred to as the

18 lynch man when Neurology Service was realigned under the

19 Medicine.

20 Q.     The lynch man?

21 A.     Lynch man.

22 Q.     Is that a word he used about himself?

23 A.     Yeah, that's what he told me.

24 Q.     All right.  Did he reference Dr. Van Buskirk in

25 these conversations?

1  A.     Well, during those conversations, he had mentioned

2  that Dr. Van Buskirk did not look highly upon employees

3  that had filed EEOs, that he actually looked very poorly

4  upon employees that had filed and that he wanted to deter

5  the filing and he would do this by ruining their

6  reputations and careers within the VA.

7  Q.     Well, with regard to the term "lynch man" that he

8  used, what was your understanding of that?

9  A.     My understanding was, with the realignment, in

10  particular with the Neurology Service, that he was

11  basically to be the lynch man to get rid of these

12  employees who had EEO -- or prior EEO complaints.

13  Q.     Okay.  Do you know whether or not Dr. Zachariah's

14  privileges were looked at during this period of time?

15  A.     Yes, they were.

16  Q.     Okay.  Now, you were -- you were talking about a

17  time period, and I think we had gotten up to the November

18  time period.  Do you recall that?

19  A.     Yes.

20  Q.     Let's move on with regard to that.  Is there

21  another incident -- you had gotten through the third

22  tire.

23  A.     I had gotten to the third tire.  As I stated,

24  things occurred, they just kept progressively getting

25  worse.  I did get an e-mail from Dr. Lin on December 1st,

1  stating that he had requested for me to go ahead and

2  start working on my PD to get my GS-12, and for me not to

3  speak to anyone in the office about this and to limit

4  discussions with Cindy Fusco.

5      So I did, I started working on getting a PD.  I

6  contacted HR and had asked for a copy of a GS-12 PD from

7  an AO and I was told by HR that I couldn't copy it, I

8  needed to write my own.  Anyway, the e-mail went on.  I

9  forwarded it to Dr. Lin and he basically approved and

10  stated that he is in support of his AO getting the GS-12,

11  to please assist, basically, was what was on that.

12      And then, within a few weeks, I went on my

13  honeymoon.  Within a few weeks of that, when I returned,

14  I got called in on the 27th of December.

15  Q.    Okay.

16  A.    And was -- I was -- actually had a meeting with

17  Dr. Lin already scheduled to talk about the performance

18  improvement plan that we prepare for him to present at

19  the Performance Improvement Board.  There's different

20  things that we look at on there, provider performance,

21  quality assurance measures, different things like that.

22      So, we were discussing that, and that's when he

23  told me that he apologized and said that he was sorry

24  that he would not be able to give me my 12.  And I said

25  why, and he said that he had met with Chris Zamberlin and

1    Chris Garrett.  Chris Garrett then was the Chief of HR,

2    or Human Resources.

3        And he had been grumbling about me to them, stating

4    that I was not writing memos, I was not doing resource

5    requests, and that I wasn't performing at the level that

6    he thought that I should be.  And by his comments and

7    with the review of Mrs. Garrett and Ms. Zamberlin that it

8    was determined that I would not get my 12.

9        So, at that point, he stated that I would get my 12

10   within 12 months if I became ruthless and did exactly

11   what he wanted and ordered of me.

12   Q.    Okay.  Now, did you -- did you have an

13   understanding of what he meant by "ruthless"?

14   A.    Yes, I did.  That understanding was that if I did

15   exactly what he had asked, did not question anything, did

16   not challenge him, did not oppose him, just did exactly

17   what he wanted, whether that be pulling clinical

18   profiles, speaking to employees who had filed EEO

19   complaints to try to get them to resign, speaking to

20   other employees in order to get them to improve

21   performance, things like that, as long as I did what he

22   wanted and didn't question or challenge him in any way,

23   then, within 12 months, then I might get it.

24   Q.    Okay.  All right.  I'm going to give you an e-mail

25   in a second with -- I mean an exhibit with these e-mails

1  in a second, but while we're waiting, with regard to --

2  even your answer there you had mentioned that --

3  something about telling employees to improve or have good

4  performance.  What are you talking about there?

5  A.    They, Dr. Van Buskirk and Dr. Lin, looked at

6  employees who were poor performers as being the low

7  hanging fruits and those people were targeted for

8  removal.

9  Q.    Did that include -- was that -- did that include

10  EEO people or did that -- was that limited to people who

11  actually performed poorly?

12  A.    No, it was -- included EEO people and then, in

13  addition, additional people that might be low hanging

14  fruits.

15  Q.    All right.  The low hanging fruit is a term that

16  they used?

17  A.    The term that they used for poor performers, and

18  that could encompass a grandeur of things, whatever they

19  thought.  So, at this point, I'm now a low hanging fruit

20  in their eyes.  I'm being targeted for assisting with --

21  Q.    What is it that they would want you to do with

22  these -- this low hanging fruit that you found

23  objectionable?

24  A.    Well, they asked me to go against my moral grain

25  and ethics, asking me to call VAs to request how they

1  hide certain wait lists.  In particular, there was a --

2  Q.     We'll get to that.

3  A.     Okay.

4  Q.     But with regard to the low hanging fruit, the --

5  what about dealing with their performance issues was of

6  concern to you?

7  A.     Well, they were -- start looking at their clinical

8  privileges and especially those that had EEO complaints,

9  they would look at their committees and remove them from

10 committees, they would address --

11 Q.     Had requests been made to look at committees for

12 any of these doctors?

13 A.     Yes.

14 Q.     What requests?  Explain that.

15 A.     There was a request for Dr. Gowski to be removed

16 from the Critical Care Committee, which she was as the

17 chair.  There was a request for Dr. Zachariah to be

18 removed from the stroke -- as the chair of the Stroke

19 Committee, and she was.  Dr. Cote was removed --

20 actually, she had applied, but was removed as the chair

21 for the medical intensive care unit.  So -- and also, I

22 think she was removed from the Critical Care Committee as

23 well.

24 Q.     And did these -- was that -- did that involve the

25 fact that they had had -- of their EEO activity?

1  A.    Correct.

2  Q.    All right.  Now --

3  A.    They were looking at these employees for that

4  reason.

5  Q.    All right.  Now, with regard to the conversation in

6  which -- or actually, I think I kind of interrupted you

7  there when you were in your answer about the things that

8  they would do to these people, and you had mentioned

9  looking through their clinic profiles.  You had mentioned

10  looking at the committees.  What -- is there anything

11  else that they would do?

12  A.    They would -- depending on what was going on, if

13  they needed to, they would call other VAs if they thought

14  the employee was going to be applying there and --

15  Q.    Did they do that with regard to any employee in

16  particular that you are thinking of?

17  A.    Yes, they did.

18  Q.    Who?

19  A.    Dr. Vandormael.

20  Q.    All right.  Now, with regard to these employees,

21  what was the -- was the purpose of going into the clinics

22  and the privileges and checking their profiles, their

23  clinic profiles, was that to put pressure on them?

24  A.    That was to put pressure on them and also to find a

25  source or a means to terminate them for having prior or

1    current EEO complaints.

2    Q.    Okay.  Now, did -- is that -- would they do this

3    for all the doctors in the hospital?  In other words,

4    would they look into their -- to the clinic profiles of

5    all the doctors in the hospital the way they would do

6    these EEO doctors?

7    A.    I can only answer for the Medicine Service, I can't

8    answer for the entire facility.  But for the Medicine

9    Service, yes.  It's not to say that we would not

10   occasionally look at another physician, especially a new

11   one that was coming on, to make sure that the clinics are

12   being met and things.

13        But for the most part, it was basically the ones

14   that had filed EEOs, they would target their clinics and

15   clinical privileges and remove them from committees

16   because that was a way of getting at them.  They get

17   performance pay based on the number of committees that

18   they help.

19   Q.    I think I asked the question poorly.  So, they did

20   not -- this was something that they would do for the EEO

21   doctors that they weren't doing for the broad spectrum of

22   doctors?

23   A.    Correct.

24   Q.    Okay.

25   A.    They were not looking at everybody in service as

1 | clinics.

2 | Q.    Okay.  Let me show you -- take a look at 114 in

3 | your notebook, Exhibit 114.

4 |         MR. MEYTHALER:  May I approach?

5 |         THE WITNESS:  Okay.  All right.

6 | BY MR. MAGRI:

7 | Q.    Have you got it?

8 | A.    Yes.

9 | Q.    And are these the e-mails that -- where Dr. Lin is

10 | saying that he's going to upgrade you to a GS-12?

11 | A.    Yes.

12 | Q.    Now, he's saying this a short time after he's told

13 | you that he's going to push you out?

14 | A.    Correct.

15 | Q.    And you indicate -- on what day did he tell you

16 | that getting the GS-12 was -- or the date of these memos

17 | is what, or these e-mails?

18 | A.    It started on December 1st.

19 | Q.    All right.

20 | A.    This is missing it, but he actually sent the e-mail

21 | to me on December 1st, and then I'm corresponding with HR

22 | all the way up through December 7th, and then Dr. Lin

23 | replies back on December 7th, that "I would like my AO to

24 | get a 12 because that's what AOs of several smaller and

25 | less complex services such as surgery and primary care

1  are getting.  Please help me.  Thanks."  He's writing

2  this to HR.

3  Q.    Okay.  Let me see if I can --

4           THE COURT:  This has not been admitted in

5  evidence.  Are you seeking to admit it?

6           MR. MAGRI:  This has been, 114, I believe.

7  Isn't it?

8           THE COURT:  It's not listed in what you gave

9  me.

10           MR. MAGRI:  I would offer it, Your Honor.

11           THE COURT:  Any objection?

12           MR. PARK:  No, Your Honor.

13           THE COURT:  114 will be admitted.

14           (Thereupon, Plaintiffs' Exhibit 114 was so

15           designated for EVIDENCE.)

16  BY MR. MAGRI:

17  Q.    Okay.  All right.  It's a series of e-mails, the

18  last of which is on December 7th, correct, from Dr. Lin?

19  A.    Correct.

20  Q.    Re GS-12 for the administrative officer.  Now, how

21  long did that last?  From December 7th to when was that

22  taken off the table?

23  A.    Well, less than 20 days.

24  Q.    Okay.  And do you have a calendar entry or note

25  concerning that?

1  A.    Yeah, I just spoke to that previously.

2  Q.    All right.  What day is that note in your -- a

3  calendar note?

4  A.    Yeah, it's a calendar.

5  Q.    Do you have written in your calendar --

6       THE COURT:  She's already testified about it.

7  She'll tell you where the note is.  You can catch up with

8  her.

9       MR. MAGRI:  All right.

10      THE COURT:  Go ahead and tell him where it is.

11      THE WITNESS:  12/27/06.

12  BY MR. MAGRI:

13  Q.    You also did a memo concerning that; is that

14  correct?

15  A.    Yes.

16      MR. MAGRI:  All right.  I would like to offer

17  113.

18      THE COURT:  113-A and B are already in.  Is

19  that something different?  It must be a separate exhibit.

20  Any objection to 113?

21      MR. PARK:  No, Your Honor.

22      (Thereupon, Plaintiffs' Exhibit 113 was so

23      designated for EVIDENCE.)

24  BY MR. MAGRI:

25  Q.    Take a look at 113.

1  A.    113.  Okay.

2  Q.    All right.  In this -- this memorandum is

3  summarizing that note?

4  A.    Yes.

5  Q.    You also had additional conversations with Dr. Lin

6  in January; is that right?

7  A.    Correct.

8  Q.    Okay.  Now, if you would read the last three lines,

9  beginning with "he told me"?

10  A.    For which date and time?

11  Q.    January 22, at 6:58.

12  A.    Okay.

13  Q.    The last -- beginning "he told me."

14  A.    "He told me if I did everything he asked me" -- let

15  me see.  "He told me if I did everything he asked, he may

16  put me in for the upgrade in 12 months and he would

17  assist me to get there.  I needed to become ruthless.  I

18  explained to him that I'm not ruthless by nature and that

19  his style of management (which is to lead by

20  intimidation)"  -- that's in parentheses, this is my

21  documentation -- "and mine are different."

22      I made another little note to myself that, you

23  know, he'd already had eight to 10 EEOs and I had zero,

24  so that should account for something.

25  Q.    Had you had conversations with him about the office

1  staff?

2  A.    Yes, on numerous occasions throughout my tenure in

3  the Medicine Service.

4  Q.    Had he expressed any stereotypical views concerning

5  those?

6  A.    Yes, he did.

7  Q.    What did he say?

8  A.    He made a comment that -- several comments

9  regarding gender and race, that -- the race one was, we

10  had three African-Americans working in our service and he

11  referred to them as being black and lazy, and I opposed

12  him each time.  That offended me, I wasn't brought up

13  like that, and I told him I didn't wish to hear that any

14  further.

15      And he continued throughout the course of my

16  tenure, each time getting a little bit more and more

17  assertive with his requests that I need to discipline

18  them and that I had to design an AO similar to what I had

19  to do.  I had to send an administrative officer report to

20  him of things that I designed at his request, but I had

21  to design one for the program support assistants that I

22  had to send to him as well.

23      I kept track of it, and he had given me -- called

24  me into his office and given me an order that he wanted

25  for me to meet with them weekly, and I had already met

1  with the staff, had already discussed this report, and it

2  was a unanimous vote that they did not want to meet

3  weekly.

4      They have other duties to do, meeting weekly is

5  time consuming to discuss this report when they can send

6  it to me and I can look at it, and if things are okay, I

7  can move it on and incorporate it into my report.  It

8  worked out beautifully.

9      He did not like that he had given me an order and

10  said that I was being insubordinate and going against

11  him.  I explained that I did this to empower my

12  employees, and he told me that, in reference to -- he did

13  agree to allow that for a couple of weeks.

14      He called me back in, and again referencing the

15  three African-American employees, and told me that I

16  needed to meet on a regular basis regarding this program,

17  support assistance report, and call them out on the

18  carpet basically to embarrass them for not doing their

19  job, to either force them to leave or to improve, and

20  that I needed to discipline them.

21  Q.    Did you believe they were not doing their job?

22  A.    No, and that's what I discussed with him, that they

23  were doing their job.  I was their supervisor, I was

24  keeping track.  They were sending me the reports, they

25  were doing everything that I had asked, so there was no

1  reason for me to discipline them.

2       And I asked him as to what basis is he referencing

3  this, because he's only pointing out the

4  African-Americans.  Why wasn't he addressing the

5  Caucasians?  And then he backed up and realized that he

6  had offended me and I think probably realized what he was

7  stating, and said that he did not mean to offend me and

8  apologized, but for me to look at all of the employees

9  and discipline them.

10 Q.    All right.  Did he ever express an opinion about

11 working for a woman?

12 A.    Yes, he did.

13 Q.    What was that?

14 A.    That opinion was that he would not want to work for

15 the director if she was a woman, and I sort of chuckled

16 because I knew that Chris Zamberlin was a person who was

17 looking to move up as well, as I was looking to move up,

18 and I had mentioned that, well, Kaye Green is the next in

19 line to move up, she's our associate director.  He stated

20 that he would not work for her if she became the

21 director.

22      I just was really in disbelief that he would even

23 think that, but that was his opinion.  And he also had

24 the opinion of the reverse role, that men should not be

25 in administrative positions.  When I hired a man as my

1  secretary to assist me, he was very angry with me and

2  told me that I was -- could not do that any longer, I

3  should have waited for him to come back, that men are not

4  to be in administrative roles.  He asked me if he could

5  dictate, and I said he did a fair job.

6       This is something that they didn't have to have a

7  true skill because it was on tape recorder and they can

8  do it at their leisure, within a timely manner, but they

9  didn't have to sit there and be transcribing everything.

10 But he was extremely upset with me for hiring a man, so

11 he said that if it didn't work out, that I was going to

12 be held responsible.  I just said okay.

13 Q.    All right.  Now -- so, after you're told that

14 you're no longer getting the GS-12 at the end of

15 December, what happens next?  Actually, let me point you

16 to something to move it along.

17 A.    Sure.

18 Q.    Did there come a point in time in early January

19 where you put in for an award for a Sylvia Russell?

20 A.    Yes, it was time to do the performance appraisals

21 and I had to submit to -- well, everyone had to submit to

22 the service chiefs employees that would be receiving

23 awards or what their ratings were going to be and if they

24 were going to be receiving awards.  I had submitted the

25 people for awards, Dr. Lin gave his recommendations of

1  the people that he wanted for awards, so I had to go back

2  and redo some of them.

3      But I had submitted Sylvia Russell, and when it

4  came time to actually -- for him to sign off on it, he

5  declined to sign off on it and told me that she wasn't a

6  team player and that she needed to come around to their

7  way of thinking and start pulling charts, if needed,

8  looking into clinic profiles, doing what was asked.

9      And I was just flabbergasted by that comment so I

10  said, well,  look, you're the one that had recommended

11  her for this award, and I said Dr. Reddy agrees with it.

12  She's done a really good job with assisting with the

13  Neurology schedules and getting them implemented and

14  helping out.  I think she deserves it.

15      I kept taking it back in there on and off a couple

16  times, he still wouldn't sign it.  And he finally said,

17  if Dr. Reddy will agree, then I'll sign it.  I called

18  Dr. Reddy, Dr. Reddy came down, went in Dr. Lin's office,

19  wasn't in there but for a short time, came out.  You

20  could tell he was upset, went upstairs and informed

21  Ms. Russell that she would not be receiving the award.

22      Mrs. Russell called me upset and wanted an

23  appointment with Dr. Lin.  And I informed her, 'cause she

24  was mad, and I informed her just to be careful what was

25  stated because he would retaliate if she challenged him.

1        I got her an appointment and he told her basically

2    the same thing, that she had to become a team player and

3    had to do what he wanted, and that if she wanted the

4    award that she --

5    Q.    Were you in this meeting?

6    A.    No, I was not in this meeting.

7    Q.    How do you know what they were saying?

8    A.    Our offices were across from each other, I could

9    hear some of what was going on because the voices were

10   raised a little.  And then Sylvia called me and told me

11   when she left the office.  So, I heard a little bit of

12   what was being said because she said that she would not

13   be a snitch, is what she told him, and she left.

14       And she went upstairs and she called me and told me

15   the entire conversation.  And I'm thinking, oh, my

16   goodness, you're never going to get this award.  But

17   later on, it was after I had left the service, that she

18   did actually, I found out, did receive the award.

19   Q.    Okay.  And did you get an e-mail from Cindy Fusco?

20   A.    Yes, I did.

21   Q.    And is Exhibit 106 that e-mail?

22   A.    Yes, it is.

23   Q.    And the date is?

24   A.    The date is June 20th of 2007.

25   Q.    And what does the first sentence say?

1  A.    "Well, I guess turning Doctor Z worked for Sylvia.

2  The boss is giving her that special contribution award.

3  I had to type it up this a.m."

4  Q.    What else does it say?

5  A.    It said, "Really sad, he should have given it to

6  her when you suggested it, but I guess she had to play

7  the game before he thought she was worthy of it.  Oh,

8  well, I'm going to be very careful what I say around her,

9  not only her, but everyone else in this office.  They

10  have a way of twisting your words, as you know."  Then

11  she asked me how I'm doing.

12  Q.    Now, this is the employee that Dr. Lin had asked to

13  talk to you at one point, right, Cindy Fusco?

14  A.    Yes, yes.

15  Q.    All right.  And you understood from her that it was

16  sort of a two-way conversation, right?

17  A.    Yeah, oh, yeah.  No, it was definitely a two-way

18  conversation.

19  Q.    All right.  Did there come a point in time when

20  Dr. Lin directed each of you not to talk together or to

21  communicate?

22  A.    Yes, he did.

23  Q.    Explain that.

24  A.    Well, one was when he had put me in -- was going to

25  try to help me with getting the 12 and he asked me not to

1    speak to Cindy or anyone else in the office.  And then

2    there was another time, I already had left the office and

3    was working over in another service, and he had asked

4    Cindy where her loyalties lied, and that she was not to

5    speak to me anymore because I was no longer in the

6    service and she should not be sharing information with

7    me.

8    Q.    Now, on June 20th, you were no longer in the

9    service?

10   A.    Correct.

11   Q.    You've mentioned team player in terms of Sylvia

12   Russell, and also -- I mean that's basically what he was

13   asking you to be in December, correct?

14   A.    Yes.

15   Q.    Now, did he treat people who were team players

16   different from people he felt weren't; and if so, how,

17   based on your observations?

18   A.    Yes, those that would become team players, they

19   would get ahead, they would serve on more committees,

20   they would be put in for awards, they could move up

21   within the organization, and they did.

22        For example, Dr. Haynes is one that comes to my

23   mind, nice physician, didn't have any problems, you know,

24   personal, I didn't have any, but he was very much

25   perceived as being a team player, and he moved up very

1  quickly.  He did go back to school, to graduate school

2  and things, but he did move up very quickly within the

3  organization.

4  Q.    Was there a time when Dr. Patel was not clearing

5  medical records?

6  A.    Yes, there was a time.

7  Q.    What does that mean?

8  A.    The Health Information Management Service, or

9  section, sends out weekly reports of delinquent records

10  that -- such as discharge summaries that might need

11  signing or co-signing from physicians, especially if

12  you're supervising residents, they need to be co-signed.

13  And there were -- you know, usually -- primarily with the

14  hospitalists, occasionally we might get one from the ER

15  or something, but primarily dealing with the

16  hospitalists, and we would send out e-mails.  The

17  physicians would clear them.

18      Dr. Patel was not doing his, was not clearing his,

19  was not also doing his trainings and things.  So, when I

20  brought this up to Dr. Lin -- because I would speak to

21  Dr. Patel and then address it with having him also

22  address it with his employees about clearing.  He would

23  tell me that he would just take care of it and just go

24  away, but they would keep showing back up.

25      So, when I went to address it with Dr. Lin, the

1 discussion took place that there was a concern because

2 Dr. Patel, how could he lead his staff if he is not

3 completing notes and discharge summaries as well.  How

4 could he be informing and lead and be a good example as a

5 leader if he's not doing the work on his own and being a

6 team player.  So, Dr. Lin told me that that was not for

7 me to worry about, that he would address it with

8 Dr. Patel.

9 Q.    Did the problem continue?

10 A.    The problem continued, it never got any better.

11 Q.    With regard to one of these EEO doctors, if --

12 when -- had they instances such as this, would that be

13 ignored?

14 A.    For clearing records?  No, they all -- if we asked

15 them, they cleared their records.

16 Q.    Okay.  When you say "clearing records" and you

17 explain that, is there a note that is supposed to be

18 prepared when a physician sees a patient?

19 A.    Yes, there's an admission note, what's called an

20 H&P, which is a health and a physical, and then there's

21 also discharge summaries.

22 Q.    And are those supposed to be prepared and signed by

23 physicians?

24 A.    Yes.

25 Q.    And this is the -- you know, this is part of the

1  thing that this policy of clearing records related to?

2  A.    Yes, it is.

3  Q.    Now, you've mentioned Dr. Zachariah several times.

4  Did there come a point in time when you learned or heard

5  that she was going to be terminated?

6  A.    Yes, there was.

7  Q.    Were you still with the service then?

8  A.    I was still with the service.  Discussions had

9  actually taken place that -- around January of '07, that

10  Dr. Zachariah was going to be terminated.  It actually

11  had happened before that I needed to go talk to them

12  because they were going to be terminated, but the actual

13  termination was really starting to fall into place.

14      Dr. Lin had already made up his mind he was going

15  to terminate her and it was being based on the EEG

16  backlog, at this point.  And he was waiting for a fee

17  basis physician by the name of Dr. Kimberly Monnell to

18  come on board, and her proposed -- what was supposed to

19  be her termination date was to be February of '07.

20      Dr. Lin learned that Dr. Kimberly Monnell would not

21  be able to start until June of '07, so her clinical

22  privileges got -- even though they were already

23  decreased, they got renewed for another three months, and

24  then that termination was then postponed until

25  Dr. Monnell could come on.

1      She was a fee basis neurologist at that time.  She

2  was appointed as the -- over the Stroke Committee, and

3  she did come on part-time and I think she's full-time

4  now, but I think she came on full-time, like I said, in

5  June, after I had already left the service.

6  Q.    Okay.  But before she came on full-time, they had

7  already -- Dr. Lin had already said he was going to

8  terminate Dr. Zachariah?

9  A.    Yes.  There was already discussions and plans.

10  Q.    Okay.  Did he indicate who the discussions and

11  plans were with?

12  A.    Well, yeah, Dr. Van Buskirk.  I mean, he had

13  mentioned that Dr. Van Buskirk had wanted her gone, that

14  they did not like Dr. Zachariah and they wanted her

15  terminated.

16  Q.    But anybody else that he mentioned?

17  A.    That Dr. Lin mentioned?

18  Q.    Yeah.

19  A.    Who he had conversations with?

20  Q.    About Dr. Zachariah at that point.

21  A.    Not that I can recall at this time, no.

22  Q.    All right.  Now, in this time period, were you on a

23  committee -- or not a committee, but in a program that

24  was designed to develop future leaders for the VA?

25  A.    Yes, I was enrolled in a competency development for

1   leaders of the 21st Century, which is a VISN, and that

2   stands for Veterans Integrated Systems Network.  We're

3   actually in VISN 8, our VA is, and one of several VAs

4   within VISN 8.  I was enrolled and participated in this

5   and graduated from that program in June of '07.

6   Q.   Okay.  How did you get on that program and when did

7   you get on it?

8   A.   You had to apply back in '06, and I got

9   notification that I was accepted in December of '06, and

10  it actually started in, I think, January.  I think it was

11  January.

12  Q.   Who did that notification come from?

13  A.   I don't recall.  I think it was the Chief of

14  Education, but I don't recall.

15  Q.   All right.  Now, as part of that, did you have any

16  conversations with -- did you have any conversations or

17  meet with Director Hopkins?

18  A.   Did I?

19  Q.   Yes.

20  A.   No.  Oh, I take that back.  Yes, I did.  At one of

21  our CDL meetings, which was I think in March, there was a

22  three day -- I want to say it was in March of '07, might

23  have been February of '07, anyway, it was either February

24  or March of '07.  There's a three-day at Indian Rocks

25  Beach and this is where you come together and you

1    actually meet your team, you work on your projects, and

2    there's usually one member from each of the facilities

3    within the VISN 8 hospitals, that includes San Juan,

4    Miami, Gainesville, Tampa, that's on your team.  And you

5    all work together on a project that is assigned by the

6    facility.

7        And also during this meeting you get to meet each

8    of the facility -- either they have quadrads, pentads,

9    triads, and what that is, is it's the director --

10        THE COURT:  Is the question whether or not she

11    had a conversation with Mr. Hopkins?

12        MR. MAGRI:  Yes.

13        THE COURT:  We don't need the whole watch built

14    here.  Why don't we get to that conversation.

15        THE WITNESS:  Okay.

16        THE COURT:  Listen to the question, ma'am, and

17    try to answer the specific question.

18        THE WITNESS:  Okay.  As part of this,

19    Mr. Hopkins was at this meeting, as well as was Kaye

20    Green.  He came to my table with our team and they give a

21    little preface about themselves and the facility, and

22    during this preface, he mentioned that they were very

23    proud of having at one point EEOs that have now been

24    decreased.  And he looked at me and said, isn't that

25    right, Roxanne, and I just smiled and said yes.  That was

1  basically the conversation.

2  BY MR. MAGRI:

3  Q.    Okay.  Now, have Dr. Van Buskirk and Dr. Lin

4  developed a reputation concerning EEOs at the facility?

5  A.    Yes.

6  Q.    Are you familiar with it?

7  A.    Yes.

8  Q.    What is it?

9  A.    That they will deter and ruin reputations and

10  careers, and that they will retaliate against anyone who

11  has filed or has an EEO case.

12  Q.    Okay.  Have you ever had conversations with Dr. Lin

13  concerning the competitive hiring process?

14  A.    Yes, several occasions --

15       THE COURT:  You answered the question.  Now

16  wait for another one.

17       THE WITNESS:  Okay.

18  BY MR. MAGRI:

19  Q.    Has he described -- has he -- has he told you how

20  he feels about those things?

21  A.    Yes, he has described that he can weight them and

22  pre-select the panels that would choose the candidate

23  that he wanted.

24  Q.    Now, you had described various dealings with

25  Dr. Lin through the first part of January, 2007, and what

1  you were going through.  I take it you didn't leave the

2  service until March of '07?

3  A.    Correct.

4  Q.    Take us -- starting there in January of '07, take

5  us -- take us through that, or highlight some of the

6  highlights for us.

7  A.    Again, some of the highlights would just be the

8  continuation of the hostile environment that was being

9  created and directed toward me.  He was slandering my

10  name to the front office, and told me he was slandering

11  my name to the front office.  He was slandering my name

12  throughout the facility, to other physicians and

13  subordinates.  That made it very hard to work and come in

14  to work and just basically do the work in that type of a

15  situation.

16  Q.    Explain that.  What do you mean?

17  A.    Because he was slandering my name and he was

18  telling everyone I was a bad employee and stating that I

19  wasn't smart and making all types of other slanderous

20  comments, that when I would walk down the hallways, I

21  didn't know who I could trust or who he had spoken to.

22  Going to meetings, it would be very uncomfortable,

23  especially at the AO meeting that I have to attend each

24  month.

25      It was very uncomfortable sitting in there with

1  Chris Brown.  There was very much a disgusted look on her

2  face and she really wouldn't direct anything toward me,

3  which I'm glad, but it was very uncomfortable at that

4  point, coming in to work each day.

5  Q.    You mentioned Chris Brown.  Had you been mentored

6  in your position?

7  A.    I had been mentored in my position.

8  Q.    By?

9  A.    By Vickie Chan.

10  Q.    For how long?

11  A.    For a year.

12  Q.    When?

13  A.    From March of '05 to March of '06.  Chris Brown

14  came in early '06, and she attended some of the meetings

15  that I was being mentored by Vickie Chan.  Vickie Chan

16  retired in March of '06, and I did not get mentored by

17  Chris Brown, so…

18  Q.    Did you --

19  A.    Until January of '07, and that was at the request

20  of Dr. Lin.

21  Q.    So, in January of '07, after he's asked you to be

22  ruthless, he's having you be mentored?

23  A.    Yes, he says he's going to be my mentor and then

24  he's also telling me that I need to be mentored by Chris

25  Brown.  So she offers and I go along with it.  I met with

1    her two or three times max, a max of three times, and on

2    the third time, it was to tell her I was really not happy

3    with her.

4        I had called -- I decided I did not need to be

5    mentored anymore.  I was doing it to try to appease

6    Dr. Lin, to keep some of the backlash from me, and I had

7    already been mentored.  I didn't need to be mentored.  I

8    was in -- you know, I have my graduate degree.

9        So, Ms. Brown, when I called down to speak to her

10   and cancel my mentor lessons, if you want to call it

11   that, or meetings, she took offense to that, and went to

12   Dr. Van Buskirk and told him that I had canceled my

13   mentor meetings.

14       And Dr. Van Buskirk called up to Dr. Lin and told

15   him that I had canceled them.  Dr. Lin calls me in all

16   upset and mad and told me that I need to call her back

17   and set them back up because I definitely needed to be

18   mentored.  And I told him I wasn't going to do it.

19       So I thought, you know what, I'm calling a meeting

20   with her.  So I met with her the very last time and

21   basically explained that I did not appreciate her when I

22   canceled my meetings, and told her why, that I was very

23   busy and did not have time to be mentored.  I was already

24   mentored.  She already knew that I was already mentored,

25   and I appreciate her assistance, if I needed her, I would

1    call upon her, which she did offer.

2        But I did not appreciate her going to Dr. Van

3    Buskirk, and she said that that's okay, she did not feel

4    slighted in any way.  And I said, well, that's good, I

5    said, because I don't want you to feel slighted, but I

6    did not appreciate you going to Dr. Van Buskirk and then

7    having him call up to Dr. Lin, because he called me in

8    his office over this.  And she said that she understood

9    and that for me to consider being mentored, if not by

10   her, by someone else.

11   Q.    Had the atmosphere -- did the atmosphere in the

12   office change during those times that she mentored you?

13   A.    Uh, did it change?  Maybe a little.  It didn't

14   really change significantly.  I was still being called in

15   his office for things and -- but I think just thinking

16   that I had come to their way and maybe had given in a

17   little made them think that I was maybe turning around

18   and that they could work with me, and maybe I would get

19   my 12, but at what price.  So, I decided that's not what

20   I wanted to do.  So, once I canceled the meetings for

21   mentoring, everything escalated again, so...

22   Q.    Now, did you have meetings with Dr. -- in which

23   Dr. Lin was present and talked to you in a condescending

24   fashion?

25   A.    Yeah, I was actually requested to attend every

1  meeting to check his schedule.  This is one of the other

2  things I had to start doing, was check his schedule daily

3  and ask him if I should be attending any meetings that

4  was on his schedule, whereas routinely I wouldn't have

5  to.  I knew which meetings I needed to attend.

6       This is one of the other duties I had to do, so I

7  did it, and during one of the meetings of the handoff

8  communication between the hospitalists and the ED

9  department, or the Emergency Department, he was talking

10  about articulating this memo and that Roxanne would do

11  it.  And he condescendingly said to me, do you think you

12  can articulate this in a memo.  Well, that's very

13  degrading, especially when you have the section chiefs of

14  each of those sections sitting there.

15       I can definitely articulate a memo.  I've been

16  writing memos for graduate school, for that service for

17  at least two years.  So, to talk to me like that upset

18  me.  And I said, no, I don't think I can do that,

19  Dr. Lin, and I just sort of chuckled and two of the

20  section chiefs chuckled.  But I said, of course I can

21  articulate that in a memo, and I did.  I had it

22  articulated in a memo for him.

23       But that wasn't the only incident of that.  He did

24  it another time in regards to the national provider

25  individual number that's now required nationwide for all

1  providers, and he did the same thing in a -- but in a

2  much slower enunciation of the words, making sure that I

3  had sent him --

4  Q.  What do you mean by that, a much slower?

5  A.  He enunciated it by saying, I requested that you

6  send me the database.  And I was already turning it

7  around because the database -- the NPI spreadsheet was

8  already on the database, so I was actually turning it

9  around to go back into his office to show him where it

10  was.

11      When he said that to me, I did turn around 'cause

12  seven devils flew through me because it infuriated me

13  that he would speak to me like that with staff around and

14  not knowing who was going to walk through that Medicine

15  Office door, and I'm in the hallway and he's talking to

16  me like that, like I'm an idiot.

17      And I said back to him in the same tone, just the

18  way he enunciated to me, that I had already sent that to

19  him, and then I requested that he never speak to me like

20  that again.  Of course, I was leaving in a couple weeks

21  so -- actually that week.

22  Q.  Now, did you know that at that time?

23  A.  I did know that.

24  Q.  All right.  Now, tell us what effect this had on

25  your career aspirations, what you were going through now.

1  A.    What effect it had?  Well, someone who started off

2  in that service as a shining employee --

3  Q.    Who described you as a shining employee?

4  A.    Dr. Lin, Dr. Van Buskirk had actually given me a

5  special contribution award for assisting with the JCAHO

6  survey.  Vickie Chan, who was my mentor, had noted

7  several things that I had done, and had even written

8  Dr. Lin stating that this should help with getting her

9  upgraded and to please use that.

10      So, here I was, this new shining employee that was

11  moving up, I had aspirations of moving up.  And then,

12  after all of this and challenging the EEO retaliations

13  and challenging him on following rules and regulations --

14  because he deemed me as being too regulatory and that he

15  would inform me on several times that he knows the rules

16  and regs and he's an ethical person and I'm not to

17  question him on any of the rules and regs and ethics.

18      So, by doing all that, it has now put me in a

19  position that I was fortunate enough to move out of the

20  service before he terminated me, because he said he was

21  going to terminate me.  And based upon that, the only

22  reason that I filed this EEO was to protect myself and my

23  career and reputation.  And it's made it very difficult.

24      It's very hard to know that the administration is

25  still watching you.  They ask, they have prevented me

1  from --  and this is Dr. Van Buskirk in particular, when

2  I applied for another section chief position, I was third

3  in line and I was told I was third in line by my current

4  supervisor, but Dr. Van Buskirk had certain criteria that

5  had to be met.

6          MR. PARK:  I'll object to this as hearsay, Your

7  Honor.

8          THE COURT:  Sustained.

9  BY MR. MAGRI:

10  Q.    Did the first two in line drop out?

11  A.    Yes, they dropped out.

12  Q.    Did you obtain the position?

13  A.    No, I did not, and I was again told for the same

14  reason.

15          MR. PARK:  Objection.

16          THE COURT:  Sustained.

17          THE WITNESS:  So, I'm told --

18          THE COURT:  Do we have a question here?

19  BY MR. MAGRI:

20  Q.    Yeah.  Wait for my question.

21  A.    Okay.

22  Q.    Now, are there other instances where you felt the

23  front office or management looking at you?

24  A.    Yes.  I am doing a report for the facility that I

25  send out monthly, and then -- which Dr. Van Buskirk gets,

1    and he has specifically requested a separate report for

2    him and that I am to do it, and has specifically

3    requested my name.

4        And this has been told to me by my supervisor,

5    which he and I have been trying to get this sent back

6    down to the front office because their program analyst or

7    whoever needs to do it down there instead of me having to

8    do this report for him.

9        I don't mind helping.  I don't mind showing

10   someone.  But after a year and a half, almost two years

11   of doing this report, it needs to go back to where, if he

12   wants to look at certain things, he needs to do his own

13   trending as far as I'm concerned.  So, this is one other

14   area that I'm constantly still doing and we're still

15   working on getting that moved.

16   Q.    Do you have a concern about that?

17   A.    Getting moved?

18   Q.    No, about having to do that report.

19   A.    Yes, because, one, it's not anything that my

20   service is even looking at.  We're not looking at this

21   data.  But because he specifically requested of me once I

22   moved and he wanted this information --

23   Q.    From you?

24   A.    From me, I had to do the report and have still had

25   to do the report, and then when my supervisor presented

1  the --

2  Q.    Are you concerned he might find a way to criticize

3  what you're doing?

4  A.    Concerned, yes.

5  Q.    Is the -- but that hasn't happened yet?

6  A.    No, no.

7  Q.    All right.  I'd like to -- like you to talk about

8  the damages that you -- oh, there is one other area I

9  need to mention or ask you about, and that is

10  investigations of employees.

11  A.    Okay.

12  Q.    As an administrative officer, have you advised

13  Dr. Lin about how one should go about investigating

14  employees?

15  A.    About how he should investigate an employee?

16  Q.    If you have an allegation against an employee, have

17  you had occasion to give advice to Dr. Lin about that?

18  A.    Yes, if there are complaints against an employee, I

19  have advised Dr. Lin on how to properly go about doing

20  the investigation, and if he wants ROCs, then there are

21  certain times that those are appropriate.  But soliciting

22  them through pressure is not one way to do that and

23  intimidating the employee, so I have advised him on that.

24  Q.    Have you asked -- ever advised him about talking to

25  the employee?

1    A.    Yes, I have, I told him that was the first thing he

2    needs to do before performing any investigation.  He --

3    even if he performs the investigation, he always has to

4    speak with the employee.  That is one of our rules, is

5    that you need to speak to the employee.  Whether an

6    investigation is performed or not, you have to speak with

7    the employee.  I mean, maybe there's no need to even do

8    the investigation and then waste resources, maybe there

9    is.  But he didn't listen, so...

10   Q.    All right.  Can you tell us about how you believe

11   you've been damaged in this process?

12   A.    Well, it's hard to answer.  It's a hard question to

13   really answer, but I've been damaged monetarily from

14   becoming a section chief on at least two occasions that I

15   can think of, by not getting the 12 that the other AOs

16   had gotten.

17        And then, you know, looking back and going through

18   the emotional distress, was I upset at times?  Yes.  Did

19   I cry?  Yes.  Did employee see me cry?  Yes.  It was a

20   very stressful time.  It wasn't the stress of the job

21   that caused me to be upset.  Dr. Lin was the stressor, he

22   stressed me out.  He caused me to be upset.

23        And as time went on and the harassment and the

24   environment worsened, yes, I did speak to Cindy Fusco.

25   Yes, at times when I had to go upstairs and follow up on

1    things for Dr. Durr, did I speak to his program

2    assistant?  Yes, 'cause I'd be speaking about something

3    else and, at times, I would break down and just cry.  Was

4    it an easy time for me?  No.

5        These are very hard things to listen to day after

6    day, to hear what a bad employee you are, know that you

7    are wanting to move up within the facility and the

8    organization, knowing your name is being slandered,

9    knowing that you're being compared as not being smart

10   when obviously, if I graduated at the top of my class, I

11   have some intellect.

12       But he's going around and telling people this,

13   slandering my name to physicians, preventing me from

14   getting promotions, having me take home e-mails to my

15   husband to review, to see that they weren't offensive

16   because he viewed them as being offensive.  Do you know

17   how hard it is to take home e-mails to your husband?

18   (Witness crying.)

19   Q.    Who is your husband?

20   A.    My husband is Dr. Gregory Bronner, he's a physician

21   in the community.  He reviewed them, he didn't see

22   anything wrong with them.  In fact, he said I was too

23   nice.

24           MR. PARK:  Hearsay, Your Honor.

25           THE COURT:  Sustained.

1          THE WITNESS:  Driving home at night, working

2    late hours, not getting compensatory time.  Occasionally,

3    yes, you'll see on the blotters that, yes, I was given

4    some compensatory time, but not what I was owed, and

5    especially not when I was being ordered to work late

6    without overtime.

7          So, to drive home tired and think about, oh, my

8    God, I didn't get this completed, am I going to get

9    yelled at, pulling up in that parking lot each morning to

10   get out of the car not knowing what I was going to be

11   walking into each morning.  Was this going to be a day

12   that I was going to be fussed at?  Was I going to be

13   called not beautiful again?  Was I going to be accused of

14   something else?  I didn't know what I was walking into.

15   It was a constant walking on egg shells from about August

16   all the way through the time that I left.

17         And I don't know how an abused spouse, whether

18   it be male or female, feels.  I can only imagine because

19   of the abuse that I had to endure during that time

20   working when things started to escalate and got worse.

21         So, how did that damage me?  It injured me, I

22   felt insulted, my pride was damaged, embarrassed,

23   probably just a whole emotional gamut, fearful at times,

24   nauseous.  I was constantly nauseous, had stomach

25   problems.  I had migraines all the time working in that

1  environment.

2      My heart would race every day not knowing, just

3  not knowing what I was going to be coming into.  Just

4  sitting in my office doing my job, trying to do the best

5  that I could, playing the cat and mouse game, and where

6  did it get me?  Nowhere within there, and I haven't

7  gotten promoted.  I got promoted to another service,

8  but --

9  BY MR. MAGRI:

10  Q.    All you had to do to change this was to become

11  ruthless?

12  A.    Was to become ruthless.

13  Q.    Why didn't you?

14  A.    Because that goes against my ethical and moral code

15  and I wasn't going to sacrifice my morals for theirs.

16  And at some time you just have to do the right thing, and

17  at some point, you have to give in.  And in March --

18  actually the end of February, I made up my mind, I had

19  come to that crossroads.  I couldn't endure it anymore

20  and I began to look for other jobs.

21      And so I did without his knowledge, because I

22  wasn't going to be grumbled about anymore.  I wasn't

23  going to take the harassment.  I wasn't going to take the

24  slanderous comments of hearing about how my employees

25  were bad, having him making racial slurs against them,

1  having him target people, having him target other

2  employees who might have had prior EEOs, because I knew

3  what was going to happen to me.

4          THE COURT:  Do you have a question here, sir?

5  BY MR. MAGRI:

6  Q.    Yeah.  Has the grumbling stopped?

7  A.    No, the grumbling is still going on.  Even as of

8  Friday, it was still going on.

9  Q.    Is there any other in your list of events that I

10  have not, or we have not discussed that you feel a desire

11  to address at this point in time?

12  A.    No, I think I'm okay.

13          MR. MAGRI:  Okay.  I don't have any more

14  questions, Your Honor.

15          THE COURT:  All right, ladies and gentlemen,

16  that's it for today.  I'm going to go ahead and excuse

17  you and ask you to be back in the Courtroom at 9:00 in

18  the morning.  We'll start afresh then with the

19  cross-examination.  Thank you.  Have a good evening.

20          (Jury out at 5:00 p.m.)

21          Okay.  Ma'am, during the overnight, don't talk

22  about your testimony with anybody, and we'll see you back

23  in the morning at 9:00 a.m.

24          (Thereupon, the Court was recessed.)

25                  * * * * * * * *

1              INDEX

2                                    Page
   EXAMINATION:

3
   ROXANNE LAINHART BRONNER                    3
4  MR. MAGRI

5
                      * * * * *
6
                      EXHIBITS
7

8  Plaintiffs' Exhibits 5, 6, 9, 11, 12, 13, 14, 40, 46, 47,
   48, 49, 57, 80, 81, 82, 83, 84, 85, 86, 89, 93, 94, 95,
9  105, 106, 113-A, 113-B, 117, 118, 119, 120, 120-A, 121-A,
   129, 137, 140, 150, 153, 154, 163, 165, 166, 167, 168,
10 204-A, 204-B, 204-C, 648

11 EVIDENCE ……… 37

12 Plaintiffs' Exhibit 114

13 EVIDENCE …….. 114

14 Plaintiffs' Exhibit 113

15 EVIDENCE …….. 115

16                    * * * * *

17

18

19

20

21

22

23

24

25

1                         CERTIFICATE

2

3    STATE OF FLORIDA       )
                        SS
4    COUNTY OF HILLSBOROUGH    )

5

6        I, CLAUDIA SPANGLER-FRY, Official Court Reporter

7    for the United States District Court, Middle District,

8    Tampa, Division,

9        DO HEREBY CERTIFY, that I was authorized to and

10    did, through use of Computer Aided Transcription, report

11    in shorthand the proceedings and evidence in the

12    above-styled cause, as stated in the caption hereto, and

13    that the foregoing pages numbered 1 to 148, inclusive,

14    constitute a true and correct transcription of my

15    shorthand report of said proceedings and evidence.

16        IN WITNESS WHEREOF, I have hereunto set my hand

17    in the City of Tampa, County of Hillsborough, State of

18    Florida, this 18th day of July, 2009.

19

20        CLAUDIA SPANGLER-FRY, Official Court Reporter

21

22

23        BY:  /s/ CLAUDIA SPANGLER-FRY

24

25